LAWRENCE BREWSTER
Regional Solicitor
DAVID KAHN
Counsel for ESA Programs
**JAN M. COPLICK**, Senior Trial Attorney
Designated Counsel for Service
California State Bar Number 124503
E-Mail: Coplick.Jan@dol.gov
ANDREW SCHULTZ
Trial Attorney
Office of the Solicitor
United States Department of Labor
90 7th Street, Suite 3-700
San Francisco, California 94103

Telephone:  (415) 625-7751
Facsimile:   (415) 625-7772

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>       Plaintiff,<br>  v.<br>JASMINE HALL CARE HOMES, INC., a corporation, HALL CARE HOMES, INC., a corporation, GEORGE K. HALL, an individual, and ESTELA HALL, an individual<br><br>       Defendants. | CIVIL ACTION NO. 2:05-cv-01306-GEB-KJM<br><br><br><br><br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE SECRETARY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

## TABLE OF CONTENTS

Table of Authorities …………………………………………………..…3

Federal Statutes……………………………………………………….5

Federal Administrative Regulations………………………………….5

State Statutes……………………………………………………...…5

State Regulations……………………………………………………5

Miscellaneous Materials……………………………………………5

Reference List: Jasmine Hall Care Homes, with addresses......…………….…………………6

I.      Statement of The Case……....………………………………………...7

II.     Statement of Issues Presented………………………………………...9

III.    Statement of Undisputed Material Facts…………………………………11

            The Applicable State Law and Regulations…………………………………12

            Care Aides' Work Schedule and Salary Compensation……………...…...13

            Jasmine Hall's Licensed Service levels & Related Staffing Requirements….14

            Employees' Scheduled Shifts As on-Duty Time…………………………..15

            Sleeping Conditions……………………………………………..…...17

            Level of Client Service Needs at Jasmine Hall Homes……………………...18

            Jasmine Hall pay and compensation practices……………………..……………22

            Jasmine Hall Homes: Reference Table………………………………………24

III ARGUMENT………………………………………………………….25

        A.      Plaintiff Meets The Standard for Summary Judgment……………………...25

        B.      Defendants' Care Aides Are on Duty All 24 Hours: All 24 Hours Are To Jasmine Hall's Benefit and Constitute "Hours Worked" Under the FLSA……………………………………………………………...27

                1.  The Care Aides Are Either Working or Waiting To Be Engaged At All Times……………………………………………………...  27

                2.  The Time Spent Is For The Employer's Benefit, To Meet Statutorily-Mandated Minimum care Hours and Staffing Ratios………………..…..28

                3.  The Care Aides Are Paid To Be Available to Handle Potential Emergencies………………………………………………………29

                4.  Defendants' Admission That Their Care Aides Remain Available All 24

*Hours To Provide Services Is Essentially An Admission That the Care Aides are "Waiting To Be Engaged" and On-Duty* .............. 31

C.   Defendants Failed to Keep The Requisite Time Records Allegedly Showing That Care Aides Were Sometimes Relieved of Duty During the Day When Clients Were Absent; The Secretary's Evidence To The Contrary Must Be Accepted As A Matter Of Law………………………………………………………….31

D.   Defendants violated the FLSA By Failing to Comply With the Homeworker Regulation……………………………………………………………34

  1.   *Defendants were required to follow the Homeworker criteria set forth at 29 CFR § 785.23*……………………………………………34

  2.   *Defendants failed to relieve employees from all duties or permit them to leave the premises during unpaid time*………………………………35

  3.   *Defendants additionally failed to provide adequate sleeping quarters for their employees*……………………………………………………36

E.   Plaintiff Has Met Her Burden of Proof By Presenting Sufficient Representative Testimony To Establish a Pattern and Practice of Violations of the FLSA…..38

F.   Defendants Do Not Have a Valid Agreement With Their Employees For Calculation Hours Worked……………………………………………41

G.   Defendants' Violation of the FLSA Was Willful……………………...…45

III.   SUMMARY and CONCLUSION……………………………………...………46

## TABLE OF AUTHORITIES

Cases

*Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144 (1970)

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)

*Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)

*Blackburn v. The Kansas Elks Training Center for the Handicapped, Inc.*, 40 F.Supp.2d 1270, 1272 (D. Kansas 1999)

*Bouchard v. Regional Governing Bd. of Region V.  Mental Retardation Servs.*, 939 F.2d 1323, 1330 (8th Cir.1991)

*Braziel v. Tobosa Developmental Services*, 166 F.3d 1061, 1062 (10th Cir. 1999)

*Brigham v. Eugene Water & Electric Board,* 357 F. 3d 931 (9th Cir. 2004)

*Brock v. City of Cincinnati*, 236 F.3d 793, 805-06 (6th Cir. 2001)

*Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986)

*Garofolo v. David B. Helsep Assoc. Inc.*, 405 F.3d 194 (4th Cir. 2005)

*Hultgren v. County of Lancaster*, 913 F.2d 498, 500 (8th Cir.1990)

*Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers*, 325 U.S. 161, 167 (1945)

*Leever v. City of Carson*, 360 F.3d 1014, 1018 (9th Cir. 2004)

*Matsushita Electric Industry Corp., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 574, 586-87

*Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

*Roy v. County of Lexington*, 141 F.3d 533, 544 (4th Cir. 1998);

*Service Employees Int'l Union Local 102 v. County of San Diego,* 35 F.3d 483 (9th Cir. 1994)

*Skelly Oil Co. v. Jackson*, 194 Okla. 183, 148 P. 2d 182 (Okla. Sup. Ct. 1944)

*Skidmore v. Swift*, 323 U.S. 134, 137 (1944).

*Thompson v. Loring Oil Co.*, 50 F. Supp. 213 (W.D. La. 1943)

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.,* 809 F. 2d 626, 630 (9th Cir. 1987)

*Utility Control Corp. v. Prince William Construction Co., Inc.*, 558 F.2d 716, 719 (4th Cir. 1977)

<u>Federal Statutes</u>

Fair Labor Standards Act, 29 U.S.C. § 201, et seq.

Federal Rules of Civil Procedure, Rule 56c, Rule 56e

<u>Federal Administrative Regulations</u>

29 CFR § 785.3, 785.7, 785.15-23

<u>State Statutes</u>

Lanterman Developmental Disabilities Services Act, California Welfare & Institutions Code, Section 4400-4906

<u>State Regulations</u>

California Code of Regulations, Title 17, Chapter 3 Community Services, SubChapter 4 Residential Services and Quality Assurance Regulations, §56001 *et seq.*

California Code of Regulations, Title 22, Section 85065

<u>Miscellaneous Materials</u>

Opinion Letter from the Acting Wage Hour Administrator regarding Sleep time in Residential Care Facilities, FLSA2004-7, July 27, 2004

1988 Enforcement Policy entitled "*Hours Worked In Residential Care (Group Home) Establishments—Sleep Time And Related Issues*, FLSA-1119, June 30, 1988.

**REFERENCE LIST OF JASMINE HALL CARE HOMES:**
**By Sheila Creel, per Creel Decl. at ¶ 61**

| JASMINE HALL<br>Care Home/Facility Number<br>Street Address | Approved<br>LEVEL OF<br>CARE | Max.No.<br>Clients<br>In Facility | *Total<br>Number of<br>Live-In Care<br>Staff |
|---|---|---|---|
| **Jasmine-Hall # 1**<br>4020 47th Street, Sacramento, CA 95820 | Level 4f | 4 | 2 |
| **Jasmine-Hall # 2**<br>3965 MLKing Blvd, Sacramento, CA 95820 | Level 3 | 6 | 2 |
| **Jasmine-Hall # 3**<br>1601 Ferran Ave., Sacramento, CA 95832 | Level 4i | 6 | 4 |
| **Jasmine-Hall # 4**<br>5 Pasture Court, Sacramento, CA 95834 | Level 4E | 6 | 3 |
| **Jasmine-Hall  # 5**<br>5729  39th Street, Sacramento, CA 95820 | Level 4d | 6 | 3 |
| **Jasmine-Hall # 6**<br>1 Goff Court, Sacramento, CA 95838 | Level 4i | 6 | 4 |
| **Jasmine-Hall # 7**<br>5447 Bartig Way, Citrus Heights, CA 95621 | Level 4i | 6 | 2 |
| **Jasmine-Hall # 8**<br>5949 Brett Drive,  Sacramento, CA 95842 | Level 4i | 6 | 3 |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56-260 of the Local Rules of Court, Plaintiff Elaine L. Chao, the Secretary of Labor, United States Department of Labor, (the "Secretary"), hereby submits this memorandum of points and authorities in support of her Motion for Summary Judgment against Defendant Jasmine Hall Care Homes, Inc., Defendant Hall Care Homes, Inc., Defendant George Hall and Defendant Estela Hall.

## I.   <u>STATEMENT OF THE CASE</u>

George Hall and Estela Hall, directly and through the two corporate defendants, operate eight for-profit Jasmine Hall residential care facilities in the Sacramento area, each of which provides a group home for between four to six developmentally disabled ("DD") adults between the ages of 18 and 59.  These clients have severe functional and behavioral impairments, often resulting from dual diagnoses of a developmental disability compounded by a behavioral disorder or mental illness such as schizophrenia.  Seven of Defendants' eight care homes are licensed to provide care at the highest service and care level, for clients with severely disruptive or self-injurious behavior.

Care aides residing on the premises provide most of the direct client care, and are responsible for monitoring and supervising the clients, as well as cooking and serving their meals, doing housecleaning and laundry, and engaging in behavioral guidance and training during the remaining periods.  Required to stay overnight at the facility in staff quarters shared among up to four employees, some of the opposite sex, the aides provide client care and supervision over the night hours as well.

The care aides are scheduled for five consecutive 24-hour duty shifts, yet Defendants pay them for only eight (8) of every 24 hours spent on-duty.   This is despite the fact that Defendants claim the care aides to be on-duty for the full 24 hours of the shift for purposes of fulfilling Defendants' weekly state-mandated care hour minimums at each facility.  The remaining16 hours out of each shift that are

unpaid, yet during which the care aides are required to remain at the care homes, provide client care and supervision, and remain constantly available to handle any emergency, are the subject of this lawsuit.

