

1  BALDWIN J. LEE (BAR NO. 187413)
   JENNIE L. LEE (BAR NO. 191350)
2  ALLEN MATKINS LECK GAMBLE
     MALLORY & NATSIS LLP
3  Three Embarcadero Center, 12th Floor
   San Francisco, CA  94111-4074
4  Phone:  (415) 837-1515
   Fax:  (415) 837-1516
5  E-Mail:  blee@allenmatkins.com
            jlee@allenmatkins.com
6
   Attorneys for Defendants
7  JASMINE HALL CARE HOMES, INC., HALL
   CARE HOMES, INC., GEORGE K. HALL, AND
8  ESTELLA HALL

9               UNITED STATES DISTRICT COURT

10            EASTERN DISTRICT OF CALIFORNIA

11

12  ELAINE CHAO, SECRETARY OF          Case No. 2:05-CV-1306-GEB-KJM
    LABOR, UNITED STATES
13  DEPARTMENT OF LABOR,               **DEFENDANTS JASMINE HALL CARE
                                       HOMES, INC., HALL CARE HOMES,
14              Plaintiffs,            INC., GEORGE K. HALL, AND
                                       ESTELLA HALL'S RESPONSE TO
15        vs.                          PLAINTIFF ELAINE CHAO,
                                       SECRETARY OF LABOR, UNITED
16  JASMINE HALL CARE HOMES, INC., a   STATES DEPARTMENT OF LABOR'S
    corporation, HALL CARE HOMES, INC., a   FIRST SET OF REQUESTS FOR
17  corporation, GEORGE K. HALL, an    ADMISSION**
    individual, and ESTELA HALL, an
18  individual,

19              Defendants.

20

21

22  PROPOUNDING PARTY:        Plaintiff ELAINE CHAO, SECRETARY OF LABOR,
                              UNITED STATES DEPARTMENT OF LABOR
23

24  RESPONDING PARTY:         Defendants JASMINE HALL CARE HOMES, INC.,
                              HALL CARE HOMES, INC., GEORGE K. HALL,
25                            AND ESTELLA HALL

26  SET NO.:                  ONE

27                            Exhibit   A
                              Page   1
28

## PRELIMINARY STATEMENT

Defendants, JASMINE HALL CARE HOMES, INC., HALL CARE HOMES, INC., GEORGE K. HALL, AND ESTELLA HALL ("Defendants") hereby respond to the Request for Admissions of Plaintiff ELAINE CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR ("Plaintiff") as follows:

This Response is made solely for purposes of this action. Each response and/or production is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statements contained herein, if such statements were made by a witness present and testifying at court, all of which objections and grounds are reserved and may be interposed at the time of trial.

The following Response is based upon information presently available to Defendants. The fact that a Defendant has responded or objected to any request or part thereof should not be taken as an admission that such response or objection constitutes admissible evidence. The fact that a Defendant has answered part or all of any request is not intended and shall not be construed to be a waiver by a Defendant of all or any part of any objections to any request.

To the extent that the request calls for information which was prepared in anticipation of litigation for trial or for information or material covered by the work product doctrine, or which constitutes information which is privileged or related to confidential trade secrets or the privilege of privacy (including the freedom of association and financial privacy), Defendants object to responding to such request.

All of the responses made herein are made subject to the objections stated above and any further objection specifically stated.

Exhibit   A
Page   2

56

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

680872.02/SF

-2-

1  ## RESPONSE TO REQUESTS FOR ADMISSION

2  **REQUEST FOR ADMISSION NO. 1:**

3  During the relevant time period, Jasmine Hall has been primarily engaged in the

4  care of persons with physical or mental infirmities or sickness or developmentally disabled

5  persons.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

7  Defendants object to this request for admission on the grounds that it is compound.

8  Subject to the foregoing objection, Defendants respond as follows: Admitted that Jasmine

9  Hall Care Homes, Inc. ("Jasmine Hall") is primarily engaged in the business of operating

10  residential adult facilities, including for a range of developmentally disabled adults.

11  Denied as to the remainder.

12  **REQUEST FOR ADMISSION NO. 2:**

13  During the relevant time period, Jasmine Hall has provided residential care for the

14  persons described in Request Number 1.

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

16  Defendants object to this request for admission on the grounds that it is compound.

17  Subject to the foregoing objection, Defendants respond as follows: Admitted that Jasmine

18  Hall is primarily engaged in the business of operating residential adult facilities, including

19  for a range of developmentally disabled adults. Denied as to the remainder.

20  **REQUEST FOR ADMISSION NO. 3:**

21  During the relevant time period, Jasmine Hall has provided the residential care

22  described in Request No. 2 in the following homes: Jasmine Hall #1, Jasmine Hall #2,

23  Jasmine Hall #3, Jasmine Hall #4, Jasmine Hall #5, Jasmine Hall #6, Jasmine Hall #7 and

24  Jasmine Hall #8.

25  **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

26  Defendants object to this request for admission on the grounds that it is compound.

27  Subject to the foregoing objection, Defendants respond as follows: Admitted that Jasmine

28  Hall is primarily engaged in the business of operating residential adult facilities, including

LAW OFFICES
n Matkins Leck Gamble
Aallory & Natsis LLP

680872.02/SF

Exhibit   A
Page   3

57

1  for a range of developmentally disabled adults at the homes listed in Request No. 3 at

2  various times.  Denied as to the remainder.

3  **REQUEST FOR ADMISSION NO. 4**:

4         During the relevant time period, the homes listed in Request No. 3 above were

5  licensed by the State of California, Department of Social Services.

6  **RESPONSE TO REQUEST FOR ADMISSION NO. 4**:

7         Defendants object to this request for admission on the grounds it is compound.

8  Defendants object that this request for admission is vague and not complete in itself with

9  respect to its reference to another request for admission.  Defendants also incorporate by

10  reference their objections to the prior request Plaintiff references in this request. Subject to

11  the foregoing objections, Defendants respond as follows:  Admitted.

12  **REQUEST FOR ADMISSION NO. 5**:

13         During the relevant time period, the homes listed in Request No. 3 were licensed as

14  Community Care Facilities ("CCF's") by the Community Care Licensing Division of the

15  State of California Department of Social Services.

16  **RESPONSE TO REQUEST FOR ADMISSION NO. 5**:

17         Defendants object to this request for admission on the grounds it is compound.

18  Defendants object that this request for admission is vague and not complete in itself with

19  respect to its reference to another request for admission.  Defendants also incorporate by

20  reference their objections to the prior request Plaintiff references in this request. Subject to

21  the foregoing objections, Defendants respond as follows:  Denied.

22  **REQUEST FOR ADMISSION NO. 6**:

23         During the relevant time period, George Hall was registered with the Alta

24  California Regional Center as the Vendor for the subject homes.

25  **RESPONSE TO REQUEST FOR ADMISSION NO. 6**:

26         Defendants object to this request for admission on the grounds it is compound.

27  Subject to the foregoing objections, Defendants respond as follows:  Admitted as to

28  Jasmine Hall 1 and Jasmine Hall 2.  Denied as to the remainder.

LAW OFFICES
en Matkins Leck Gamble
Mallory & Natsis LLP

680872.02/SF

Exhibit   A
Page   4

58

-4-

1 | **RESPONSE TO REQUEST FOR ADMISSION NO. 257:**

2 |     Defendants lack personal knowledge to authenticate the document in the manner

3 | requested by this request for admission.

4 |

5 | Dated:  July 28, 2006

6 |                                                 ALLEN MATKINS LECK GAMBLE
                                                   MALLORY & NATSIS LLP
7 |                                                 BALDWIN J. LEE
                                                   JENNIE L. LEE

8 |                                                 By: _____

9 |                                                 BALDWIN J. LEE
                                                   Attorneys for Defendants
10 |                                                JASMINE HALL CARE HOMES, INC.,
                                                   HALL CARE HOMES, INC., GEORGE
11 |                                                K. HALL, AND ESTELLA HALL

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

680872.02/SF

Exhibit   A
Page  5

59

-68-

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ELAINE CHAO, SECRETARY OF
LABOR, UNITED STATES
DEPARTMENT OF LABOR,

**COPY**

        Plaintiff,

                    Case No.
  -vs-                  2:05-CV-1306 GEB-KJM

JASMINE HALL CARE HOMES,
INC., a corporation, HALL
CARE HOMES, INC., a
corporation, GEORGE K. HALL,
an individual, and ESTELA
HALL, an individual,

        Defendant.
_____/

--oOo--
March 14, 2007
--oOo--
DEPOSITION OF
GEORGE K. HALL
--oOo--

Ref No. 1-3596
Reported by:  WENDY E. ARLEN, CSR No. 4355, RMR, CRR

## CAROL NYGARD
### & ASSOCIATES

### DEPOSITION REPORTERS

**916-928-8999 · 877-Get-Rptr**
**Fax 916-928-9989**

4180 Truxel Road · Suite 100 · Sacramento, CA 95834
www.sacramentocourtreporter.com

Exhibit B
Page 1

George K. Hall

```
 1    APPEARANCES

 2

 3    For Plaintiffs:

 4         U.S. DEPARTMENT OF LABOR OFFICE OF THE SOLICITOR

 5         JAN M. COPLICK, Senior Trial Attorney

 6         ANDREW J. SCHULTZ, Trial Attorney

 7         71 Stevenson Street, Suite 1110

 8         San Francisco, California  94105

 9         415.975.4484

10         coplick.jan@dol.gov

11

12    For Defendants:

13         ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

14         BALDWIN J. LEE, Attorney at Law

15         Three Embarcadero Center, 12th Floor

16         San Francisco, California  94111-4074

17         415.837.1515

18         blee@allenmatkins.com

19

20

21    ALSO PRESENT:

22         Estela Hall

23         Sheila Creel, Senior Investigator

24

25                         --oOo--
```