In June 2004, the Sacramento District Office of the Wage and Hour Division, Employment Standards Administration, United States Department of Labor ("Labor Department"), initiated an investigation of the Jasmine Hall care homes operated by Defendants ("Jasmine Hall") to determine if any person had violated any provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. (FLSA). In the course of its investigation, the Labor Department determined that Jasmine Hall assigned its care aides to 24-hour duty shifts on the premises, during which the aides were responsible for the severely disabled and disturbed adult residents, as well as housekeeping and cooking, and could not leave without advance permission. Yet Jasmine Hall was only paying their employees a salary which covered 8 hours out of each 24-hour duty shift.

The Labor Department found that Defendants were failing to compensate employees for all hours worked under the FLSA. In response, Defendants incorrectly cited to a Labor Department interpretive regulation at 29 CFR § 785.23 regarding methods to calculate hours worked when an employee lives on his employer's premises. However, the Defendants had not incorporated into their staffing practices the conditions precedent set out in the clear language of 29 CFR § 785.23 itself, namely that employees must be entirely relieved of duties and free to leave the premises during non-duty non-sleep time before such time can be unpaid. Jasmine Hall's care aides, in contrast, are required to provide client care and supervision at the facility throughout their entire duty shifts and, moreover, must do so in order to fulfill Defendants' obligations under state law to provide specified weekly minimums of staff client care.

Moreover, Jasmine Hall's position also failed to take into account a long-standing and consistently-applied Labor Department enforcement policy interpreting the application of 29 CFR § 785.23 in the residential care industry,

outlining basic minimum criteria before the regulation can be used in that industry to exclude care aide time.  These minimum criteria include the provision of adequate sleeping quarters to the employee, including a private room.  Here, it was clear that the Jasmine Hall employees were required to share a bedroom with up to three other employees.  Nevertheless, Defendants refused to pay any of the back wages found owing to their employees or to change Jasmine Hall's pay practices going forward.

On June 28, 2005, the Secretary filed a complaint alleging violations of Sections 6, 7,  11(c), 15, 16, and 17 of the FLSA, 29 U.S.C. §§ 206, 207, 211(c), 215, 216, and 217, for violations of the minimum wage, overtime and mandatory recordkeeping provisions of the FLSA and for injunctive relief.  The Secretary amended her complaint on March 3, 2006, to incorporate two additional Jasmine Hall care homes purchased by Defendants since the Labor Department had begun its investigation, and to add those employees to the list of employees in Exhibit A to the Complaint for whom the Secretary seeks back wages under the Act.

## II.    STATEMENT OF ISSUES PRESENTED

The Secretary has brought this action to recover, on behalf of Defendants' resident care aide employees, unpaid minimum wage and overtime back wages owing to them under the FLSA, and to further enjoin the Defendants from committing future minimum wage, recordkeeping and overtime violations of the Act.

Specifically, the Secretary asserts that:

1.    Defendants' care aide employees, during their regular duty shifts of 24 hours per day, five consecutive days per week on the premises of Defendants' care homes, are "on-duty" within the meaning of the Fair Labor Standards Act.

2.    Defendants' care aides are working within the meaning of "hours worked" under the FLSA throughout their 24-hour on-duty shifts at

Defendants' care homes;

3.     Defendants failed to keep time records as required by Section 11(c) of the FLSA, including of any regular, predictable and significant period of hours during the 24-hour duty shifts when employees were allegedly relieved of all client care and supervision duties and free to leave the premises for their own personal purposes daily, if such situations occurred;

4.     Section 6 of the FLSA requires Defendants to compensate their care aides for the full 24 hours in each of the care aides' regular 24-hour duty shifts;

5.     Defendants have failed to prove any entitlement to invoke 29 CFR § 785.23 as grounds for paying their employees for any less than the full length of the 24-hour duty shift, as Defendants have not satisfied the requisite criteria for the applicability of 29 CFR § 785.23 set forth in the body of the regulation, namely that employees must be relieved of responsibilities and entirely free to leave the premises for their own personal purposes during unpaid, non-sleep time;

6.     Defendants have failed to prove any entitlement to invoke 29 CFR § 785.23 as a basis to avoid paying their employees for less than the full length of their 24-hour duty shifts, as Defendants have not met the requisite criteria for the application of 29 CFR § 785.23 to the residential care facility industry, as set forth by the Department of Labor in its Interpretive Bulletins, including the requirement that employees be provided with adequate sleeping quarters;

7.     Defendants' putative employer agreement does not provide a defense to the Secretary's action because:

a)  It purports to redefine hours worked to exclude on-duty hours, which is beyond the lawful scope permitted by 29 CFR § 785.23;

b) It is unreasonable as a matter of law for purporting to exclude from

compensation, out of each 24-hour duty shift worked, 16 hours which are otherwise compensable under the FLSA as on-duty hours worked;

  c) It is unreasonable as a matter of law because the agreement lacks any mechanism for adjusting the hours as staffing requirements increase.

  8.     Defendants owe minimum wage and overtime back wages to their care aide employees resulting from Defendants' failure to include 16 out of 24 hours worked as compensable hours in each regularly scheduled duty shift, 5 days per week since 2002, in the amount of $3,270,201.35.

  9.     Defendants' unlawful failure to compensate their care aides for 16 out of every 24 on-duty hours worked since 2002 by purporting to rely on a Labor Department regulation in the face of the Labor Department's repeated advice that such reliance was unjustified and warranted, is a willful violation of Sections 6 and 7 of the FLSA.

  10.    Defendants are additionally obligated to compensate their employees for liquidated damages in the further amount of $3,270,201.35 pursuant to Section 216(b) of the FLSA.


## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS
### *The Defendants*

1.     Directly, as well as through the corporations Jasmine Hall Care Homes, Inc. and Hall Care Homes, Inc., Defendants George Hall and Estela Hall operate eight Jasmine Hall adult residential care facilities for developmentally disabled (DD) adults in Sacramento, California,  (Exhibit A, Defendants' Response to Plaintiff's First Set of Requests for Admissions, # 1-3; Answer of Defendants, ¶ 3).

2.     George Hall is the president and CEO of Jasmine Hall Care Homes Inc. and Hall Care Homes, Inc.  (Answer of Defendants, ¶ 3; Exhibit B, Deposition of George Hall, at p. 9, ln. 8-11)[1].

---

[1] Those portions of the Deposition of George Hall that are referenced herein are excerpted and attached to the Secretary's Motion at Exhibit B.  The entire deposition has been made available to the Court pursuant to local Rule 56.

3.      Estela Hall is the Vice President of Operations of Jasmine Hall. (Exhibit C, Jasmine Hall Personnel Report).

4.      Defendants, jointly or severally, own all eight Jasmine Hall care homes, as well as the real property on which each is situated. (Creel Declaration at ¶ 60.)

### *The Applicable State Law and Regulations*

5.      The Lanterman Mental Retardation Services Act of 1969 sets out a system of rights and services for developmentally disabled adults and children in California, which services are approved and provided through a network of 21 private, non-profit regional centers that work under contract with the California Department of Developmental Services (DDS). (Exhibit D, Declaration of Tanya Nalley, ¶ 3; Exhibit T, Declaration of Sandy Nunez, ¶3).

6.      Alta California Regional Center ("Alta" or "ACRC") provides services to persons with developmental disabilities (DD) and their families throughout a ten county area around Sacramento, including assessment and placement for 24-hour residential non-medical care for DD adults and children. (Exhibit D at ¶¶ 3-4; Exhibit T at ¶¶ 3-4.)

7.      Residential placement is made in Community Care Facilities (CCFs), which have been licensed by the Community Care Licensing (CCL) Division of the Department of Social Services. (Exhibit D at ¶¶ 5-9; Exhibit T at ¶ 4)

8.      In addition to CCL licensing, these residential facilities are also regulated by the Regional Centers through a process called Vendorization, which process seeks to ensure that the facility, its administrator and staff will be able to provide care at a specific designated level, in order to meet the needs of clients placed there. (Exhibit D at ¶¶ 8-9; Exhibit T at ¶ 5)

9.      All adult residential care facilities in California are both licensed and vendored at a specific Level of Care (LOC) on a four-level scale from I to IV, representing increasing client impairments and needs, which correspond to increased standards for client care and staffing levels which facilities must provide. (California Code of Regulation, Title 17, Section 56.0004(a); Exhibit D at ¶¶ 9-13)

10.     Level 4 is the highest of the levels of care and in turn is divided into sublevels, with Level 4(i) the highest level of care required in the system.  (Exhibit D at ¶¶ 10-12.)

### *Care Aides' Work Schedule and Salary Compensation*

11.     Jasmine Hall regularly schedules its care aide employees or Residential Care Aides (RCA's) to work five consecutive 24-hour duty shifts per week at their assigned care home.  (Exhibit E; Exhibit F, Defendants' Responses to the Secretary's First Set of Interrogatories, Response #1; Exhibits G,H, I, J, K, L, M, N, O, P, Q, Declarations of various current employees, at ¶¶ 2, 3, 6; Exhibit R, Declaration of former employee Josefa Lastimosa, at ¶¶ 2, 3, 6; Exhibit S, Declaration of former supervisor Valerie Lowery, at ¶¶ 3-5; Exhibit V, Declaration of former employee Joyce Glover, at ¶¶ 2-3.)[2]

12.     The Jasmine Hall workday is a consecutive 24-hour period. The workweek begins on Sunday and ends on Saturday. (Exhibit Y, Jasmine Hall *Employee Policy*, at p. 13.)

13.      Jasmine Hall uses the same regular weekly work scheduling pattern for the care aides working at all of its eight care homes.  (Exhibits G through R, at ¶ 2).

14.     This same regular weekly work schedule has been in effect since 2002, continuing through to the present time.  (Exhibits G through R, at ¶¶ 1-2).

15.     Jasmine Hall only compensates its care aide employees for 8 out of 24 duty hours in each regular shift worked at the employees' assigned care home.  (Exhibit F, Response #1).