Exhibit  B
Page 2

2

Carol Nygard & Associates
916-928-8999

George K. Hall

1                  INDEX OF EXAMINATIONS

2

3    EXAMINATION BY:                           Page

4       MS. COPLICK                        6

5

6                    --oOo--

7

8                    INDEX OF EXHIBITS

9

10   EXHIBIT NO.     DESCRIPTION               PAGE

11    Exhibit A   Direct Care Staff Schedule     73

12    Exhibit B   July 2004 Jasmine Hall II Hall Care   126

13                Homes, Inc, Work Schedule

14    Exhibit C   Direct Care Staff Schedule    140

15    Exhibit D   Staff Service Hours Jasmine Hall III  155

16    Exhibit E   Department of Developmental Services  200

17                Community Care Facility Rates

18                Effective July 1, 2006

19    Exhibit F   Jasmine Hall VIII schedule of   245

20                activities

21

22

23

24

25

Exhibit  B
Page  3

62

```
 1              INDEX OF CERTIFIED QUESTIONS

 2

 3     Page   Line

 4     113   21   Q.  Is there some reason you are unwilling to

 5     try and assist us in this, Mr. Hall by marking on

 6     Exhibit A the type of shift you are talking about in

 7     your response to the Interrogatory No. 1?

 8     196   15   Q.  Would you consider that that staff member

 9     is on duty?

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit  B
Page  4

4

1                  UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF CALIFORNIA

3  ELAINE CHAO, SECRETARY OF
     LABOR, UNITED STATES
4  DEPARTMENT OF LABOR,

5           Plaintiff,
                        Case No.
6    -vs-                  2:05-CV-1306 GEB-KJM

7  JASMINE HALL CARE HOMES,
     INC., a corporation, HALL
8  CARE HOMES, INC., a
     corporation, GEORGE K. HALL,
9  an individual, and ESTELA
     HALL, an individual,
10
           Defendant.
11                  /

12
                  --oOo--
13

14       BE IT REMEMBERED that on Wednesday, March 14,

15  2007, commencing at the hour of 10:00 a.m., at the

16  offices of CAROL NYGARD & ASSOCIATES, 4180 Truxel Road,

17  Suite 100, Sacramento, California, before me, WENDY E.

18  ARLEN, a Certified Shorthand Reporter, of the State of

19  California, there personally appeared

20               GEORGE K. HALL,

21  called as a witness by the plaintiff, who, being first

22  by me duly sworn was thereupon examined and interrogated

23  as hereinafter set forth:

24                --oOo--

25

Exhibit  B
Page  5

64

5

1              EXAMINATION BY MS. COPLICK

2    Q.        Mr. Hall, could you please identify yourself

3    for the record?

4    A.        George Hall.

5    Q.        Okay.  And you've been sworn to tell the truth

6    here today.

7    A.        I have.

8    Q.        Mr. Hall, have you ever been deposed before?

9    A.        Yes.

10   Q.        Okay.  Can you tell me the circumstances under

11   which you were deposed previously?

12   A.        Once with regard to an issue with residential

13   care facilities.  I appealed an action with the Regional

14   Center, submitted issues and was deposed.

15   Q.        Did that involve an issue of payment,

16   reimbursement?

17   A.        No.

18   Q.        Can you tell me a little bit what it did

19   involve?

20             MR. LEE:  Objection, vague, not reasonably

21   calculated to lead to the discovery of admissible

22   evidence.

23             MS. COPLICK:  I'm not sure that that's the

24   case.  This case involves care -- the running of care

25   homes.  I don't know yet what the matter is that

Exhibit  B
Page 6

65

6

1    Mr. Hall was involved with.

2              MR. LEE:  Objection stands.

3              THE WITNESS:  Could you repeat the question?

4    Q.       MS. COPLICK:  What did the issue involve that

5    you were involved in the previous deposition?

6    A.       It simply involved whether or not we were

7    limited to two care facilities.

8    Q.       And who deposed you on that occasion?

9    A.       I don't recall.

10   Q.       Were you ever deposed on another occasion?

11   A.       I don't recall.

12   Q.       Is it possible that you were?

13   A.       It's possible.

14   Q.       Is there anything you could refer to that would

15   help you recall that?

16   A.       No.

17   Q.       Well, I'd like to give you just a few brief

18   instructions before we go any further, Mr. Hall, and you

19   may have discussed this with your counsel as well, but

20   I'd like to just go over the basic ground rules.

21             It should be very straightforward here today.

22   I will ask you questions under oath and ask you to give

23   verbal answers in reply unless your counsel objects and

24   instructs you not to answer the question.

25             And it's important that neither of us interrupt

Exhibit  B
Page  7

7

Carol Nygard & Associates
916-928-8999

1   each other or both speak at the same time because the

2   court reporter will be taking down what everyone in the

3   room says, can't take down more than one person talking

4   at a time.

5          That also means that it's important for you to

6   give verbal answers rather than nodding or shaking your

7   head.

8          Do you understand?

9   A.       I understand.

10  Q.       You will have an opportunity to review the

11  transcript when the transcript is created by the

12  reporter, and you will have the opportunity to make any

13  corrections, but I can have the opportunity to comment

14  on those corrections.

15         Do you understand?

16  A.       Yes.

17  Q.       I am going to try to make my questions to you

18  clear, but if I don't or if there is any part of my

19  question, I'm going to ask you to please ask me for

20  clarification to make sure that you understand all

21  aspects of every question that I ask you.  But if you do

22  go ahead and answer my question, I will assume that you

23  understood it.

24         Do you understand?

25  A.       Yes.

Exhibit  B
Page  8

Carol Nygard & Associates
916-928-8999

1    Q.       Is there any reason not to go forward with this

2    deposition today?  For example, because you don't feel

3    well or you're on any medication?

4            MR. LEE:  You're asking about his ability?

5            MS. COPLICK:  Yes.

6            MR. LEE:  Okay.

7            THE WITNESS:  No.

8    Q.       MS. COPLICK:  Mr. Hall, I'd like to ask you

9    what your current position is with the defendant

10   Jasmine Hall Care Homes, Inc.

11   A.       I am the president, CEO.

12   Q.       Does anyone else hold any offices in that

13   corporation?

14   A.       No.

15   Q.       Are there any directors of that corporation?

16   A.       No.

17   Q.       Are there any assets held by that corporation?

18   A.       What do you mean by assets?

19   Q.       Does that corporation own any real property or

20   money or debts?

21           MR. LEE:  Objection.

22   Q.       MS. COPLICK:  Sorry.  Credits?

23           THE WITNESS:  I didn't hear your objection.

24           MR. LEE:  Objection, compound.

25           THE WITNESS:  If what you mean is does it own

Exhibit  B
  Page  9

68

Carol Nygard & Associates
916-928-8999

1    any property, real property, no.

2    Q.    MS. COPLICK:  Does it own any other kind of

3    asset?

4    A.    I don't believe so.

5    Q.    And who operates the care homes?  There are

6    currently eight Jasmine Hall Care Homes; is that

7    correct?

8    A.    Correct.

9    Q.    Who operates those?

10    MR. LEE:  Objection to the extent it seeks a

11   legal conclusion.  Objection, vague.

12   Q.    MS. COPLICK:  Can you answer the question,

13   please, the best you can?

14   A.    I don't understand the question.

15   Q.    We'll come back to that.

16    Mr. Hall, you've been involved in the care home

17   business for some period of time and I'll ask you about

18   that shortly.  I'd like to go back to your position that

19   you held or the work that you did before you got

20   involved with Jasmine Hall.

21    Can you tell me the first involvement you had

22   with Jasmine Hall Care Homes?

23   A.    I don't understand your question.

24   Q.    When did you first have any involvement with

25   operating or running any Jasmine Hall care home?

Exhibit  B
Page  10

10

Carol Nygard & Associates
916-928-8999

George K. Hall

1      MR. LEE:  If you would like for her to

2  rephrase, request her to do so.

3      THE WITNESS:  Rephrase, please.

4  Q.      MS. COPLICK:  How many homes did you have at

5  that time?

6  A.      At which time?

7  Q.      At the time that you learned that the Regional

8  Center would be approving Level 4 facilities?

9  A.      How many homes?  Let's see.  I believe -- I

10  believe four or five.

11  Q.      And how many of those did you apply to be

12  vendored at Level 4 at that time?

13  A.      One.

14  Q.      Which one was that?

15  A.      I believe it was Jasmine Hall VI.

16  Q.      Did you later apply for the others to be

17  vendored at Level 4?

18  A.      Yes.

19  Q.      And which homes are now vendored at Level 4?

20  A.      Which homes?  Jasmine Hall I, Jasmine Hall III,

21  Jasmine Hall IV, Jasmine Hall V, and VII and VIII.

22  Q.      Is it fair to say then, Mr. Hall, that all of

23  the homes except Jasmine Hall II are now vendored at

24  Level 4?

25  A.      Yes.

Exhibit  B
Page  11

46

70

1    record any time they are disrupted in their sleep time."

2    Do you see that sentence?

3         MR. LEE:  So you're presenting to Dr. Hall

4    what's a letter from Allen Matkins Leck Gamble Mallory &

5    Natsis dated February 26, 2007, page 2 where you

6    bracketed the statement and then there is a notation

7    with a star.

8         MS. COPLICK:  Yeah.

9         THE WITNESS:  So, yes.

10   Q.    MS. COPLICK:  My question to you, Mr. Hall, is

11   how are employees told that they are to record the time

12   they are disrupted during their sleep?

13   A.    By identifying the activity that they are

14   engaged in, the time it starts and the time it stops.

15   Q.    And is that contained anywhere in the personnel

16   manual or in any memorandum?

17   A.    I don't recall specifically.

18   Q.    Dr. Hall, do you recall a situation where an

19   employee, after you posted a schedule similar to Exhibit

20   B, left the care home after the time that her shift

21   indicated she was finished?

22         MR. LEE:  Objection, compound, assumes facts

23   not in evidence.

24   Q.    MS. COPLICK:  Can you ever recall if something

25   like that happened?

         Exhibit  B
         Page  12