16.     Jasmine Hall pays all its care aide employees a set monthly salary, to cover and compensate all hours worked during their regular weekly duty shifts in that month.  (Exhibits G through R, at ¶ 4).

17.     The amount of the monthly salary paid by Jasmine Hall varies slightly among employees, but only within in a narrow range between $1500.00 monthly to

---

[2] See Exhibit AA, Declaration of Luis Cabahut, for translation of non-English employee declarations.

$1800.00 monthly before taxes.  (Exhibits G through R, at ¶ 4)

18.    Any hours worked during the care aides' two scheduled days off per week is referred to by Defendants as "overtime" and paid separately, and is not a subject of this lawsuit.  (Exhibits G through R, at ¶ 5).

### *Jasmine Hall's Licensed Service Levels & Related Staffing Requirements*

19.    Seven of the eight Jasmine Hall care homes are licensed and operate as Level 4 facilities, with just one, Jasmine Hall # 2, licensed and operating at Level 3. (Hall Depo p. 46, ln. 22-25)   Four of the eight Jasmine Hall care homes are Level 4(i) facilities, the highest need and service level in the residential care system. (Creel Decl. at ¶ 28; Nalley Decl. at ¶ 12)

20.    Jasmine Hall's clients are placed in the homes pursuant to vendor agreements between Jasmine Hall and Alta Regional.  (Exhibit U, "Residential Services Contract Agreement, Level 4".)

21.    California law, Jasmine Hall's licenses and its contracts with Alta Regional require specific minimum on-duty staffing levels in its Level 3 and Level 4 facilities.  (California Code of Regulations, Title 17, §56004; Exhibit D at ¶¶ 13-14).  These include, for all Level 4 care facilities such as Jasmine Hall's, a requirement that at least one staff member be present whenever any client is  on the premises and that, further, the ratio of clients to staff not exceed 2 to 1 while clients are awake. (Title 17, *Chapter 3 - Community Services, SubChapter 4 - Residential Services and Quality Assurance Regulations*, §56004.)

22.    In addition, all of Level 4 care facilities must also provide sufficient client care staffing on-site so that the staff *on-duty* care hours, each week, meet a weekly minimum number of hours set by regulation. (Title 17, §56004).  For all of Jasmine Hall's Level 4 care homes, there are additional requirements to provide a minimum number of direct care staff hours each week.  For Jasmine Hall's Level 4(i) care homes, each home must ensure that 420 hours of direct client care and supervision, independent of consultant hours, are provided weekly.  Title 17,

§56004. (Exhibit D at ¶¶ 12-14.)

23.    Jasmine Hall's licensing and contracts to provide residential care also include similar guarantees to provide mandatory minimum direct care staffing levels in each care home.  (Exhibit D; Exhibit U, p. 1)

24.    Jasmine Hall specializes in accepting DD clients with dual diagnoses of serious behavioral and mental problems, who need less physical care but have intensive needs for behavioral care and attention. (Lowery Decl., at ¶ 6.)

25.    Service Level 4(i) is the highest Service Level for residential care facilities, reserved for clients with the most severe disabilities, requiring the greatest amounts of direct care and supervision. (Nalley Decl., at ¶ 12.)

26.    The primary and most essential service provided by Jasmine Hall's care aides is giving 24-hour direct care and supervision to all clients under Jasmine Hall's legal supervision.  (Lowery Decl., at ¶ 6.)

27.    Jasmine Hall's care aides are responsible for handling the clients' daily behavioral data gathering and intervention programs, as well as some specified training programs, and related record keeping and charting.  The problem behaviors are identified by a paid consultant, but it is the care aides who monitor for the behaviors and provide the data about how often daily they occurred, when, and why, and take the prescribed interventions and trainings. (Lowery Decl., at ¶ 7.)

28.    Jasmine Hall's regular employee work schedule of 5 consecutive 24-hour duty shifts each week is designed to have care aides on duty at each care home on a 24-hour basis to satisfy Jasmine Hall's contractual and regulatory direct care staffing minimum staffing levels and weekly care hours. (Exhibit D at ¶¶ 14-28; Exhibit Y, Jasmine Hall *Employee Policy*, at p. 13.

### *Employees' Scheduled Shifts As On-Duty Time*

29.    The primary responsibility of Jasmine Hall's care aides or RCA's is to provide direct care and supervision to the clients on a 24-hour basis.  (California

Welfare & Institutions Code, Section 46.1(a)(2); California Code of Regulations, Title 17, §56002(a)(14); Exhibit E).

30.    Level 4 care is described by the state Department of Developmental Services as:

> SERVICE LEVEL 4: Care, supervision, and professionally supervised training for persons with deficits in self-help skills, and/or severe impairment in physical coordination and mobility, and/or severely disruptive or self-injurious behavior. (Nalley Decl. at ¶ 11.)

31.    In Level 4 facilities, the minimum staffing levels start from the requirement that at least one staff member must be on duty anytime a client is present in the home, and with the presence of additional clients, the client staff ratio cannot exceed 2 clients per staff member on duty.  (Exhibit E; California Code of Regulations, Title 17, § 56004).

32.    Jasmine Hall's care aides are the staff members who fulfill most of Jasmine Hall's direct care staffing requirements by providing client care and supervision in the care homes. (Nalley Decl., at ¶¶ 19-20.)

33.    Jasmine Hall's care aides must be on-duty in the sense of actively providing client care and supervision in their assigned care homes in order to be viewed as satisfying Jasmine Hall's direct care staffing requirements (Nalley Decl. at ¶¶ 19-20.)

34.    Having direct care staff "on duty" in these residential facilities requires the care staff to be more than simply physically present on the premises.  The care staff must also be consciously supervising clients whenever clients are awake in the home, as well as ready, willing and able to assist and supervise clients at all hours of the night.  (Nalley Decl. at ¶ 21.)

35.    Each Jasmine Hall care aide must remain physically present on the premises, within earshot or view of the clients and consciously supervising them at all times that any client is awake in the home, in order for that care aide's time to count towards Jasmine Hall's direct care staffing requirements (Nalley Decl. at ¶ 22.)

36.   A care aide who was out of earshot or view of the clients, for example in the back yard or in the staff bedroom with the door closed watching TV, may not be considered "on-duty" by Alta California Regional Center, and that time would not be considered to have constituted direct client care or supervision or count towards the facility's weekly minimum hours.  (Nalley Decl. at ¶ 23.)

37.   The minimum number of direct care hours required at Level 4(i) is 312 hours *weekly* if 4 clients are currently residing at the home, and 420 hours *weekly* if 6 clients.

38.   If Jasmine Hall care aides were in fact only on-duty for eight (8) hours per shift, none of Jasmine Hall's care homes could meet their minimum mandatory number of direct care hours required per week with their existing number of staff. (Creel Decl., at ¶¶ 28-30.)

39.    Jasmine Hall instructs its care aides that they cannot leave their assigned care home without advance management permission during their 24-hour duty shift for anything more than a brief errand of less than one hour. Exhibit W, Deposition of Estela Hall, at pp. 127-128[3] (Exhibits G through Q at ¶¶15-17; Exhibit Y at p. 23).

40.   Jasmine Hall has reprimanded care aides for leaving the premises for a personal break without permission, even when there was sufficient staff present to care for clients. (Lowery Decl., at ¶ 16.)

41.   Jasmine Hall supervisors have been instructed that the Jasmine Hall policy does not allow care aides to leave the facility during the care aides' scheduled shift without advance permission, and the supervisors have enforced this policy with the care aides who reported to them. (Lowery Decl., at ¶ 15.)

42.   Defendant George Hall has stated to care aides that the Jasmine Hall rule is that they cannot leave the premises until their day off. (Lowery Decl., at ¶ 16.)

### *Sleeping Conditions*

---

[3] Exhibit W, attached, includes those portions of the deposition of Estela Hall that are referenced herein.  The full deposition will be made available to the Court pursuant to Local Rule 56.

43.   Jasmine Hall employees are required to sleep at the facilities during their five consecutive 24-hour duty shifts.  (Exhibit G through Q, ¶¶ 7, 9; Exhibit B at pp.188-89; Exhibit E)

44.   The RCA's are required to share sleeping quarters consisting of one room with up to four staff members.  (Exhibits G through Q, ¶ 9; Exhibit R at ¶ 9; Exhibit S at ¶ 5; Exhibit V at ¶ 20)

45.   Alta Regional requests that all Level 4 facilities provide a staff member who is assigned to be on duty, awake, all night in order to meet the greater nighttime care and supervision needs of Level 4 clients. (Nunez Decl. at ¶10 )

46.   George Hall and Estela Hall have guaranteed Alta Regional that Jasmine Hall assigns a care aide to be on duty, awake, overnight, every night, at each of Jasmine Hall's seven Level 4 homes.  (Nunez Decl. at ¶¶11 and 12 )

47.   Even when able to sleep, the care aides' sleep is periodically interrupted by clients.  (Exhibits G through Q, ¶¶ 18-19; Exhibit R at ¶¶ 18-19; Exhibit S at ¶¶ 10-11; Exhibit V at ¶¶ 20-21).

48.   Until at least 2005, Jasmine Hall did not provide a timekeeping mechanism for tracking interruptions in employees' sleep.  (Exhibit V at ¶ 21; Creel Decl. at ¶ 14).

### Level of Client Service Needs at Jasmine Hall Homes

49.   In order to be placed at Jasmine Hall's Level 4 facilities, clients must meet the following criteria:  they rely upon others to perform all activities of daily living (ADL's). (California Code of Regulation, Title 22, Section 85065)

50.   Clients at Jasmine Hall's Level 4 facilities require care, supervision and professionally supervised training due to deficits in self-help skills, and/or severe impairment in physical mobility and coordination, and/or severely disruptive or self-injurious behavior.  (Exhibit D, ¶¶ 11-12; California Code of Regulations, Title 22, Section 85065).