Carol Nygard & Associates
916-928-8999

George R. Hall

1   A.        I recall discussions about it.

2   Q.        Okay.  What do you recall of those discussions?

3   A.        I recall her claim that she'd perceived this

4   schedule to be her specific times to work.

5   Q.        And do you recall that based on that claim she

6   went home or otherwise left the care site?

7   A.        That's what I understand.

8   Q.        And what was your reaction to that?

9   A.        I had no particular reaction.  I didn't address

10  it, and based upon --

11            MR. LEE:  She asked if you had any reaction.

12  Is that what you're answering?

13            THE WITNESS:  Yeah.

14  Q.        MS. COPLICK:  Who did address it?

15  A.        I understand Stella did.

16  Q.        Did you ask Estela to address it?

17  A.        No.

18  Q.        Did you discuss it with Estela before she

19  addressed it?

20  A.        I don't recall.  I discussed with it her.  I

21  don't recall whether it was before or after.

22  Q.        Did you agree with the way Estela addressed it?

23  A.        Yes.

24  Q.        And how did Estela address it?

25  A.        She told the staff member that this was a

Exhibit  B
Page  13

Carol Nygard & Associates
916-928-8999

George K. Hall

1    model, which is stated on the document.

2    Q.       And you were holding up Exhibit B.

3    A.       Right.

4    Q.       Now, what do you mean by model, Mr. Hall?

5    A.       I mean that this is one possible scenario of

6    the account of staff time.

7    Q.       So this is -- Exhibit B reflects one possible

8    scenario of the staff time; is that correct?

9    A.       Yes.

10   Q.       And, in fact, Exhibit B would reflect one

11   possible scenario of staff time that would be in

12   accordance with eight hours a day of work; is that

13   correct?

14   A.       If they worked eight hours, but our studies

15   show they don't.

16   Q.       But, in fact, you had no expectation that the

17   staff would follow Exhibit B, did you, as a schedule?

18   A.       Could you clarify?

19   Q.       The staff could not -- you didn't expect that

20   the staff would rely on Exhibit B to know when they were

21   free to leave and when they had to stay at the care

22   home.

23   A.       I don't think that this says that.

24   Q.       I'm sorry. I didn't understand how your answer

25   was responsive to my question. I'm asking if you -- you

Exhibit  B
Page  14

187

73

George K. Hall

1   did not expect the staff to look at the grid that's on

2   Exhibit B and use that to guide their expectations of

3   when they had to be on duty or not on duty at the care

4   home; is that correct?

5   A.      Well, we still haven't gotten past this

6   discussion of what you mean by on duty.  This grid shows

7   when they're on duty here.  Okay?

8   Q.      And you're now pointing to the smaller grid in

9   the upper left-hand side of Exhibit B.  Then perhaps

10  that's a good place to start with your discussion of

11  what does on duty mean.  If the grid in the upper left

12  shows on duty, is that a fair statement to you of what

13  it means to be on duty?

14  A.      I've answered that question.

15  Q.      Mr. Hall, I'm really attempting to understand

16  what you just meant by picking up Exhibit B and waving

17  it at us.  So I'm just going to ask you if you would

18  please answer my question.  Does the grid that's

19  shown -- the small grid in the upper left-hand corner of

20  Exhibit B, does that describe what you understand to

21  mean as being on duty at your care home?

22          MR. LEE:  Objection to the extent it seeks a

23  legal conclusion.

24  Q.      MS. COPLICK:  What you understand --

25  A.      I've indicated that we have live-in staff.

Exhibit  B
Page  15

1    They reside at the facility five days on and two days

2    off.   All of the time that they are at the facility

3    doesn't necessarily mean that they work.

4    Q.      No, but does all of the time that they are at

5    the facility mean they are on duty?

6            MR. LEE:  Objection, seeks a legal conclusion.

7            THE WITNESS:  I don't know what you mean.  I

8    don't know what you mean by on duty.  I've said it

9    repeatedly.  You haven't given me any further

10   clarification.  I've told you what we do.

11   Q.      MS. COPLICK:  Let me -- I will give you a very

12   simple -- it won't be short, but it will be quite a

13   simple definition of what I mean to be on duty.  Okay?

14   And I'm going to ask you, because it won't be simple,

15   Mr. Hall, I'm going to ask you to really focus.

16           If you'd like me to take a moment, I will, but

17   this is what I mean by being on duty is not being

18   completely relieved of all responsibilities and not

19   being completely free to leave the premises for their

20   own purposes.

21   A.      Is that a provision that you're citing?

22   Q.      I'm starting with that as my definition of

23   being on duty.  For the sake of argument, let's start

24   with that as the definition for being on duty.

25           The people that are living on the premises

Exhibit  B
Page  16

1    during their five days on, using that as the definition
2    for on duty.
3         MR. LEE:  Objection, misstates the law.
4    Objection to the extent it calls for a legal conclusion.
5    Objection, compound.
6    Q.    MS. COPLICK:  Please proceed, Mr. Hall.
7    A.    I object to the question, and I object not
8    necessarily for Baldwin's questions.  I've tried to
9    articulate to you throughout the day that we set our
10   system up based upon 785.23 and we've developed our duty
11   statements modeled around it and our schedules to
12   reflect it.
13   Q.    I appreciate your objection, Mr. Hall, the best
14   I understand it.  All I can say is we wrote 785.23, and
15   I don't think we would be engaged in this lawsuit if we
16   agreed with your interpretation of it.  So here we are.
17   A.    Okay.
18   Q.    So that's why we're attempting and going
19   through this very long exercise to try and understand
20   what you mean and the difference between duty and work.
21        So please let's look for a moment at Exhibit B
22   and the small grid at the top.  Now, is it fair to say
23   that that small grid at the top accurately describes the
24   day on and day off patterns of the employees?
25   A.    That's accurate.

Exhibit  B
Page  17

76

Carol Nygard & Associates
916-928-8999

George K. Hall

1   Q.        Now, looking at that small grid in Exhibit B,
2   can you identify for me any predictable or regularly
3   occurring period of time during those on duty days when
4   those staff members would be completely free to leave
5   the premises for their own purposes and be relieved of
6   all responsibilities other than during sleep time?
7   A.        As I said, 785.23 says it's difficult to
8   determine the time or schedules that people work who
9   reside on a facility.
10  Q.        Well, thank you for telling me what 785.23
11  says, Mr. Hall.  Again, that's not the question that I
12  asked you to answer.
13            I am asking you very specifically to identify
14  out of the grid that you yourself have drafted up at the
15  top of Exhibit B of the day on and days off schedule of
16  your employees any predictable or regularly occurring
17  periods of time when those employees would be completely
18  relieved of all duties and free to leave the premises
19  for their own purposes other than during sleep time.
20            MR. LEE:  Objection, compound.  Objection,
21  incomplete hypothetical.  Objection, misstates the law.
22            THE WITNESS:  As I've indicated, it's difficult
23  to determine.  It's not predictable.
24  Q.        MS. COPLICK:  Not predictable.
25  A.        Unless you want to use these, it varies, but I

Exhibit  B
Page  18

77

Carol Nygard & Associates
916-928-8999

1   think the duty statements show that they don't work.

2   Q.      That wasn't at all my question, Mr. Hall, not

3   not slightest.

4   A.      I'm trying to help you as best I can.

5   Q.      Mr. Hall, if you listen quite closely, you'll

6   notice I didn't use the word work.  So I'm happy to

7   repeat my question for you again, and let's all listen

8   very closely.

9           Madam Reporter, will you --

10          MR. LEE:  Objection, argumentative.

11          MS. COPLICK:  Not at all argumentative,

12  Counsel.  I'm attempting to get a very -- Mr. Hall

13  believes he is entitled to use section 785.23, which has

14  very clear criteria for its use, and these are two of

15  them and he has not demonstrated any understanding of

16  them or any factual indicia for its application.  We're

17  allowed to ask this until we get some meaningful

18  response.

19          Could you please read back my last question to

20  Mr. Hall?

21          MR. LEE:  Notwithstanding plaintiff's counsel's

22  decision to make that statement on the record, in the

23  interest of conserving time, I'll simply state that we

24  disagree, but the purpose of today is for Dr. Hall to be

25  here and his deposition.  So I'm not going to take up

Exhibit  B
Page  19

192

78

Carol Nygard & Associates
916-928-8999

George K. Hall

1   time to respond in more detail than to say that we

2   disagree with the plaintiff's statement that she decided

3   just to put on the record.

4          (Record read:  Q.  Well, thank you for telling

5   me what 785.23 says, Mr. Hall.  Again, that's not the

6   question that I asked you to answer.

7          I am asking you very specifically to identify

8   out of the grid that you yourself have drafted up at the

9   top of Exhibit B of the day on and days off schedule of

10  your employees any predictable or regularly occurring

11  periods of time when those employees would be completely

12  relieved of all duties and free to leave the premises

13  for their own purposes other than during sleep time.)

14          MR. LEE:  Asked and answered, incomplete

15  hypothetical.

16          THE WITNESS:  It varies.

17  Q.      MS. COPLICK:  What does it vary according to?

18  A.          It varies what's going on in the day, what

19  their assignments are, who happens to be there.

20  Q.          Let's assume for the sake of argument that all

21  the clients at the home are present in the home.  We

22  just talked about earlier, whether the clients are there

23  or not, and I understand that that is a variable or can

24  be a variable.  So let's say for the sake of argument