51.   Many of the clients at Jasmine Hall's Level 4 facilities have behavioral

deficits and/or excesses which are so severe that they prevent the clients' participation in activities of daily living and from being placed in other residential facilities, and require a "highly-structured environment". (Exhibit Z, Residential Vendor Orientation, Alta California Regional Center Model Service Levels, at 1.)

52.     Level 4 clients require "enriched staffing", including staff intervention in a predictable manner due to the "challenging" needs of the clients. (Exhibit Z at 20.)

53.     The Level 4 client profile is described as:  severe limitations of the basic Activities of Daily Living (ADL); severe behaviors, aggression to self/others, restiveness, tantrum, property destruction; AWOL; self-injurious; severe behaviors which prevent participation in ADL and community involvement.  (Exhibit Z at p. 20.)

54.     At Level 4(i), this client behavior profile is described as including:  breaking windows, tearing clothing, destroys furniture, customary pattern of severe property damage, frequency of once a month; client actively attempts to leave, many require alarms on doors; client's cognitive level means he would do unsafe things such as getting into traffic, serious endangerment; self-injurious behavior includes biting self, inflicts serious injury to self requiring medical attention, ER visits, etc, on an ongoing frequent basis.  (Exhibit Z at p. 20-22.)

55.     Some of the client behaviors that Jasmine Hall care aides have been required to handle during the relevant time period include:

a) A client had urinary incontinence averaging 4.8 incidents per week (DEF 2200), requiring staff to document each incident, monitor his consumption of liquids before bedtime, and wake him up every night at midnight to take him to the bathroom (DEF 2195) ; care aides were required to wake up the client every night between 2 a.m. and 3 a.m., to document the sessions, and to 'collect frequency and prescriptive analysis data re eliminating inside and outside the toilet' (DEF 2210.);

b) Some clients, if not watched closely, wander away, or get up at night and

injure themselves.  One client urinated on herself and required close attention and frequent clean-up and laundry.  At night, she was at risk of burning herself by leaving her face for long periods under the hot-water tap in the bathroom, if not carefully monitored.  (Lowery Decl., at ¶ 10.)

c)   Client behaviors range from nighttime bedwetting and soiling, yelling, stealing, smearing feces, hitting others, throwing food, public masturbation, self-injury, and others. (Lowery Decl. at ¶ 8.)

d)   Some of the training the care aides provided to clients included performing daily hygiene, requiring the employee to hold her hand over the client's hand to teach themselves how to wash themselves, or brush their teeth – "hand over hand" training.  (Lowery Decl. at ¶ 8.)

e)   While watching television, some clients yell out interruptions, get into fights, engage in obsessive behaviors, or keep asking for an explanation of what is being said or shown on TV. (Lowery Decl. at ¶ 9.)

f)   A client was described as doing well with "one on one" attention from staff when upset or engaging in self-injurious behavior (DEF 1914); Client was dancing to the radio during the night, and wet herself (DEF 1932); Client needed medical treatment after she  injured herself with a toothbrush in a delicate area (DEF 1932); Client didn't sleep at night but flushed the toilet constantly, went downstairs at midnight to eat and made a mess (DEF 1945); Client was agitated at night, going up and down the stairs repeatedly, wet herself requiring staff to change her clothes, twice in one night. (DEF 1945.)

g)   For one client, staff was tasked by the behavior consultant with tracking his hand-washing routine on a daily basis to confirm the rate of non-compliance during hand washing, "Staff should make a deal with client prior to each session and make reinforcements available." (DEF 1995); Staff was also instructed to "encourage socialization and engage in reality based conversations", and monitor for inappropriate behavior (trying to

beg for cigarettes from strangers or trading possessions for cigarettes.) (DEF 2051); One evening entry noted: "10 pm Staff found clients' room empty, client missing, found them in the back yard drinking wine. Threatened to slap the staff." (DEF 2076);

h) One client needed care aides "to assist with all of her ADL's" (DEF 2098); while her records showed repeated acts of self-injurious and disruptive behavior such as "Scratched her legs until bleeding, fought with staff who tried to stop her (DEF 2120); Care aides had to clean the bathroom because another client had scattered stool on the floor of the bathroom. This client had then flooded it with water, mixing with the stool. Client got upset and began hitting the staff. (DEF 2127); in the evening, the client was watching TV when another client turned it off. Client started screaming and the other one grabbed her—staff had to separate them.  (DEF 2131.)

i) Employees had to handle and gather data on identified behavioral deficiencies such as clients' running away, calling 911, threatening suicide, calling in false fire alarms, assaulting staff, talking to self (and voices) out loud, refusing to do personal grooming, and engaging in fights with other clients.  (Glover Decl., at ¶ 12.)

j) Clients often awakened and need help after 10 p.m., sometimes as a continuation of prior acting-out or AWOL behavior described, and other times clients got up to smoke a cigarette, visit the bathroom or do something to disturb others. (Glover Decl., at ¶ 19.)

56.  Jasmine Hall's care aides typically spend an average of 10-16 awake (or daytime) hours per day on direct client care and supervision, and behavioral management, as well as household chores such as cooking meals, doing laundry and cleaning.  (Exhibits G through Q, ¶ 10; Exhibit R at ¶ 10; Exhibit S at ¶ 12; Exhibit V at ¶¶ 11-13).

57.  The RCA's rarely have more than 3-5 hours where they are not actively

engaged in active tasks or duties during their 16 awake hours.  (Exhibits G through Q, ¶ 11; Exhibit R at ¶ 11; Exhibit S at ¶ 12; Exhibit V at ¶¶ 14-17).

58.    The RCA's have no regularly scheduled free time during their awake hours on their 24-hour duty shifts.  (Exhibits G through Q at ¶¶ 11-14; Exhibit B at pp. 188-89; Exhibit R at ¶ 11-14; Exhibit S at ¶¶ 16-17; Exhibit V at ¶¶ 14-17)

59.    Clients are permitted by law to refuse to attend any program or activity during the day, and to choose instead to stay at their residential care facility. (Exhibit U, at p. 2)

60.    Unannounced Visit records in Alta's files show that during each such visit made during the relevant time period, Alta documented that at least one client and direct care staff were present in each of the Jasmine Hall care homes visited during the day. (Creel Decl. at ¶ 14).

61.    A representative sample of the Jasmine Hall Home Logs and attendance records showed that, during the day, clients were present in any given Jasmine Hall care home approximately 80% of the time at most.  (Creel Decl. at ¶ 51).

62.    Jasmine Hall does not keep records of any times during each shift when employees might be relieved from all duties and responsibilities and free to engage in their own private pursuits, including times when care aides have allegedly been free to leave the premises during unpaid non sleep hours. (Creel Decl. at ¶ 35).

### *Jasmine Hall pay and compensation practices*

63.    Jasmine Hall excludes from compensation any time employees are "not busy" (Exhibit E).

64.    Jasmine Hall excludes from compensation 8 of the 16 non-sleep hours when employees are on duty but does not identify which 8 hours are paid and which are not.  (Exhibit F, Response #1)

65.    Jasmine Hall does not consider any time spent outside of preparing meals and performing household chores to be work.  (Exhibit B, pp. 195-197)

66.    Jasmine Hall does not consider the supervision of clients to be compensable

work.  (Exhibit B, pp. 195-197).

67.    Jasmine Hall does not consider any of the RCA's idle time during their 24-hour shift as compensable even if the RCA cannot leave the care home.  (Exhibit B, pp. 195-197)

68.    Jasmine Hall excludes from compensation 8 hours per day for sleep time even when RCA's do not get 8 hours of sleep time, and even when that sleep time is interrupted.  (Exhibit F, Response #1; Exhibit E)

| Jasmine Hall Homes:  Reference Table by Investigator Creel April, 2007 | | | | | | |
|---|---|---|---|---|---|---|
| Care Home/Facility Number Street Address | Approved LEVEL OF CARE | Max.No. Clients In Facility | *Total Number of Live-In Care Staff | State-Required Number of Weekly Care Hours  A. with max. clients in home  B.  with only 4 clients in home | Number of Weekly Care Hours If Staff Is On-Duty All 24 Hours Per Shift | Number of Weekly Care Hours If Staff Is On-Duty For Just The 8 Paid Hours Per Shift** |
| Jasmine-Hall # 1 4020 47th Street, Sacramento, CA 95820 | Level 4f | 4 | 2 | A. 248 hrs (168 + 80 ) | 240 | 80 |
| Jasmine-Hall # 2 3965 MLKing Blvd, Sacramento, CA 95820 | Level 3 | 6 | 2 | A. 210 hrs (168 + 42) B. 172 hrs (168+4) | 240 | 80 |
| Jasmine-Hall # 3 1601 Ferran Ave., Sacramento, CA 95832 | Level 4i | 6 | 4 | A. 420 hrs (168 + 252) B. 312 hrs (168 + 144) | 480 | 160 |
| Jasmine-Hall # 4 5 Pasture Court Sacramento, CA 95834 | Level 4E | 6 | 3 | A.300 hrs (168 + 132) B.232 hrs. (168 + 64) | 360 | 120 |
| Jasmine-Hall  # 5 5729  39th Street Sacramento, CA 95820 | Level 4d | 6 | 3 | A. 276 hrs (168+108) B. 216 hrs (168 + 48) | 360 | 120 |
| Jasmine-Hall # 6 1 Goff Court Sacramento, CA 95838 | Level 4i | 6 | 4 | A. 420 hrs (168 + 252) B. 312 hrs (168 + 144) | 480 | 160 |
| Jasmine-Hall # 7 5447 Bartig Way Citrus Heights, CA 95621 | Level 4i | 6 | 2 | A. 420 hrs (168 + 252) B. 312 hrs (168 + 144) | 240 | 80 |
| Jasmine-Hall # 8 5949 Brett Drive Sacramento, CA 95842 | Level 4i | 6 | 3 | A. 420 hrs (168 + 252) B. 312 hrs (168 + 144) | 460 | 120 |

\*   As provided to State of CA, Community Care Licensing, November 2005

*Motion for Summary Judgment*          *Page-* 24

** or calculated based on George Hall's "Model" Schedules as shown at Exhibit 1

## III.  ARGUMENT

### A.  Plaintiff Meets The Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment where it can demonstrate that the pleadings, and discovery responses, depositions, together with affidavits, if any, show that there is no genuine issue of material fact, and that the moving party is entitled to summary judgment as a matter of law.  Summary judgment serves an important purpose in a case such as that at bar.  The purpose of summary judgment is to avoid useless trials where material facts are not disputed and the law points unerringly to the conclusion that one of the parties is entitled to judgment as a matter of law.  *Utility Control Corp. v. Prince William Construction Co., Inc.*, 558 F.2d 716, 719 (4th Cir. 1977) (citations omitted).