25  that all the clients are present in the home.

Exhibit B
Page 20

79

Carol Nygard & Associates
916-928-8999

1          What other factors can affect that?

2     A.        It's hypothetical.

3     Q.        Yes.

4     A.        It's getting hypothetical.  And the only time

5     that that occurs, quite frankly, is in the application

6     process.  Our process is a living, breathing process.

7     It varies.

8     Q.        Mr. Hall, I'm just wondering, are you aware of

9     any other care facility that pays its employees for

10    eight hours out of every 24?

11    A.        I'm not responsible for any other care

12    facilities but my own.

13    Q.        That's right.  I understand that.  But I'm

14    asking if you're aware --

15    A.        I've answered your question.

16    Q.        No, you haven't, sir.

17         MR. LEE:  You guys -- you can continue to argue

18    with him if you want.

19         MS. COPLICK:  Well, Counsel, I believe that

20    that's not an appropriate objection.

21    Q.        Mr. Hall --

22         MR. LEE:  I'm just saying what's occurring.

23         MS. COPLICK:  You could direct your client,

24    Counsel, to answer the questions that are posed unless

25    they are subject to proper objection.

Exhibit  B
Page  21

George K. Hall

1      MR. LEE:  Well, you're welcome to spend your

2  time asking whatever questions you want, and I'd also

3  interpose the objection not reasonably calculated to

4  lead to the discovery of admissible evidence.

5      MS. COPLICK:  But you didn't and he's

6  neglecting to -- he's arguing with counsel.

7      MR. LEE:  If there is a question that you wish

8  to pose, please go ahead and pose your question.

9  Q.      MS. COPLICK:  Mr. Hall, if an employee was

10 reading -- let's say an employee who was shown at the

11 top of Exhibit B to be on one of their days on and they

12 were reading a book at 1:00 p.m., 1:00 in the afternoon,

13 they were the only person in the home and a client, the

14 only client, was upstairs in the house.  Do you consider

15 that employee to be working?

16     MR. LEE:  Objection, incomplete hypothetical.

17     THE WITNESS:  Do I?

18 Q.      MS. COPLICK:  Yes.

19 A.      I don't.

20 Q.      And why do you not?

21 A.      Because staff are entitled to engage in their

22 own personal time.  It's noted in the duty statement.

23 Q.      Now, what if that same staff member who's

24 reading the book is the only qualified person at the

25 care home able to provide for the supervision of the

Exhibit  B
Page  22

81

1   client?

2           MR. LEE:  Objection, incomplete hypothetical.

3   Q.      MS. COPLICK:  Does that change your answer at

4   all?

5   A.      No.

6   Q.      So, in other words, you don't believe that the

7   obligation to provide any supervision for clients by

8   itself creates any obligation to pay the employees?

9           MR. LEE:  Objection, vague.

10          THE WITNESS:  785.23 says that not all the time

11  that a staff member is on the facility constitutes work,

12  and as long as they're engaging in their -- they have

13  large blocks of time to engage in their own personal

14  activities.  I consider reading a personal activity.

15  Q.      MS. COPLICK:  Would you consider that that

16  staff member is on duty?

17          MR. LEE:  Objection to the extent it calls for

18  a legal conclusion.

19          THE WITNESS:  I consider that staff residing at

20  the facility and free to engage in whatever personal

21  activities they choose to.

22  Q.      MS. COPLICK:  Would you consider that staff

23  member free to leave the facility for personal reasons

24  of his or her own?

25          MR. LEE:  Objection, incomplete hypothetical.

Exhibit  B
Page  23

82

Carol Nygard & Associates
916-928-8999

1    THE WITNESS:  I don't believe that 785 requires

2  them to leave the facility in order to engage in

3  personal activities.

4  Q.    MS. COPLICK:  Mr. Hall, I don't believe I asked

5  you how you interpreted --

6  A.    I'm trying to help you to the best of my

7  ability.

8    MS. COPLICK:  Madam Reporter, would you please

9  read back the question?

10    (Record read:  Q.  Would you consider that

11  staff member free to leave the facility for personal

12  reasons of his or her own?)

13    MR. LEE:  Objection, incomplete hypothetical.

14    THE WITNESS:  I believe I've answered that

15  question.

16  Q.    MS. COPLICK:  I'm afraid you haven't, Mr. Hall.

17  A.    I believe I have.  You've painted the picture,

18  I've given you my answer.

19    MS. COPLICK:  Can you certify that, Madam

20  Reporter?

21  Q.    Mr. Hall, do you remember Mrs. Creel coming to

22  your facility to do her inspection?

23  A.    Yes.

24  Q.    Do you remember meeting with her and then

25  agreeing to meet at another one of your care homes?

Exhibit  B
Page  24

Carol Nygard & Associates
916-928-8999

REPORTER'S CERTIFICATE

I, WENDY E. ARLEN, a Certified Shorthand

Reporter of the State of California, duly authorized to

administer oaths, do hereby certify:

That I am a disinterested person herein; that the

Witness, GEORGE K. HALL, named in the foregoing

deposition was by me duly sworn to testify the truth,

the whole truth, and nothing but the truth; that the

deposition was reported in shorthand by me, WENDY E.

ARLEN, a Certified Shorthand Reporter of the State of

California, and thereafter transcribed into typewriting.

IN WITNESS WHEREOF, I have hereunto set my hand

this __14th__ day of __March_____, 2007.


_____
WENDY E. ARLEN
Certified Shorthand Reporter
State of California
Certificate No. 4355

Exhibit  B
Page  25

84

252

## Direct Care Staff Schedule

Facility: JASMINE HALL

Week Of: _____

| | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| 1:00 AM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 2:00 AM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 3:00 AM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 4:00 AM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 5:00 AM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 6:00 AM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 7:00 AM | VS/LS | VS/LS | VS/LS/TR | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 8:00 AM | VS/LS | VS/LS | VS/LS/TR | PD/LS | PD/LS | VS/PD/LS | VS/PD/EH |
| 9:00 AM | VS/LS | VS/LS | VS/LS/TR | PD/LS | PD/LS | VS/PD/LS | VS/PD/EH |
| 10:00 AM | VS/LS | VS/LS | VS/LS/TR | PD/LS | PD/LS | VS/PD/LS | VS/PD/EH |
| 11:00 AM | VS/LS | VS/LS | VS/LS/TR | PD/LS | PD/LS | VS/PD/LS | VS/PD/EH |
| 12:00 PM | VS/LS | VS/LS | VS/LS/TR | PD/LS | PD/LS | VS/PD/LS | VS/PD/EH |
| 1:00 PM | VS/LS | VS/LS | VS/LS/TR | PD/LS | PD/LS | VS/PD/LS | VS/PD/EH |
| 2:00 PM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD/EH |
| 3:00 PM | VS/LS/EH | VS/LS/EH | VS/LS | PD/LS/TR | PD/LS/GH | VS/PD/LS | VS/PD/EH |
| 4:00 PM | VS/LS/EH | VS/LS/EH | VS/LS | PD/LS/TR | PD/LS/GH | VS/PD/LS | VS/PD/EH |
| 5:00 PM | VS/LS/EH | VS/LS/EH | VS/LS | PD/LS/TR | PD/LS/GH | VS/PD/LS | VS/PD |
| 6:00 PM | VS/LS/EH | VS/LS/EH | VS/LS | PD/LS/TR | PD/LS/GH | VS/PD/LS | VS/PD |
| 7:00 PM | VS/LS/EH | VS/LS/EH | VS/LS | PD/LS/TR | PD/LS/GH | VS/PD/LS | VS/PD |
| 8:00 PM | VS/LS/EH | VS/LS/EH | VS/LS | PD/LS/TR | PD/LS/GH | VS/PD/LS | VS/PD |
| 9:00 PM | VS/LS/EH | VS/LS/EH | VS/LS | PD/LS/TR | PD/LS/GH | VS/PD/LS | VS/PD |
| 10:00 PM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 11:00 PM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| 12:00 PM | VS/LS | VS/LS | VS/LS | PD/LS | PD/LS | VS/PD/LS | VS/PD |
| TOTAL | VS/LS | | | | | | |

Direct Care Staff:

#1 VIRGINIA SANTIAGO          #9 _____

#2 PRIYANKA DISSANAYAKA       #10 _____

#3 LEO SANTIAGO

#4 _____

#5 LYLE McCollough

#6 Estela Hall

#7 GEORGE Hall

#8 _____

EXHIBIT
3-14-07
A
Hall

PENGAD 800-631-6989

**DEF1230**

Exhibit A

**Hall Care Homes, Inc, Work Schedule**

Facility:    Jasmine-Hall II
Beginning Month: July 2004

The purpose of this form is show the assigned work days for staff residing and/or working at this Residential Care Facility.

| | Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Gloria Main | W | W | OFF | OFF | W | W | W |
| Rebecca Arreola | W | W | W | W | OFF | OFF | W |
| | | | | | | | |
| Dr. Geo. Hall | OFF | OFF | W | W | W | W | W |
| Erin la Hall | OFF | OFF | W | W | W | W | W |
| Xo. Zimmerly | OFF | W | W | W | W | W | OFF |

Residential Care staff are employed on a salary basis and typically work on average of some 22 days each month. Residential Care Assistants live on the premises. According to Section 785.23 of Title 29, Part 785 of the Code of Federal Regulations: "An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises."

The basic weekly coverage of this facility is as follows:

| HOURS | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 1AM | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep |
| 2AM | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep |
| 3AM | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep |
| 4AM | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep |
| 5AM | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep |
| 6AM | GM | RA | RA | GM | GM | RA | RA |
| 7AM | GM | RA | RA | GM | GM | RA | RA |
| 8AM | GM | RA | RA | GM | GM | RA | RA |
| 9AM | GM | RA | RA | GM | GM | RA | RA |
| 10AM | GM | RA | RA | GM | GM | RA | RA |
| 11AM | GM | RA | RA | GM | GM | RA | RA |
| 12PM | GM | RA | RA | GM | GM | RA | RA |
| 2PM | RA | GM | RA | RA | GM | GM | RA |
| 3PM | RA | GM | RA | RA | GM | GM | RA |
| 4PM | RA | GM | RA | RA | GM | GM | RA |
| 5PM | RA | GM | RA | RA | GM | GM | RA |
| 6PM | RA | GM | RA | RA | GM | GM | RA |
| 7PM | RA | GM | RA | RA | GM | GM | RA |
| 8PM | RA | GM | RA | RA | GM | GM | RA |
| 9PM | RA | GM | RA | RA | GM | GM | RA |
| 10PM | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep |
| 11PM | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep |
| 12PM | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep | Sleep |

The work schedules presented here identifies staff coverage during waking hours and permits employees a scheduled period of eight hours of sleep. This model is based on an hourly model. Our time studies, however, indicate that the duties required to be performed by staff may be completed in no more than 4 to 5 hours, thereby leaving large blocks of time for employees residing on site to entertain friends, watch TV, retreat to their own rooms, engage in personal activities of their own, or even leave the facility in the absence of residents. For these reasons we don't believe an eight hour work model reflects work performed by staff in our industry and have established a monthly salary model as a basis for pay excluding payment for periods where staff is engaged in personal activities and not busy, taking of meals, and scheduled periods for sleep.