The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986) (citing *Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144 (1970)).  Plaintiff's Motion and supporting papers together demonstrate that all of the material facts in this case are undisputed—particularly that Defendants' employees were assigned to 24-hour duty shifts at the care homes, unable to leave without advance permission, and responsible for the care and supervision of the home's severely impaired residents throughout that entire shift.  Further, those undisputed facts clearly demonstrate that Defendants cannot defend their practice of paying employees for only 8 out of 24 on-duty hours by invoking the FLSA's Homeworkers Exemption at 29 CFR § 785.23.  Employees are not free to leave without restriction during their unpaid time as required by the language of the regulation itself.  Moreover, employees lack the "home-like" environment and private sleeping quarters required by the Department of Labor's consistently

*Motion for Summary Judgment*        Page- 25

enforced policy interpreting the Homeworker regulation in the residential care facility industry.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial.  Fed. R. Civ. P. 56(e).  The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial.  *See T.W. Elec. Serv., Inc.* v. *Pacific Elec. Contractors Assn.,* 809 F. 2d 626, 630 (9th Cir. 1987); *Anderson* v. *Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). The party opposing summary judgment must do more than simply show that there is some metaphysical doubt as to the material fact; it must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Electric Industry Corp., Ltd. v. Zenith Radio Corp*., 475 U.S. at 574, 586-87.

At the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence.  *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).  The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law?  *Id.* (citation omitted).)  The Plaintiff submits that summary judgment can be awarded in her favor without the need for any such credibility determinations, as the material facts in this matter are so clearly undisputed.

The Secretary's supporting documents, including deposition testimony, declarations, and Defendants' interrogatory responses, all clearly establish that there are no material facts in dispute, while a review of the long-standing applicable FLSA law demonstrates that the Secretary is entitled to judgment as a matter of law.

**B.    Defendants' Care Aides Are On Duty All 24 Hours; All 24 Hours Are To Jasmine Hall's Benefit and Constitute "Hours Worked" Under the FLSA**

    1. *The Care Aides Are Either Working Or Waiting To Be Engaged At All Times*

It is a fundamental principle of the Fair Labor Standards Act that employees must be compensated for every hour that they spend either working or waiting to be engaged in work, unless an exemption applies.  29 U.S.C. § 207; *Skidmore v. Swift*, 323 U.S. 134, 137 (1944).  The FLSA presumes that an employee working a 24-hour shift must be paid for all 24 hours.  An employee is considered "on duty" for all hours that he or she is either working or waiting to be engaged in work during the entire shift.  29 CFR § 784.15; *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) (readiness to serve may be hired, quite as much as service by itself).

Time spent predominantly for the employer's benefit constitutes working time compensable under the FLSA, regardless of whether the employee is actively engaged in a task or is idle.  *Roy v. County of Lexington,* 141 F.3d 533, 544 (4th Cir. 1998); *Service Employees Int'l Union Local 102 v. County of San Diego,* 35 F.3d 483, 490-91 (9th Cir. 1994), *cert. denied*, 516 U.S. 1072 (1996).

It is undisputed that the care aides cannot leave the care home during their 24-hour shifts for any significant time without Defendants' permission (Employee Decl. ¶¶ 16-17).  An employee who is required to remain on-call on the employer's premises or so close to the premises that the employee cannot use the time effectively for his or her own purpose is considered engaged to wait and is working while on-call.  29 CFR § 785.17; *Service Employees Int'l*, 35 F.3d at 490-91.  In contrast, on-call status permitting employees to respond to a cell phone or a beeper allows greater freedom to engage in a wide range of personal pursuits, both private and public, over a greater geographical distance, and is usually not considered waiting to be engaged or working while on-call, absent additional constraints on the employee's freedom; Defendants could arrange its staffing in such a manner,

but has chosen not to do so, and the Jasmine Hall care aides do not fall into the latter category.

### 2. The Time Spent Is For The Employer's Benefit, To Meet Statutorily-Mandated Minimum Care Hours and Staffing Ratios

It is undisputed that the care home employees must be on duty for their scheduled hours in order to satisfy Defendants' regulatory, contractual and licensing requirements, including the total amount of direct care staff hours required weekly under Title 17 of the California Code of Regulation. (Exhibit D at ¶¶ 14-20; Creel Decl. at ¶¶ 27-30.)  In addition, the employees are required by law to be on duty in order to meet each care home's minimum staffing ratio; at least one employee must be on duty in the home at all hours when a single client is home and there cannot be more than two clients present for every staff member on duty in a Level 4 home while the clients are awake. (Exhibit E; California Code of Regulations, Title 17, § 56004)

The undisputed facts show that Defendants' employees are on duty for five consecutive 24-hour shifts.  (Exhibit E; Exhibit F, Defendants' Responses to the Secretary's First Set of Interrogatories, Response #1; Exhibits G,H, I, J, K, L, M, N, O, P, Q, Declarations of various current employees, at ¶¶ 2, 3, 6; Exhibit R, Declaration of former employee Josefa Lastimosa, at ¶¶ 2, 3, 6; Exhibit S, Declaration of former supervisor Valerie Lowery, at ¶¶ 3-5; Exhibit V, Declaration of former employee Joyce Glover, at ¶¶ 2-3.) The employees must be available to care for the clients on a moment's notice and to meet Jasmine Hall's client care and supervision obligations.  (Exhibits G through R at ¶¶ 7, 9,15-19)  As such, the time is spent for the benefit of the Employer, not the care aides.

### 3. *The Care Aides Are Paid To Be Available To Handle Potential Emergencies*

The undisputed facts in this case fit within the plain language of the *on duty* regulation at 29 CFR §785.15:

> A stenographer who reads a book while waiting for dictation, a messenger who works a crossword puzzle while awaiting assignments, a fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while waiting for machinery to be repaired are all working during their periods of inactivity. The rule also applies to employees who work away from the plant. For example, a repair man is working while he waits for his employer's customer to get the premises in readiness. The time is worktime even though the employee is allowed to leave the premises or the job site during such periods of inactivity. **The periods during which these occur are unpredictable. They are usually of short duration. In either event the employee is unable to use the time effectively for his own purposes. It belongs to and is** controlled by the employer. In all of these cases waiting is an integral part of the job. The employee is engaged to wait. (See: Skidmore v. Swift, 323 U.S. 134, 137 (1944); Wright v. Carrigg, 275 F. 2d 448, 14 W.H. Cases (C.A. 4, 1960); Mitchell v. Wigger, 39 Labor Cases, para. 66, 278, 14 W.H. Cases 534 (D.N.M. 1960); Mitchell v. Nicholson, 179 F. Supp, 292, 14 W.H. Cases 487 (W.D.N.C. 1959)) (Emphasis added.)

No less than the firemen playing checkers yet being paid while waiting for an alarm or the stenographer who reads a book while waiting for dictation, the RCA's are paid precisely to be immediately available should an emergency develop, and to provide care and supervision to the clients at all other times.

Defendants themselves admit that the RCA's must be present at the facility and available to provide services during the RCA's entire 24-hour shift. (Exhibit B at pp. 79-80; Exhibit X, Deposition of Care Home Administrator Kyle McCollough, at pp. 19-21). Moreover, the undisputed facts of the Jasmine Hall care aides' employment—and the many undisputed restrictions upon the aides'

ability to leave the premises for very long without advance permission—constitute compensable "on duty" hours worked as interpreted by the Courts, and especially the Ninth Circuit Court of Appeals.  In *Brigham v. Eugene Water & Electric Board, 357 F. 3d 931 (9th Cir. 2004)* the Court noted as significant that the plaintiff-employees worked and were required to live (along with their families) on-site in housing provided to them by the employer—like Jasmine Hall's care aides, except they had private quarters—stating:

> Although *Owens* and *Berry* represent this court's closest guidance on the issue of on-call compensation, we observe here that the [Eugene Water & Electric Board] employees differ from the employees whose claims were at issue in those cases in one particularly significant way: They are required to live on their employer's premises.  *Cf. Berry,* 30 F.3d at 1178 (off-site, 24-hour on-call coroners); *Owens*, 971 F.2d at 348 (daytime mechanics on-call at their own, off-site homes in the evenings).

The Court went on to apply the *Owens* factors to employees living on their employer's premises, finding the most significant to be that, utterly unlike Jasmine Hall's care aides, the employees in *Brigham*—

> …routinely engaged in personal activities while they were on-call (factor 7).  As the district court highlighted, they were able to use portions of their duty shifts to: sleep, eat, read, study, exercise, watch television, help their children with homework, play games, maintain their homes and yards, work on their motorcycles, and entertain guests.

Nevertheless, the Court in *Brigham* concluded that the on-call time was compensable, primarily because the geographical and response time restrictions were especially restrictive:  the employees needed to be able to hear their phones ring, and to respond quickly, and were responsible for safety issues and therefore needed to remain sober and watchful during their on-call shift.

These key elements of immediacy and watchfulness apply equally, if not more so, to the Defendants' care aides, who must be immediately available to be responsible for the safety, health and care of developmentally disabled adults.

Accordingly, Defendants cannot use 29 CFR § 785.23 to circumvent the body of jurisprudence requiring such on-duty personnel to be paid,  in recognition of the very significant restrictions Defendants are making upon their employee's time and their lives, all to Defendants' benefit.