EXHIBIT
3-14-07
B
Hall

**DEF1237**

Exhibit B

Exhibit   B
Page   27

86



Staff 1
Staff 2.
Staff 3

DIRECT CARE STAFF SCHEDULE

FACILITY: _____
SIZE: _____

| HOURS | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| 1:00 AM | | | | | | | |
| 2:00 AM | | | Bed | Time | | | |
| 3:00 AM | | | | | | | |
| 4:00 AM | | | | | | | |
| 5:00 AM | | | | | | | |
| 6:00 AM | S-1 | S-3 | S-5 | S-1 | S-1 | (S-2 Bath) | S-1 |
| 7:00 AM | S-1 | S-3 | S-3 | S-1 | S-1 | S-1 | S-1 |
| 8:00 AM | S-1 | S-3 | S-3 | S-1 | S-1 | S-1 | S-1 |
| 9:00 AM | S-1 | S-3 | S-3 | S-1 | S-1 | S-1 | S-1 |
| 10:00 AM | S-1 | S-3 | S-3 | S-1 | S-1 | S-1 | S-1 |
| 11:00 AM | S-1 | S-3 | S-3 | S-1 | S-1 | S-1 | S-1 |
| 12:00 PM | S-1 | S-3 | S-3 | S-1 | S-1 | S-1 | S-1 |
| 1:00 PM | S-1 | S-3 | S-3 | S-1 | S-1 | S-1 | S-1 |
| 2:00 PM | S-2 | S-2 | S-2 | S-3 | S-3 | S-1 | S-2 |
| 3:00 PM | S-2 | S-2 | S-2 | S-3 | S-3 | S-3 | S-2 |
| 4:00 PM | S-2 | S-2 | S-2 | S-3 | S-3 | S-3 | S-2 |
| 5:00 PM | S-2 | S-2 | S-2 | S-3 | S-3 | S-3 | S-2 |
| 6:00 PM | S-2 | S-2 | S-2 | S-3 | S-3 | S-3 | S-2 |
| 7:00 PM | S-2 | S-2 | S-2 | S-3 | S-3 | S-3 | S-2 |
| 8:00 PM | S-2 | S-2 | S-2 | S-3 | S-3 | S-3 | S-2 |
| 9:00 PM | S-2 | S-2 | S-2 | S-3 | S-3 | S-3 | S-2 |
| 10:00 PM | | | | | | S-3 | |
| 11:00 PM | | Bed | Time | | | | |
| 12:00 PM | | | | | | | |
| Total No. of Hours | | | | | | | |



EXHIBIT
3-14-07
C
Hall

Exhibit C

Exhibit B
Page 28

87

# STAFF SERVICE HOURS

| DATE | | House Keeping | | | | | | | Direct Care | | | | | Consumer Programming | | | | | | | | | | | | WEEK TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME | | Meal Prep | | | Laundry | Clean/Dust Vacume | Maintanence | Other | Med/Assist | Personal/Ass | Impulse Managemen | First Aide 911 | Other | Comm. Survival | Enrichment Group | Shower | Bed Making | Grooming | One to One Counseling | Money Management | Social Skills Training | Community Outing | Bus Mobility | Current Events | Resident Government | Other |
| FACILITY | | Brkfst | Lunch | Dinner | | | | | | | | | | | | | | | | | | | | | | |
| FROM | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TO | | | | | | | | | | | | | | | | | | | | | | | | | | |

| DATE | | Brkfst | Lunch | Dinner | Laundry | Clean/Dust | Maintanence | Other | Med/Assist | | | | Shower | Grooming |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUNDAY 3 | A.M. P.M. NOC. | | | | | | | | | | | | | |
| MONDAY 4 | A.M. P.M. NOC. | | | | | | | | | | | | | |
| TUESDAY 5 | A.M. P.M. NOC. | | | | | | | | | | | | | |
| WEDNESDAY 6 | A.M. P.M. NOC. | | | | | | | | | | | | | |
| THURSDAY 7 | A.M. P.M. NOC. | | | | | | | | | | | | | |
| FRIDAY 8 | A.M. P.M. NOC. | | | | | | | | | | | | | |
| SATURDAY 9 | A.M. P.M. NOC. | | | | | | | | | | | | | |
| TOTALS | | | | | | | | | | | | | | ADD TOTALS IN BACK |

Enter time and initials in appropriate boxes above.

\* Must have identified problem in IPP or Service Plan

STAFF SIGNATURES AND INITIALS

| Initials | Signature | Initials | Signature |
|---|---|---|---|

PENGAD 800-631-6989

EXHIBIT D Hall

DEF1482

Exhibit B
Page 29

# DEPARTMENT OF DEVELOPMENTAL SERVICES
## COMMUNITY CARE FACILITY RATES
### EFFECTIVE JULY 1, 2006

| Service Level | Monthly Payment Rate Per Consumer Effective 7/01/2006[1] |
|---|---|
| 1 | $898 |
| 2-Owner | $1,745 |
| 2-Staff | $1,961 |
| 3-Owner | $2,006 |
| 3-Staff | $2,287 |
| 4A | $2,941 |
| 4B | $3,134 |
| 4C | $3,326 |
| 4D | $3,567 |
| 4E | $3,825 |
| 4F | $4,082 |
| 4G | $4,386 |
| 4H | $4,707 |
| 4I | $5,159 |

[1] Includes the July 1, 2006 3% across-the-board increase to ARM levels 2 through 4I.

Exhibit  B
Page   30



EXHIBIT
8-14-07
E
Hall

**Jasmine-Hall VIII**
**5949 Brett Dr.**
**Sacramento, CA 95842**
**(916) 348-9470**

| | |
|---|---|
| **A.M.** | Weekday Morning Schedule |
| 6:00 | Wake Up Time |
| 6:00-6:30 | Toilet & Personal Care |
| |     Hygiene |
| |     Bed making |
| |     Matching clothes |
| 6:30-7:00 | Breakfast Preparation |
| |     Table Preparation |
| |     Food Preparation, M W |
| |     Table Manners |
| 7:00-7:40 | Breakfast |
| 7:40-8:00 | Post-Breakfast Cleaning |
| |     Table Cleaning |
| |     Personal Care |
| 8:00-9:30 | Gross Motor Exercise, M W F |
| | Gardening/Nursery, T Th |
| | Weekday Morning Schedule, S Su |
| 9:45-10:00 | Break |
| 10:00-12:00 | Academics |
| |     Preacademics, M W F |
| |     Community Survival Skills, T Th |
| |     Family Home Hour, S |
| |     Personal Hour, Su |
| **P.M.** | Afternoon Schedule |
| 12:00-1:00 | Lunch |
| 1:00-1:30 | Post Lunch Cleaning |
| 1:30-4:00 | Prime Time |
| |     Continued Morning Academics |
| |     Community Activities |
| |     Community Events, S Su |
| 4:00-5:00 | Check in Time |
| |     Personal Time |
| |     Notice of Unscheduled Activities |
| 5:00-6:00 | Dinner Preparation |
| |     Table Preparation |
| |     Food Preparation, M W |
| |     Table Manners |
| 6:00-6:40 | Dinner |
| 6:40-7:00 | Post-Dinner Cleaning |
| |     Table Cleaning |
| |     Personal Care |
| 7:00-8:00 | Residential Training |
| | Grooming (Laundry, Clothes, Room & Personal Care) |
| | Group Discussion & Personal Counseling |
| 8:00-9:30 | Recreation (Reading, Games, Music & T.V.) |
| 9:30 | Bedtime |



EXHIBIT
F
Hale



RECEIVED
APR 2 2 2005

Exhibit   B
Page   31

90

CALIFORNIA DEPARTMENT OF SOCIAL SERVICES

# PERSONNEL REPORT

**INSTRUCTIONS:** This form is intended for keeping a current roster of all the facility personnel, other adults and licensees residing in the facility, including backup persons, volunteers and licensee if administrator/director. Show license/certificate number if applicable for specialized staff (i.e., Social Workers and other consultant(s)). Show coverage for twenty-four hour supervision in residential facilities. Report any changes in personnel to the licensing agency as required by regulations. Send original to Licensing Agency and retain copy in facility file.

| NAME OF FACILITY | | FACILITY TYPE | |
|---|---|---|---|
| | | Adult Residential | |

**PREPARED BY:** Josephine-Hall V

**FACILITY NUMBER:** 347000288

**DATE:** Sept 16, 2005

Dr George K. Hall

**A. STAFF SUBJECT TO CRIMINAL BACKGROUND CHECK REQUIREMENTS:** The following staff members are subject to a criminal background check pursuant to Sections 1522, 1568.09, 1569.17 and 1596.871 of the Health and Safety Code. A California background clearance or a criminal record exemption shall be obtained prior to employment, residence or initial presence in the facility.

| NAME | DATE EMPL'D | JOB TITLE | SPECIFY DAYS AND HOURS ON DUTY | | | | SPECIFY DAYS AND HOURS ON DUTY | | | | SPECIFY DAYS AND HOURS ON DUTY | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Licensee/Administrator | | | DAYS | FROM | TO | | DAYS | FROM | TO | | DAYS | FROM | TO |
| Dr George K. Hall | 1/13/88 | Pres/CEO (Licensee, Adm.) | Tu-Sat | 6 am | 5 pm | | | | | | | | |
| Esther O. Hall | 1/19/88 | VP Operations ( Adm.) | Tu-Sat | 6 am | 5 pm | | | | | | | | |
| Xochitl Zimmerly | 8/18/97 | Adm. Support | M-F | 8 am | 5 pm | | | | | | | | |
| Rosa Mendoza | 6/1/02 | Live-in Res. Care Asst. | Thur-M | | | | | | | | | | |
| Grethe Darwin | 6/25/99 | Live-in Res. Care Asst | Sat-W | | | | | | | | | | |
| Antonio Darwin | 4/1/02 | Live-in Res. Care Asst | Tu-Sat | | | | | | | | | | |
| | | | | | | | | | | | | | |

△ EXHIBIT C
Deponent E Hall
Date 3/10/07 Rptr. RD

Exhibit C
Page 1

91

1

2

3

4

5

6

7

8

9

LAWRENCE BREWSTER
Regional Solicitor
DAVID KAHN
Counsel for ESA Programs
**JAN M. COPLICK**, Senior Trial Attorney
Designated Counsel for Service
California State Bar Number 124503
E-Mail: Coplick.Jan@dol.gov
ANDREW SCHULTZ
Trial Attorney
Office of the Solicitor
United States Department of Labor
90 7th Street, Suite 3-700
San Francisco, California 94103

10

11

Telephone: (415) 625-7751
Facsimile: (415) 625-7772

12

13

14

15

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| ELAINE CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br>Plaintiff,<br>v.<br>JASMINE HALL CARE HOMES, INC., a corporation, HALL CARE HOMES, INC., a corporation, GEORGE K. HALL, an individual, and ESTELA HALL, an individual<br><br>Defendants. | CIVIL ACTION NO. 2:05-cv-01306-GEB-KJM<br><br><br><br>DECLARATION IN SUPPORT OF THE SECRETARY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

26

27

28

I, TANYA NALLEY, swear the following to be true:

1.      I am employed by Alta California Regional Center ("Alta"), 2235 Butano Drive, Sacramento, California, in the position of Community Services Supervisor and, currently, the Acting Chief.

Exhibit  D
Page  1

*Declaration in Support of Secretary's Motion for Partial Summary ⌐*

92

- 1 -

2.    I have worked for Alta since August of 1997.  Prior to that, I spent a number of years working in the field of residential treatment, for disabled persons, including providing direct residential care, and hold a Masters degree in Social Work.

3.    Alta is one of a network of 21 regional centers in California established by the Lanterman Mental Retardation Services Act of 1969. Alta is a private non-profit corporation working under contract with the California Department of Developmental Services (DDS.)

4.    Alta provides services to over 14,000 persons with developmental disabilities (DD) and their families throughout a ten county area around Sacramento.

5.    One of the many services Alta provides is helping DD persons who need assessment and placement for 24-hour residential care.  Both children and adults with DD are eligible for residential placement if personal services, supervision, and/or assistance are necessary either for self protection or to sustain the activities of daily living.

6.    24-hour non-medical residential care is provided by Community Care Facilities (CCFs), which are private care  facilities, both profit and non-profit, licensed by the Community Care Licensing Division of the State Department of Social Services.

7.    Adult Residential Facilities (ARF's) are the sub-category of facilities designed to meet the needs of DD adults who are between the ages of 18 and 59.

8.    In addition to licensing by the Community Care and Licensing Division, residential facilities are also regulated by the Regional Centers through the "vendorization" process.

9.    Alta "vendors"  each individual CCF in its region to provide services at a particular client Service Level, after approving material supplied by the CCF to demonstrate that it can meet the requisite client requirements, including specified staffing levels, for the Service Level applied for.