> ***4. Defendants' Admission That Their Care Aides Remain Available All 24 Hours To Provide Services Is Essentially An Admission That The Care Aides are "Waiting To Be Engaged" or On-Duty.***

There is no legal distinction between the FLSA concept of "waiting to be engaged" and the Defendants' view of "available to provide services." Defendants' pay practices are little more than an attempt to rewrite the FLSA and almost fifty years' jurisprudence to exclude from compensable time most hours the RCA's are required to spend on Defendants'  premises.  The absurdity of Defendants' legal position is underscored by the fact that the care aides are primarily tasked with providing Jasmine Hall's contracted weekly hours of client care and supervision for its Level 4 severely impaired clients; it is this care and supervision of difficult and demanding clients—not the household tasks—for which Jasmine Hall receives at a high monthly payment. (Exhibit D at ¶ 20).

Defendants' position is entirely without legal support, is moreover directly contrary to the protective nature of the FLSA, and is contrary to its goals of stopping substandard labor.  For all of these reasons, Defendants have failed entirely to meet their burden of establishing a reason known to law under which their employees should not be compensated for all hours the employees are required to be present and on-duty in Defendants' care homes, providing client care and supervision.

> **C.**   **Defendants Failed to Keep The Requisite Time Records Allegedly Showing That Care Aides Were Sometimes Relieved of Duty During the Day When Clients Were Absent; The Secretary's Evidence To The Contrary Must Be Accepted As A Matter of Law.**

Defendants assert that their care aides were relieved from duty periodically during the middle of weekdays on which all resident clients in the care home supposedly attended scheduled Day Programs.  (Exhibit F, Response #1) However, this position is not only unsupported by the documentary evidence, it also fails to provide a defense at law because such breaks were not predictable nor scheduled in advance as required under 29 CFR § 785.16.  Further, Defendants failed to keep any of the requisite timekeeping records, mandated by the recordkeeping provisions of Section 11 of the FLSA[4], which might have demonstrated their assertion about the quality and frequency of these breaks. (Creel Decl., at ¶35.)

The law is clear that, as a result, the burden shifts to Defendants to prove that the Secretary's efforts to reconstruct the time were unreasonable.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).  Defendants cannot meet that burden here.  All the available evidence, including contemporaneous records created by third parties as well as the Defendants, has only served to demonstrate that any such occurrences of free time for the RCA's were rare if they occurred at all. For example, Defendants provided a representative sample of Home Logs showing—on all but 18% of the records—at least one client remaining at home during the day, and Alta's Unannounced Spot Visit records similarly reflecting a client present during each daytime. (See, Creel Decl. at ¶¶ 50, 52.)

Further, because direct client care is expected to be provided during all periods when clients were present, the only time during which residential care aides have available in which to perform household tasks and cleaning, is when the clients are not present during midday or when clients are asleep. (Exhibit D at ¶¶ 14-20)  Accordingly, an absence of clients from the homes in these

---

[4] Section 11 of the FLSA directs employers subject to the Act to make and preserve such records as the Secretary shall prescribe by regulation, as authorized under the Act (29 U.S.C. § 211(c).  The following records, required to be kept by employee name and preserved for three years under Part 516 (29 C.F.R. Part 516), were not so kept by Defendants in this matter:  the hour and the day the workweek begins and the hours worked each workday and each workweek.  Further, no records were kept by employee name, showing sleep time interruptions, occasions in which uninterrupted sleep time was less than five hours, or of payments made for such sleep time interruptions.

circumstances when the RCA's are performing household tasks does not necessarily equate to the employees being relieved from duty, as asserted by Defendants.

Moreover, any such "free" time which may have occurred was not sufficiently regular, scheduled or guaranteed such that the care aides could meaningfully plan in advance to use such time for their personal use, as required by 29 CFR § 785.16. Under this regulation, "off duty" time is compensable unless: (1) the employee is completely relieved from duty; and (2) the breaks are long enough to enable the employee to use the time effectively for her own purposes. 29 CFR § 785.16(a). An employee is not completely relieved from duty and cannot use the time effectively for her own purposes unless she is definitely told in advance that she may leave the job and that she will not have to commence work until a specific time. Id.

In this case, the undisputed evidence shows that any instances in which care aides were actually relieved from duty occurred on a random and unpredictable basis, often dependent on the clients' health and emotional states from day to day, and not scheduled in advance as required by 29 CFR § 785.16(a).

.(Exhibits G through Q at ¶¶ 11-14; Exhibit B at pp. 188-89; Exhibit R at ¶¶ 11-14; Exhibit S at ¶¶ 16-17; Exhibit V at ¶¶ 14-17)

For all of these reasons, the Secretary submits that Defendants' assertions that care aides had time free during the day does not create a genuine dispute issue as to any material fact.

**D.     Defendants violated the FLSA By Failing to Comply With the Homeworker Regulation**

**1.     Defendants were required to follow the Homeworker criteria set forth at 29 CFR § 785.23.**

The FLSA starts from a presumption that employees must be paid for all of the time they are required to be on the employer's premises.  29 CFR § 785.7; *Mt. Clemens*, 328 U.S. at 690-91.   One recognized exception to this general rule is where an employee lives or resides for an extended period of time on his employer's premises.  29 CFR § 785.23; *Brigham*, 357 F.3d at 940.  This exception is the subject of the Department of Labor's interpretive regulation at 29 CFR § 785.23, which states:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises.  Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and **other periods of complete freedom from all duties when he may leave the premises for purposes of his own.**  It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.  This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home. (*Skelly Oil Co. v. Jackson*, 194 Okla. 183, 148 P. 2d 182 (Okla. Sup. Ct. 1944; *Thompson v. Loring Oil Co.*, 50 F. Supp. 213 (W.D. La. 1943).) (Emphasis added.)

This common sense exception was designed to exclude from hours worked those periods spent on an employer's premises during which a resident employee who has been provided a home-like environment engages not in work but rather in the normal routines of living, such as sleeping, eating, bathing and entertaining, and during which the employee may leave the premises.

The facts of the instant case, with employees forced to share a single room in double sets of bunk beds and, moreover, bearing responsibility for severely

impaired clients throughout their entire 24-hour shift, have no similarity to the situation of the telephone operator with the switchboard in her home.

### 2. Defendants failed to relieve employees from all duties or permit them to leave the premises during unpaid time.

By its own terms, 29 CFR § 785.23 is only applicable to employment arrangements where the employees "may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own."  29 CFR § 785.23.

There is no genuine dispute that the Jasmine Hall care aides are on duty for their entire 24-hour shift in order to provide the necessary client care and supervision for Defendants' Level 4 clients.  The evidence is also undisputed that employees could not regularly leave the care facility during their shift for their own purposes—not merely because Defendants had a rule to that effect, but also because the Level 4 clients required constant care and attention and because Defendants were required to satisfy weekly staff care hours and minimum client/staff ratios.   (Nalley Decl., at ¶ 24).

Moreover, Defendants have admitted that care aides remain "available" to provide care throughout their entire shift (Creel Decl. at ¶13), while Defendant Estela Hall has conceded that the care aides cannot leave the facility during their duty shift without advance permission for more than a token period of minutes. (Estela Hall Deposition Id).  In their sworn Declarations filed herewith, a representative number of current and former Jasmine Hall employees have stated unequivocally that, during their 24-hour duty shift, they were not relieved of duty nor able to leave the premises for purposes of their own during their unpaid non-sleep hours.  (Exhibits G through R  at ¶¶ 11-16 )

Defendants' own Personnel Manual further confirms the existence of a formal Jasmine Hall policy severely restricting the employees' freedom to leave the premises for purposes of their own, contrary to 29 CFR § 785.23:

a) Prohibited Conduct Number #15: Failure to obtain permission to leave work for any reason during normal working hours.  (DEF 1208);

b) Employees are also expected to remain at their entire work schedule except when required to leave on authorized company business. (DEF 1211);

c)  Employees may not conduct personal business…during their scheduled working hours.  (DEF 1218.);

d) Medical Leave:  Title 17 §.56004 requires staffing ratios…consequently, [Hall Care Homes] expects full-time live-in staff to continue to reside at their work site while on medical leave. (DEF  1223.) (Exhibit Y, Jasmine Hall Employee Policy, at 23.)

Further, uncontroverted evidence shows that Jasmine Hall's supervisors enforced the firm policy prohibiting care aides from leaving the premises during their shifts without advance permission (Lowery Decl., at ¶ 15) and that Jasmine Hall has reprimanded employees who have left the premises during their scheduled shifts without advance permission, even if other staff remained to care for clients. (Glover Decl. at ¶XX)

Accordingly, it is undisputed that Jasmine Hall care aides do not fall within the category of employees described in 29 CFR § 785.23, and the homeworker regulation, by its own terms, is inapplicable, to them.

### 3.   Defendants additionally failed to provide adequate sleeping quarters for their employees

The Department of Labor has provided specific guidance for the application of the homeworker regulation to the residential care home industry.  The Wage and Hour Division's 1988 Enforcement Policy entitled "*Hours Worked In Residential Care (Group Home) Establishments—Sleep Time And Related Issues*" expressly states that residential care aides living on the premises for five consecutive 24-hour shifts will qualify as residing permanently on the premises for the purposes of 29 CFR § 785.23 as long as they have, *inter alia*, "private quarters," defined as "living quarters that are furnished, are separate from the "clients" **and from any other staff members**" (FLSA-1119, June 30, 1988, emphasis added).

Courts have repeatedly granted deference to the Department of Labor's requirement that private sleeping quarters be provided to a residential care employee before § 785.23 can apply.  *Bouchard v. Regional Governing Bd. of Region V  Mental Retardation Servs.*, 939 F.2d 1323, 1330 (8th Cir. 1991), *cert. denied*, 503 U.S. 1005 (1992); Cf. *Braziel v. Tobosa Developmental Services*, 166 F.3d 1061, 1062 (10th Cir. 1999) (sleeping facilities adequate where residential assistants had own bedrooms, often with own bathrooms); *Blackburn v. The Kansas Elks Training Center for the Handicapped, Inc.*, 40 F.Supp.2d 1270, 1272 (D. Kansas 1999) (sleeping facilities adequate where employees had private quarters in home-like setting).