*Declaration in Support of Secretary's Motion for Partial Summary J*

Exhibit  D
Page 2

- 2 -

10.   "Service Level" means one of a series of 4 levels which has been approved for each facility by a regional center, with 4 being the highest level serving the clients with the most serious needs. The criteria for the service levels are set by DDS according to the intensity of client need, and the corresponding amount of care which must be provided to that client; monthly state reimbursement to the Vendor operating the facility parallels the increases in Service Level.

11.   The Service Levels, and their DDS descriptions, are:

  a.   SERVICE LEVEL 1: Limited care and supervision for persons with self-care skills and no behavior problems.

  b.   SERVICE LEVEL 2: Care, supervision, and incidental training for persons with some self-care skills and no major behavior problems.

  c.   SERVICE LEVEL 3: Care, supervision, and ongoing training for persons with significant deficits in self-help skills, and/or some limitations in physical coordination and mobility, and/or disruptive or self-injurious behavior.

  d.   SERVICE LEVEL 4: Care, supervision, and professionally supervised training for persons with deficits in self-help skills, and/or severe impairment in physical coordination and mobility, and/or severely disruptive or self-injurious behavior.

12.   Service Level 4 is further subdivided into Levels 4A through 4I, in which staffing levels are increased to correspond to the escalating severity of disability levels. Service Level 4(i) is the highest Service Level in our system, reserved for clients with the most severe disabilities, requiring the most intensive amount of direct care and supervision.

13.   Service Levels 2, 3 and 4 have a specified set of requirements that a facility must meet which addresses the direct supervision and special services for clients within that facility.

14.   Facilities "vendored" or contracted at Service Level 4(i), for example, must provide a specific  minimum hours of "direct client care and supervision" time

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*

1  each month which meet  the requirements of the clients' individual plans and also

2  Section §56004 ,Title 17, Cal. Code.  The latter Section sets forth a formula based

3  on the number of clients in the facility; applying that formula to a Level 4(i)

4  facility with 4 clients would require the facility to provide 312 hours of *direct*

5  *client supervision* hours weekly; 420 hours for a Level 4(i) facility with 6 clients;

6  and 210 hours for a Level 3 facility with 6 clients. [1]

7  15.    The weekly direct care staffing hours required for a Level 3 facility with 6

8  clients must be **doubled** for a Level 4(i) facility with the same number of clients.

9  The total monthly payment received from the regional center to the vendor for each

10  Level 4(i) client is more than double that for each Level 3 client, to represent this

11  increased direct care staffing cost and some required professional hours.

12  16.    The type of staff activities which qualify towards a facility's requisite

13  weekly minimum hours is also defined by statute and regulation.  The hours, rather

14  than being spent in housekeeping or cooking, must be spent primarily in the *direct*

15  *care* of clients, which is defined in the California Welfare and Institutions Code

16  (WIC)  as to "supervise or support the person's functioning in the areas of self-care

17  and daily living skills, physical coordination mobility, and behavioral self-control,

18  choice making, and integration. WIC, Section 4681.1(a)(2)

19  This is specifically distinguished from those hours spent to provide clients with

20  their "basic living needs" such as housekeeping, food and personal care and other

21  items necessary to ensure a quality environment for persons with developmental

22  disabilities.  WIC, Section 4681.1(a)(1)

23  17.    *Direct client  supervision* time is defined in the regulations at Section

24  56002(a)(14) as meaning "those activities in which direct care staff provide care,

25  supervision, training and support to promote the consumer's functioning in the

26

27  [1]   The chart shown in Section 56004 is read by adding 168 hours per week (24 hours a day 7 days a
week) for the first client, plus 36 + 54 + 54 +54 + 54 = 420 hours of direct care staff hours for _6_ clients,

28  based on the clients  being present in the home throughout the day.  In addition, 16 consultant hours per
six months are also required.

1   areas of self-care, daily living skills, physical coordination, mobility, behavioral
2   self-control, choice-making, community integration, accessing community
3   resources and participating in leisure time activities." (Section 56002(a)(14),Title
4   17, Cal. Code,)

5   18.   This definition does allow staff to spend some time in program preparation
6   functions but does not include staff hours spent on such facility tasks as
7   housekeeping or cooking, unless they are performed in the presence of clients and
8   used as teaching, modeling or coaching opportunities for the clients.  The essence
9   of the services for which Alta is providing reimbursement to residential care
10  facilities, and particularly when we reimburse at the higher Service Levels, is not
11  household tasks but client care and supervision, which is usually very demanding
12  at Level 4(i).

13  19.   Accordingly, some of Alta's residential facility vendors hire outside help to
14  perform the care home's cooking, cleaning or yard work chores, so that the care
15  aides may focus their time and energies  on client supervision.  Another alternative
16  method that some of our vendors choose, is for direct care staff to complete
17  housekeeping tasks when clients are out of the home or asleep, and therefore do
18  not require direct care under Title 17.   Other care homes, typically Level 4, hire
19  "awake" staff to do nighttime housekeeping chores while clients are sleeping. The
20  awake staff are also remain available to provide care, as necessary; in the latter
21  situation, we would count all these nighttime "awake" hours as direct care hours,
22  which we would not do if these chores were being performed while clients were
23  awake, at home, and requiring direct staff care.

24  20.   In order to show that they will meet the direct care and supervision service
25  hours required, vendors are required to complete and maintain a Weekly Staff
26  Schedule listing which staff members are on-duty during which hours of the week,
27  providing direct client care and supervision within the statutory definitions
28  outlined above, so as to meet the facility's required minimum hours.  If an Alta
    representative makes a spot inspection to check on facility staffing levels, the

representative will ask for the Weekly Staff Schedule, and ensure that actual facility staffing matches the schedule.

21.     The staff members so listed on the schedule are required to be "on-duty" during the times listed, in order to meet the minimum hours required.

22.     The facility's promise to provide 24 hour client care and supervision also requires them to have direct care staff "on duty" 24 hours a day.

23.     Having direct care staff "on duty" in these residential facilities requires the care staff to be more than simply physically present on the premises. The care staff must also be consciously supervising clients whenever clients are awake in the home, as well as ready, willing and able to assist and supervise clients at all hours of the night.  When clients get up in the night with problems or just to smoke cigarettes, a care aide must supervise them as needed.   With Level 4 (i) clients, night activity of one kind or another can happen quite often.

24.     A further element of providing proper direct client care and supervision in a residential facility is that direct care staff should be focusing most of their attention on the clients at all times, and remaining in sufficiently close enough proximity to the clients to safely supervise them.  While this does not mean infringing upon the personal space of the clients or treating them like children, many Level 4(i) clients have serious behavioral or mental disorders which almost always require them to be carefully supervised at all times.

25.     If any of the staff members listed on the direct care schedule were out of earshot or view of the clients for more than a moment, such as in the back yard or in the staff bedroom with the door closed watching TV, we would probably not consider them to be on duty, and would not consider the facility to have provided direct client care or supervision by that person for that period of time.

26.     In addition to setting out a requirement for a monthly total of direct care and supervision hours described above, §56004 of Title 17 also sets forth minimum staff/client ratios that residential care facilities must independently satisfy at all times; for Service Levels 4C, 4D, and 4E, one direct care staff person for up to two

1  consumers in the facility, §56004 (C); for Service Levels 4F, 4G, 4H, and 4I, one

2  direct care staff person for the first consumer in the facility, §56004 (D).

3  27.    If one of two scheduled staff members chose to leave a Level 4(i) facility

4  for some personal reason on one of their assigned duty days (assuming 4 clients

5  were present and unless someone covers for the absent staff member such as the

6  Administrator), it would likely impact the facility's compliance with the DDS

7  regulations in two important respects, even if that staff member was not required

8  for any housekeeping task.

9  28.    Such a situation would likely violate the facility's staff/client ratio  by

10  leaving  only one staff member to try and meet the needs of  4 clients who, at a

11  Level 4(i) facility, are likely to have highly aggressive behaviors or mental health

12  or behavioral problems compounding their developmental disabilities.   The

13  requirement is to meet the needs of the consumers at all times.  Second, the

14  absence would create a deficiency in direct client care hours that the facility would

15  need to make up with supplemental staff in future days.  If such an absence

16  occurred repeatedly, it would be difficult to make up the deficiency in direct care

17  hours without bringing on an additional crew.

18     I give this declaration freely, without promise or threat, and have been

19  encouraged to change or cross out any portion of it that does not seem fair or