The Department of Labor recently reaffirmed this guidance in a 2004 Wage Hour Opinion Letter explaining compliance with 29 CFR § 785.23 in the adult residential care industry.  Wage Hour's letter expressly stated that it presumed that the residential care home staff members had their own private bedrooms as part of their home-like environment.  FLSA2004-7, July 27, 2004.  It is a common sense and reasonable requirement that employees have private living quarters before they can be considered to be "residing" at the care home.[5]

 It is undisputed that Defendants' employees do not have private living quarters; rather, care aides are forced to sleep overnight in the care homes' staff rooms with up to three other care aides, including members of the opposite sex and married couples.  (Exhibits G through Q, ¶ 9; Exhibit R at ¶ 9; Exhibit S at 5; Exhibit V at 20))  The staff quarters are additionally used to house food and cleaning supplies, business supplies, files, telephones, desks, and office machines for Jasmine Hall's business operations.  (Exhibit B at pp. 172-77; Creel Decl., ¶¶ 37 to 40.)

At least three of the Jasmine Hall care homes have staff quarters consisting of a single room no larger than 150 square feet and housing 4 staff members, either

---

[5] The Secretary does not take the position that spouses must be provided separate bedrooms if both spouses are employees of the same care home.

in 2 shared double beds or 2 double bunk beds, plus all the staff members' belongings, toiletries and clothes.  (Creel Decl., ¶¶ 37 to 46. )  Thus, none of the Defendants' staff facilities comes anywhere close to qualifying as a home-like environment, nor private quarters.  Indeed, many of Defendants' employees have permanent residences where they would reside at night if permitted.  (Exhibits H through I and K through R at ¶ 8; Exhibit S at 5; Exhibit V at 20).

As demonstrated above, Defendants failed to satisfy regulatory criteria available to allow residential care facilities to reach reasonable agreements that hours worked in a day are less than those spent on site.  Accordingly, all of the hours in the shift are time compensable under the FLSA, and Defendants were required to pay employees for all 24 hours the employees were on duty, far more than the 8 hours the employees were paid for each shift.  Defendants' failure to do so violates the FLSA's requirement that employers pay employees the overtime rate for any hours worked in excess of 40 in one week. 29 U.S.C. § 207(a). Accordingly, summary judgment should be entered in favor of Plaintiff with respect to Defendants' failure to compensate their employees for the unpaid 16-hour portion of each employee shift worked, in violation of 29 U.S.C. § 207(a).

These undisputed facts of the care aides' living conditions demonstrate the patent unfairness should Defendants be permitted to use 29 CFR § 785.23 to avoid paying their employees for the shifts that Defendants require them to remain on the premises, caring for severely impaired and disordered clients, and sleeping overnight in shared quarters—instead of in their own homes—all in order to meet Defendants' 24-hour care and supervision obligations.  Defendants are handsomely compensated when those obligations are met, while attempting to deny their employees even minimum wage for the hours taken out of their lives and away from their families.

**B. Plaintiff Has Met Her Burden of Proof By Presenting Sufficient Representative Testimony To Establish a Pattern and Practice of Violations of the FLSA**

The 14 declarations of current and former Jasmine Hall employees and supervisors, attached hereto as exhibits, show clear violations of the FLSA at each of the eight residential care homes operated by Jasmine Hall within the relevant time period.  These declarations satisfy Plaintiff's burden of proof and are sufficient representative testimony and record evidence to establish a pattern and practice with respect to the entire pool of 54 employees for whom Plaintiff is seeking backwages. [6]

Plaintiff can rely on testimony and evidence of representative employees as prima facie proof of a pattern or practice of FLSA violations. See, *e.g., Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680 (1946); *Donovan v. Bel-Loc Diner, Inc,,* 780 F.2d 1113, 1116 (4th Cir. 1985); *Reich v Southern New England Tel.,* 121 F.3d 58, 67 (2d Cir. 1997); *Martin v. Selker Bros.,* 949 F.2d 1286, 1298 (3d Cir. 1991). The scope of testimony required in order to be representative in an FLSA case depends on the particular facts of the case.  The most common factors used by the courts in determining the adequacy of representative testimony are: (1) the ratio of the number of testifying employees to the number of employees for whom back wages are claimed; (2) the similarity of the work performed; (3) working conditions and relationships; and (4) the detail and credibility of the testimony.

---

[6]  As of April 16, 2007, Plaintiff has calculated that, to the best of her current knowledge, 54 past and present employees of Jasmine Hall are due back wages based on the violations of the FLSA referenced herein. Accordingly, the 14 employee declarations submitted herewith constitute testimony from 25.92% of these employees, and fairly represent working conditions at all 8 Jasmine Hall care homes operated by Defendants.

*Secretary v. DeSisto*, 929 F.2d 789, 793 (1st Cir. 1991).

Generally, the testimony of employees is only considered representative of other employees who perform substantially similar work. *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 590 (9th Cir. 1988) (testimony of 5 garment factory workers deemed representative for 23 who did not testify), *cert. denied,* 480 U.S. 1040 (1989); *McLaughlin v. DialAmerica Marketing*, 716 F. Supp. 812, 825 (D.N.J. 1989) (43 testifying telephone researchers considered representative of 350 who did not testify), *aff d,* 935 F.2d 1281 (3d Cir. 1991), *cert. denied,* 502 U.S. 981 (1991). Although there is no requirement that the Secretary present testimony from each shift of the back pay period to establish the requisite pattern (*Bel-Loc Diner, Inc.*, 780 F.2d at 1116) the evidence here is undisputed that the working conditions of all the care aides were similar, across time and among different care homes.

As noted above, the Secretary is here presenting the testimony of over 25 percent of the employees for whom she is seeking back wages. No fixed ratio between testifying and non-testifying employees exists for determining the percentage of employees that must testify, and, "[c]ourts have frequently granted back wages under the FLSA to non-testifying employees based upon the representative testimony of a small percentage of the employees." *Bel-Loc Diner,* 780 F.2d at 1116. Indeed, ratios much smaller than the 25.92 percent here have been deemed adequate. See, *e.g., Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 690-93 (1946) (testimony of 8 of approximately 300 employees, or 2.7% of

group, sufficient to establishment entitlement to recovery under the FLSA*);*

*Southern New England Telecommunication Corp.,* 121 F.3d at 58, 68 (testimony

of 2.5% employees sufficient).

As indicated consistently by the testimony of the employees, that of

Investigator Creel, and all statements by Defendants, Jasmine Hall employs the

same working, staffing and pay practices at all its 8 care facilities.  This employee

testimony is therefore representative of employees at all eight residential care units

operated by Defendants, throughout the relevant time period.  Accordingly,

Plaintiff has presented more than sufficient representative testimony to establish

the violations herein.

### E.    Defendants Do Not Have A Valid Agreement With Their Employees For Calculating Hours Worked.

Defendants claim to have entered into an "agreement" with their RCA's

providing that the RCA's will work five consecutive 24-hour duty shifts, but will

only be paid for eight hours per day.  (Exhibit E)  Defendants rely upon 29 CFR

§ 785.23 to claim that this arrangement is a reasonable agreement for calculating

the number of hours worked by the RCA's.  Not only are Defendants not entitled

to invoke section 785.23, for the reasons noted previously, but Defendants also

bear the burden of proving that they have a reasonable agreement with their

employees.  *Garofolo v. David B. Helsep Assoc. Inc.,* 405 F.3d 194 (4th Cir. 2005);

*Leever v. City of Carson,* 360 F.3d 1014, 1018 (9th Cir. 2004).

In this case, Defendants' putative agreement on its face and in its application

effectively seeks to rewrite the definition of *hours worked* under the FLSA, and is

invalid as beyond the scope of the intended reach of section 785.23.

The plain language of the agreement, Defendants' "Duty Statement," purports to exclude from working hours any time employees are required to be on the premises if they are "not busy."  (Exhibit E)  This ambiguous and overbroad characterization is not at all analogous to "complete freedom from all duties."  For example, Defendants argue that any time an employee spends reading a book while a client is in the home is not compensable time, even if the employee is the sole on-duty staff member in the home.  (Exhibit B at pp. 195-97).  Even if the RCA's had such free time, such an interpretation overlooks the fact that the very essence of the RCA's job is to provide care and supervision to clients. (Exhibit D at ¶¶ 14-20.)

No agreement between an employer and employee can waive an employee's rights to be compensated for all hours worked under the FLSA.  *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers*, 325 U.S. 161, 167 (1945).  Defendants' "agreement" is an attempt to redefine what constitutes *hours worked* under the FLSA and is facially invalid as an unenforceable waiver of FLSA rights.

Yet a further legal obstacle to Defendants' claimed defense is that even should Defendants prove as a threshold matter that the agreement as written is acceptable, Defendants cannot meet their legal burden of establishing that their putative agreement is reasonable.

The law is clear that, as the parties seeking the benefit of section 785.23, Defendants bear the burden of proving that the employment agreements at issue were reasonable, for example, in terms of the amount of work actually performed by the employees.  *Brock v. City of Cincinnati*, 236 F.3d 793, 805-06 (6th Cir. 2001) (agreement only reasonable if the employer reasonably believed that the agreement's approximation of time fairly estimated the actual FLSA time spent, or that the non-monetary benefits provided reasonably compensated the employees for any deficiency in the time approximation); *Leever*, 360 F.3d at 1018.

The *Leever* court found that, at a minimum, an agreement can only be considered reasonable under section 785.23 if it takes into account some

approximation of the actual number of hours worked.  Id.  Defendants'
"agreement" with their employees amounts to a policy that employees will only be
paid for 8 hours per day during their five consecutive 24-hour duty shifts.  It is
undisputed that the care aides are on duty for the entire 24-hour shift, have client
care and supervision responsibilities for all 24 hours, and cannot leave the care
home for their own purposes during their 24-hour shifts.  Even if we put aside the
legal effect of being on-duty, a representative sample of employees, as well as
former supervisors, have declared that the care aides regularly work an average of
10-14 hours during the daytime alone in direct client care and household tasks.
(Exhibits G through R, at ¶¶ 10-20; Exhibit S at ¶¶ 10-17; Exhibit V at ¶¶ 14-17).).