20  accurate to me.

21  I declare under penalty of perjury that the foregoing is true and correct.

22  Date  4-9-07          _Tanya Nalley_

23              TANYA NALLEY, MSW

24

25

26

27

28

Exhibit   D
Page 7

96.5

## DUTY STATEMENT

<u>Resident Care Assistant(Live in)</u>: The Resident Care Assistant (RCA) reports to the Care Home Administrator, and assist in the operation of the facility through the provision of services to residents required by law, including those services identified in the residents individual need and service plan. The RCA may be required to make arrangements for attendance of community events and other activities, transport clients, prepare meals, disburse medication, do house cleaning laundry, maintain building, equipment and grounds, and other duties as assigned.

In carrying out the functions of a RCA, an employee should demonstrate knowledge of and skill in:

1. Principles of nutrition, food preparation and storage and menu planning.
2. Housekeeping and sanitation principles.
3. Provision of client care and supervision, including communication.
4. Principles of patient rights
5. Assistance with prescribed medications which are self-administered.
6. Recognition of early signs of illness and the need for professional assistance.
7. Availability of community services and resources.

## WORKING CONDITIONS

The performance of the duties of a Resident Care Assistant is a shared responsibility and calls for individuals to work in teams of two or more on a 24 hour duty assignment. The working teams are expected to live on the facility site, in a room assigned by the Care Home Administrator, and share in the home life of its residents. Consequently, the presence of the RCA in the facility while engaging in personal activities and not busy, taking of meals, and scheduled periods for sleep will not be considered as part of the regular work program, or pay schedule. The RCA will work a 5 day work week at times and intervals assigned by the Home Administrator. In addition to food and lodging, the RCA will be paid a salary with a total value of <u>$1,500.00</u> per month.

The RCA will provide for the care and supervision of residents, enforce house rules, and maintain conditions which insure the health, safety, and personal rights of residents. Violations of these expectations may be cause for termination.

## EMPLOYMENT AGREEMENT

I, _____ , hereby accept the position of Resident Care Assistant for Jasmine-Hall VIII Residential Care Home. In so doing, I will perform the duties described in the above statement to the best of my ability in full cooperation with the Home Administrator and Facility Owner.

Licensee _____      Date _____

Administrator _____      Date _____

Exhibit  E
Page  1

97

DEF 014648

OFFICE OF THE SOLICITOR
SAN FRANCISCO

JUL 31 2006

1  BALDWIN J. LEE (BAR NO. 187413)
   JENNIE L. LEE (BAR NO. 191350)
2  ALLEN MATKINS LECK GAMBLE
      MALLORY & NATSIS LLP
3  Three Embarcadero Center, 12th Floor
   San Francisco, CA  94111-4074
4  Phone:  (415) 837-1515
   Fax:  (415) 837-1516
5  E-Mail:  blee@allenmatkins.com
              jlee@allenmatkins.com
6
   Attorneys for Defendants
7  JASMINE HALL CARE HOMES, INC., HALL CARE
   HOMES, INC., GEORGE K. HALL, AND ESTELLA
8  HALL

9                UNITED STATES DISTRICT COURT

10              EASTERN DISTRICT OF CALIFORNIA

11

12 ELAINE CHAO, SECRETARY OF LABOR,        Case No. 2:05-CV-1306-GEB-KJM
   UNITED STATES DEPARTMENT OF
13 LABOR,                                  **DEFENDANTS JASMINE HALL CARE
                                           HOMES, INC., HALL CARE HOMES, INC.,
                                           GEORGE K. HALL, AND ESTELLA
14         Plaintiffs,                      HALL'S RESPONSE TO PLAINTIFF
                                           ELAINE CHAO, SECRETARY OF LABOR,
15         vs.                             UNITED STATES DEPARTMENT OF
                                           LABOR'S FIRST SET OF
16 JASMINE HALL CARE HOMES, INC., a        INTERROGATORIES**
   corporation, HALL CARE HOMES, INC., a
17 corporation, GEORGE K. HALL, an individual,
   and ESTELA HALL, an individual,
18
           Defendants.
19

20
   PROPOUNDING PARTY:         Plaintiff ELAINE CHAO, SECRETARY OF LABOR,
21                            UNITED STATES DEPARTMENT OF LABOR

22 RESPONDING PARTY:          Defendants JASMINE HALL CARE HOMES, INC., HALL
                              CARE HOMES, INC., GEORGE K. HALL, AND
23                            ESTELLA HALL

24
   SET NO.:                   ONE
25

26                    Exhibit   F
                      Page   1
27
                         98
28

1      Defendants, JASMINE HALL CARE HOMES, INC., HALL CARE HOMES,

2 INC., GEORGE K. HALL, AND ESTELLA HALL ("Defendants") hereby respond to the

3 Request for Admissions of Plaintiff ELAINE CHAO, SECRETARY OF LABOR,

4 UNITED STATES DEPARTMENT OF LABOR ("Plaintiff") as follows:

5      This Response is made solely for purposes of this action. Each response and/or

6 production is subject to all objections as to competence, relevance, materiality, propriety

7 and admissibility, and any and all other objections and grounds which would require the

8 exclusion of any statements contained herein, if such statements were made by a witness

9 present and testifying at court, all of which objections and grounds are reserved and may

10 be interposed at the time of trial.

11      The following Response is based upon information presently available to

12 Defendants. The fact that a Defendant has responded or objected to any request or part

13 thereof should not be taken as an admission that such response or objection constitutes

14 admissible evidence. The fact that a Defendant has answered part or all of any request is

15 not intended and shall not be construed to be a waiver by a Defendant of all or any part of

16 any objections to any request.

17      To the extent that the request calls for information which was prepared in

18 anticipation of litigation for trial or for information or material covered by the work

19 product doctrine, or which constitutes information which is privileged or related to

20 confidential trade secrets or the privilege of privacy (including the freedom of association

21 and financial privacy), Defendants object to responding to such request.

22      All of the responses made herein are made subject to the objections stated above

23 and any further objection specifically stated.

24             **RESPONSE TO INTERROGATORIES**

25 **INTERROGATORY NO. 1**:

26      State all facts upon which Defendants rely to support their fourth affirmative defense that

27 Plaintiffs claims consist, in whole or in part, of non-compensable sleeping time, and that the

28 Complaint is barred by the provisions of the Portal-to-Portal Act as to all pre- and post-liminary

1  activities, including, for each of these three asserted categories of non-compensable employee

2  time:

3      (a)    Stating all facts upon which you base your assertions that the time represented in

4  each such category is non-compensable;

5      (b)    Identifying how many total dollars and total employee hours in Plaintiff's claim

6  Defendants assert are represented by non-compensable sleep time, how many hours in a typical

7  RCA shift such sleep time represents and between what times of day such sleep time typically

8  takes place;

9      (c)    Identifying how many total dollars and total employee hours in Plaintiff's claim

10 Defendants assert are represented by non-compensable pre-liminary and post-liminary activities;

11 how many hours in a typical RCA shift such pre-and post-liminary time represents and at what

12 time(s) of day these activities typically take place; and of what the allegedly pre-and post-liminary

13 activities consist.

14     (d)    Describing with specificity the beginning and end of such period, for each

15 category, and how such period is recorded for payroll and scheduling purposes;

16     (e)    Describing with specificity the usual activities and location of employees during

17 each such category of alleged non-compensable time;

18     (f)    Describing with specificity any resident or consumer-monitoring obligations, if

19 any, which apply to employees during each such category of alleged non-compensable time;

20     (g)    Describing with specificity any obligation applying to employees to be available to

21 handle potential emergencies or to meet residents' direct care needs during each such category of

22 alleged non-compensable time;

23     (h)    Describing with specificity any restriction(s) on employee freedom to leave their

24 assigned facility without management permission during any of the said categories of alleged non-

25 compensable time;

26     (i)    Describing with specificity how such asserted defenses differ, if they do, from that

27 asserted in your Eighth Affirmative Defense that the Complaint is barred as to all hours sought in

28 which the employees were engaged in preliminary or postliminary activities.

**RESPONSE TO INTERROGATORY NO. 1**:

Defendants object to this "interrogatory" on the grounds that it is compound. This discovery request in fact comprises multiple interrogatories propounded by Plaintiff. Defendants object to these interrogatories on the grounds that they are ambiguous, overly broad, unduly burdensome, and unanswerable to the extent that it requests Defendants to prove a negative -- that the acts alleged did not occur and that Plaintiff is not entitled to the requested relief. Federal Rules of Civil Procedure Rule 8(c) requires that an answer to a complaint contain whatever defenses a defendant might have that would not otherwise be put at issue by way of a general denial. Any affirmative defense that is not specifically plead in an answer may be precluded from being raised at trial. Answering an unverified complaint and pleading affirmative defenses simply places matters at issue, pending further discovery and investigation. It is the recommended practice to plead potential issues as new matters, rather than omit them. As of the time these responses were prepared, it is anticipated that continued discovery, investigation, research and analysis may disclose additional facts, at some future time, which may be responsive to this interrogatory. Defendants further object to this interrogatory because it seeks disclosure of information protected by the attorney-client privilege and work product doctrine. Defendants further object to these interrogatories on the grounds that they calls for a legal conclusion. Subject to these objections and without waiver thereof, Defendants respond to these multiple interrogatories as follows:

Jasmine Hall Care Homes are licensed Adult Residential Facilities, more commonly known as "group homes," that have arrangements with its employees to live at the respective group homes on a permanent basis. Employees who choose not to reside at the group homes on a permanent basis agree to reside at the group home for extended periods of time. These employees typically share the home with one and no more than six clients. The employees reside in a separate bedroom than the clients.

The employees agree to the terms and conditions of work, including by signing an agreement prior to starting work. The agreement provides that duty shifts are scheduled for 24-hours and that not all hours at the home will be work time. The agreement is that the employee is permitted while present at the home to engage in personal activities, such as taking meals and

1    scheduled sleep periods of at least eight hours, such time will not be paid. **While** residing at the

2    group home, each employee is able to engage in normal private pursuits, **including** eating,

3    sleeping, entertaining, watching TV and other periods of freedom from **all duties.**

4        An employee's duties may include providing certain care and **supervision** of the group

5    home clients, enforce house rules, and maintain conditions which insure **the health,** safety and

6    personal rights of the residents. Employees are informed and agree, **including in the** written

7    agreement, that their sleep time of up to eight hours is not work time. **Employees** are further told

8    that any time they are disrupted during their sleep time where they **are called to duty,** they should

9    alert the administrator and report it.

10       Time spent on duties by employees are recorded by the **employees on the** staff service hour

11   forms. Employees are required to fill out the form indicating the start **and stop** time for each tasks.

12   Even though the employees only spend less than eight hours a day **performing their** duties,

13   Jasmine Hall pays the employees for eight hours of work. Jasmine **Hall also pays** for the

14   employee's food and lodging.

15       Defendants are unable to ascertain at this time what dollar amount **and total** employee

16   hours non-compensable time constitute as part of Plaintiff's claim because **Plaintiff** has not

17   provided Defendants with a specific amount of damages or an accounting **as to how** Plaintiff

18   calculates its damages.

19   **INTERROGATORY NO. 2:**

20       State with specificity all facts upon which Defendants rely to **deny the** averments of

21   Paragraph IX of the Complaint and Amended Complaint herein, and **identify all documents** related

22   thereto.

23   **RESPONSE TO INTERROGATORY NO. 2:**

24       Defendants object to this "interrogatory" on the grounds that it is compound. This

25   discovery request in fact comprises multiple interrogatories propounded by Plaintiff. Defendants

26   object to these interrogatories on the grounds that they are ambiguous, overly broad, unduly

27   burdensome, and unanswerable to the extent that it requests Defendants to prove a negative -- that

28   the acts alleged did not occur and that Plaintiff is not entitled to the requested relief. Defendants

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

Exhibit F
Page 5

102

Case No. 2:05-CV-1306-GEB-KJM
RESPONSE TO PLAINTIFF'S FIRST SET OF

1  further object to these interrogatories because they seek disclosure of information protected by the

2  attorney-client privilege and work product doctrine. Defendants further object to this

3  interrogatory on the grounds that it calls for a legal conclusion. Subject to these objections and

4  without waiver thereof, Defendants state the following:

5       Jasmine Hall Care Homes are licensed Adult Residential Facilities, more commonly

6  known as "group homes," that have arrangements with its employees to live at the respective

7  group homes on a permanent basis. Employees who choose not to reside at the group homes on a

8  permanent basis agree to reside at the group home for extended periods of time. These employees

9  typically share the home with one and no more than six clients. The employees reside in a

10  separate bedroom than the clients.

11       The employees agree to the terms and conditions of work, including by signing an

12  agreement prior to starting work. The agreement provides that duty shifts are scheduled for 24-

13  hours and that not all hours at the home will be work time. The agreement is that the employee is

14  permitted while present at the home to engage in personal activities, such as taking meals and

15  scheduled sleep periods of at least eight hours, such time will not be paid. While residing at the

16  group home, each employee is able to engage in normal private pursuits, including eating,

17  sleeping, entertaining, watching TV and other periods of freedom from all duties.

18       An employee's duties may include providing certain care and supervision of the group

19  home clients, enforce house rules, and maintain conditions which insure the health, safety and

20  personal rights of the residents. Employees are informed and agree, including in the written

21  agreement, that their sleep time of up to eight hours is not work time. Employees are further told

22  that any time they are disrupted during their sleep time where they are called to duty, they should

23  alert the administrator and report it.

24       Time spent on duties by employees are recorded by the employees on the staff service hour

25  forms. Employees are required to fill out the form indicating the start and stop time for each tasks.

26  Even though the employees only spend less than eight hours a day performing their duties,

27  Jasmine Hall pays the employees for eight hours of work. Jasmine Hall also pays for the

28  employee's food and lodging.

1    Documents that support the above facts are found in those documents listed in Defendants

2  Initial Disclosure and those that have or will be made available to Plaintiff in response to its

3  Requests for Production.

4  **INTERROGATORY NO. 3**:

5    State with specificity all facts upon which Defendants rely to deny the averments of

6  Paragraph X of the Complaint and Amended Complaint herein and identify all documents related

7  thereto.

8  **RESPONSE TO INTERROGATORY NO. 3**:

9    Defendants object to this "interrogatory" on the grounds that it is compound. This

10  discovery request in fact comprises multiple interrogatories propounded by Plaintiff. Defendants

11  object to these interrogatories on the grounds that they are ambiguous, overly broad, unduly

12  burdensome, and unanswerable to the extent that it requests Defendants to prove a negative -- that

13  the acts alleged did not occur and that Plaintiff is not entitled to the requested relief. Defendants

14  further object to these interrogatories because they seek disclosure of information protected by the

15  attorney-client privilege and work product doctrine. Defendants further object to this

16  interrogatory on the grounds that it calls for a legal conclusion. Subject to these objections and

17  without waiver thereof, Defendants state the following:

18    Jasmine Hall Care Homes are licensed Adult Residential Facilities, more commonly

19  known as "group homes," that have arrangements with its employees to live at the respective

20  group homes on a permanent basis. Employees who choose not to reside at the group homes on a

21  permanent basis agree to reside at the group home for extended periods of time. These employees

22  typically share the home with one and no more than six clients. The employees reside in a

23  separate bedroom than the clients.

24    The employees agree to the terms and conditions of work, including by signing an

25  agreement prior to starting work. The agreement provides that duty shifts are scheduled for 24-

26  hours and that not all hours at the home will be work time. The agreement is that the employee is

27  permitted while present at the home to engage in personal activities, such as taking meals and

28  scheduled sleep periods of at least eight hours, such time will not be paid. While residing at the

1   group home, each employee is able to engage in normal private pursuits, including eating,

2   sleeping, entertaining, watching TV and other periods of freedom from all duties.

3        An employee's duties may include providing certain care and supervision of the group

4   home clients, enforce house rules, and maintain conditions which insure the health, safety and

5   personal rights of the residents. Employees are informed and agree, including in the written

6   agreement, that their sleep time of up to eight hours is not work time. Employees are further told

7   that any time they are disrupted during their sleep time where they are called to duty, they should

8   alert the administrator and report it.

9        Time spent on duties by employees are recorded by the employees on the staff service hour

10   forms. Employees are required to fill out the form indicating the start and stop time for each tasks.

11   Even though the employees only spend less than eight hours a day performing their duties,

12   Jasmine Hall pays the employees for eight hours of work. Jasmine Hall also pays for the

13   employee's food and lodging.

14        Documents that support the above facts are found in those documents listed in Defendants

15   Initial Disclosure and those that have or will be made available to Plaintiff in response to its

16   Requests for Production.

17   **INTERROGATORY NO. 4:**

18        For the relevant time period, identify all documents that show or describe any of the

19   following for any of Defendants' employees: hours, shifts or days worked, assigned duties, direct

20   care coverage obligations, direct care staffing, weekly facility scheduling, non-compensable time

21   periods, duties or activities, work site location, regular rates of pay, premium pay, and total wages

22   paid by Defendants; and for each document so identified, describe in detail who created and who

23   used the template for the document, how said document was used by Defendants, how training and

24   instructions on the use of the document were transmitted, whether any copy of any of these

25   documents were provided to any other person and if so, identify which documents, and to whom

26   they were provided.

27        Exhibit  F

28          Page  8