Defendants' putative agreement is plainly unreasonable as it does not even
attempt to accurately gauge the amount of time worked under the FLSA, much less
fairly approximate such time.  Nor does it provide any mechanism for revising the
hours, for example when Defendants have succeeded in having the Service Level
of a Jasmine Hall care home increased, such that the mandatory direct care hours
required by staff, will increase.

That Defendants' agreement is patently unreasonable is clear from
Defendants' application of it, to insist that the 8 hours compensable work that it
allegedly provides can be spread out throughout the course of the entire workday,
without any advance notice to the employee and, in fact, not determinable in
advance by anyone.  The 8 compensable hours apparently occur in bits and pieces
scattered throughout the course of the 24-hour "workday" or duty shift,
presumably sandwiched between allegedly "personal" and uncompensable pursuits
of the employees such as watching television.  Apart from the contrary on-duty
issues described at greater length above, this putative agreement and its
interpretation by Defendants essentially allows Defendants not only to schedule
work but to define it.  In the absence of any objective criteria, the agreement would
create an untenable system—contrary to the fundamental principles of the Fair
Labor Standards Act—under which employees cannot know when they are deemed

to be working.   Nor would such an assessment be reviewable by a regulatory or protective agency such as the Labor Department.

Significantly, Defendants failed to keep the mandatory records of hours worked daily, required under Section 11 of the FLSA, which would have demonstrated any *bona fide* belief by Defendants that its employees in fact only work 8 hours a day, and also demonstrate the way in which such "work" is reconciled with the care aides' 24-hour "workday".

Section 785.23 requires very specific recordkeeping, including of all calls to duty during the putative sleep period and payment for those calls, and payment for the entire sleep period where employees do not receive five uninterrupted hours of sleep.  However, the evidence is undisputed that Defendants have not engaged in any such recordkeeping of or payment for duty calls and sleep interruptions between at least 2002 and 2005.  (Creel Decl. at ¶14.)

Granting the Secretary's motion and awarding back wages without any deduction for sleep time will not serve to create a windfall to the Jasmine Hall aides resulting from a mere technical or strategic error by Defendants.  The reality is that, at Level 4, clients require substantial nighttime supervision (Nalley Decl. at ¶23), which are reported in fact in numerous employee declarations.   (Employee Decls.)  Jasmine Hall RCA's were generally not getting substantial sleep.

Several reported cases have addressed the compensability of sleep time for care aides in residential homes for the mentally impaired, with varying results according to the degree of client impairment, the need for client supervision or monitoring, and its interruptive effect on the aides' sleep.  In *Hultgren v. County of Lancaster*, 913 F.2d 498, 500 (8th Cir. 1990), the court held that the employer must compensate residential care aides for sleep time where they were awakened regularly by the nocturnal needs of their seriously mentally handicapped patients. The Court noted:

> The aides' job was "to sleep with one eye and one ear open" to
> ensure the safety and well-being of the residents.  Residents at each
> facility displayed a variety of behaviors which resulted in numerous

interruptions during the nighttime hours.  This behavior included
attempts to escape or leave the facility, displaying aggressive and
self-abusive behaviors, taking frequent loud and disruptive trips to
the bathroom and kitchen, urinating in inappropriate places, talking
in their sleep, turning on the stereo, being afraid of thunderstorms,
attacking other residents, throwing tantrums, having itching attacks,
waking up and wandering around, watching the television (which in
at least one facility was in the same room where the relief employee
was supposed to sleep), asking for cigarettes, and having delusions
or coughing attacks.
*Hultgren v. County of Lancaster*, at 500.

Defendants' clients require a similarly high level of care, monitoring and
supervision.

### G.    Defendants' Violation of the FLSA Was Willful

Willfulness can be established if it is shown that an employer knew or

showed reckless disregard for whether its conduct was prohibited by the FLSA.

*McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 135 (1988). Such knowledge

can be established by a history of prior investigations. See, *e.g., Herman v. Palo*

*Group Foster Home, Inc.,* 183 F.3d 468, 474 (6th Cir. 1999) (knowledge

established where an employer had been investigated twice in the past, had paid

unpaid overtime wages, had received explanations of what was required to comply

with the FLSA and had assured the Department of Labor that he would comply in

the future).

In this case, the Labor Department performed a prior investigation of

Jasmine Hall in 1998, and provided Defendant George Hall with copies of the

relevant portions of the FLSA and Labor Department interpretative bulletins

concerning Hours Worked.  (Creel Decl., at ¶ 59.)  Further, early in the Labor

Department's 2004 investigation, Wage Hour Investigator Sheila Creel told Defendants that their failure to compensate their care aides for all 24 hours of their duty period violated the FLSA. Not only did Defendants choose, at that time, not to bring their pay practices into compliance with the FLSA nor their staffing policies within the criteria for reliance upon the Homeworker regulation at 29 CFR § 785.23, they have consistently refused to do either of these things in the intervening years. Yet Defendants continue to insist that their care aides remain "on duty" for all 24 hours of their shift within the meaning of Title 17, so as to fulfill Defendants' regulatory requirement to provide on-duty staff hours at all of the Jasmine Hall facilities.

The record demonstrates that Defendants continue to violate the FLSA in spite of warnings from the Department of Labor, and prior explanations of the relevant law and regulations. Accordingly, these violations should be deemed willful.

## III.   SUMMARY and CONCLUSION

Defendants have never disputed that their operation is subject to the Fair Labor Standards Act, nor that the care aides on whose behalf the Secretary brought suit are covered by the protections of the Act.

Neither have Defendants ever disputed that their employees are assigned to 24-hour shifts for five consecutive days each week, during which they are required

to sleep in shared bedrooms, and remain responsible for client care and supervision throughout their 24-hour "workday".

Defendants do not dispute that they have paid these employees for only eight hours out of every 24-hour shift.   The only dispute is whether Defendants can bring themselves within the purview of 29 CFR § 785.23 to justify what would otherwise constitute a blatant violation of the FLSA's minimum wage and overtime protections.  Yet each of the separate and discrete facts which independently disentitle Defendants to invoke 29 CFR § 785.23—that the Jasmine Hall care aides are neither relieved of all duties nor free to leave their assigned care homes, and are not provided with a "home-like" environment but rather must share sleeping quarters with up to four employees—are equally undisputed.

Accordingly, the Secretary prays that Partial Summary Judgment against all Defendants be awarded in the following terms:

An order that Defendants violated the minimum wage, recordkeeping and overtime provisions of the Fair Labor Standards Act and in particular, that:

1.     Defendants' care aide employees, during their regular duty shift of 24 hours per day, five consecutive days per week, on the premises of Defendants' care homes, are "on-duty" within the meaning of the Fair Labor Standards Act.

2.     Defendants' care aides are working within the meaning of "hours worked" under the Fair Labor Standards Act throughout their 24-

hour on-duty shifts at Defendants' care homes;

     3.    Defendants failed to keep time records as required by Section 11 of the Fair Labor Standards Act including of any regular, predictable and significant period of hours during the 24-hour duty shift when employees were allegedly relieved of all client care and supervision duties and free to leave the premises for their own personal purposes daily, if such situations occurred;

     4.    Section 6 of the FLSA requires Defendants to compensate their care aides for the full 24 hours in each of the care aides' regular 24-hour duty shift;

     5.    Defendants have failed to prove any entitlement to invoke 29 CFR § 785.23 as a grounds for paying their employees for any less than the full length of the 24-hour duty shift, as Defendants have not satisfied the requisite criteria for the applicability of 29 CFR § 785.23 set forth in the body of the regulation, namely that employees must be relieved of responsibilities and entirely free to leave the premises for their own personal purposes during unpaid, non-sleep time;

     6.    Defendants have failed to prove any entitlement to invoke 29 CFR § 785.23 as a basis to avoid paying their employees for less than the full length of their 24-hour duty shifts, as Defendants have not met the requisite criteria for the application of 29 CFR § 785.23 to the residential

care facility industry, as set forth by the Department of Labor in its

Interpretive Bulletins, including the requirement that employees be provided

with adequate sleeping quarters;

      7.    Defendants' putative employer agreement does not provide a

defense to the Secretary's action because:

      a)  It purports to redefine hours worked to exclude on-duty

hours, which is beyond the lawful scope permitted by 29 CFR

§ 785.23;

      b) It is unreasonable as a matter of law for purporting to

exclude from compensation, out of each 24-hour duty shift worked, 16

hours which are otherwise compensable under the FLSA as on-duty

hours worked;

 c) It is unreasonable as a matter of law because the "time studies" on which

Defendants claim it was allegedly based were entirely subjective,

undocumented and performed at a lower level of service facility; and it lacks

any mechanism for adjusting the hours as staffing requirements increase.

      7.    Defendants owe minimum wage and overtime back wages to

their care aide employees resulting from Defendants' failure to include 16

out of 24 hours worked as compensable hours worked in each regularly

scheduled duty shift, 5 days per week since 2002, in the amount of

$3,270,201.35.

8.      Defendants' unlawful failure to compensate its care aides for 16 out of every 24 on-duty hours worked since 2002 by purporting to rely on a Labor Department regulation in the face of the Labor Department's repeated advice that such reliance was unjustified and warranted, is a Willful violation of Sections 6 and 7 of the Fair Labor Standards Act.

9.      Defendants are additionally obligated to compensate Plaintiff for liquidated damages in the further amount of $3,270,201.35 pursuant to Section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b).

For all of these reasons, the Secretary's Motion for Partial Summary Judgment should be granted forthwith, so that the protection of the Fair Labor Standards Act can be properly provided to the long-suffering employees at the Jasmine Hall care homes

Dated: April 16, 2007

JONATHAN L. SNARE
Acting Solicitor of Labor

LAWRENCE BREWSTER
Regional Solicitor

DAVID KAHN
Counsel for ESA Programs

By: \s\ *Jan M. Coplick*
JAN M. COPLICK
Senior Trial Attorney

ANDREW SCHULTZ
Trial Attorney

<u>ATTORNEYS FOR THE PLAINTIFF</u>
—