1    22.   I have read this declaration from beginning to end, and was told that I should

2   feel free to cross out or change any part of this declaration that I thought was not

3   accurate, fair or correct.

4

5        I declare under penalty of perjury in the County of Sacramento, California,

6   that the foregoing is true and correct.

7   Date - 4-6-07        _Rose O. Mendoza_

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26             Exhibit   P

27              Page   4

28                157

1  LAWRENCE BREWSTER
2  Regional Solicitor
   DAVID KAHN
3  Counsel for ESA Programs
   **JAN M. COPLICK**, Senior Trial Attorney
4  Designated Counsel for Service
   California State Bar Number 124503
5  E-Mail: Coplick.Jan@dol.gov
   ANDREW SCHULTZ
6  Trial Attorney
7  Office of the Solicitor
   United States Department of Labor
8  90 7th Street, Suite 3-700
   San Francisco, California 94103
9
10 Telephone:  (415) 625-7751
   Facsimile:  (415) 625-7772
11

12

13                 UNITED STATES DISTRICT COURT
14              EASTERN DISTRICT OF CALIFORNIA
15

16 ELAINE CHAO, SECRETARY OF      )  CIVIL ACTION NO. 2:05-cv-01306-
   LABOR, UNITED STATES           )  GEB-KJM
17 DEPARTMENT OF LABOR,           )
18             Plaintiff,         )
                                  )
19      v.                        )
   JASMINE HALL CARE HOMES,       )  DECLARATION  IN SUPPORT OF
20 INC., a corporation, HALL CARE )  THE SECRETARY'S MOTION FOR
   HOMES, INC., a corporation,    )  PARTIAL SUMMARY JUDGMENT
21 GEORGE K. HALL, an individual, and )
22 ESTELA HALL, an individual     )
                                  )
23                                )
             Defendants.          )
24 _____)
25

26      I, _Milenio Pilar_ , swear the following to be true:

27 1.   I have been employed by the Defendants ("Jasmine Hall" or "JH") from
28 _01-2000_ , to _Present_ as a live-in care provider.

                        Exhibit   Q          158
                        Page   1

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*                    - 1 -

2.    The regular weekly work schedule for Jasmine Hall's care aides is 5 on-duty days in a row, then 2 days off.

3.    I currently work at Jasmine-Hall home #___3___ on this same weekly schedule.

4.    I am paid $__1,800---__ per month in salary to cover all hours I am on duty monthly during the 5 on-duty days per week.

5.    If I work any hours on my 2 days off, Jasmine Hall considers this "overtime" and I am paid extra.

6.    Each on-duty shift is 24 hours long.

7.    For each of my duty shifts, I must stay overnight at my care home in the staff bedroom.

8.    I do __✓__ do not_____ have another residence where I could stay if I was not required to stay overnight at the care home.

9.    I do __✓__ do not _____ have to share the staff bedroom with up to __3__ other employees.

10.    During each 24 hour duty shift, I spend an average of __11½__ hours daily in direct client care, behavioral interaction, client charting, and household chores.

11.    On a typical day, it is rare that I have more than __3__ daytime hours free when I am not required to care for and interact with clients or handle household chores.

12.    Apart from these work tasks, I must also be immediately available for potential emergencies at all times during my 24 hour duty shift when clients are in the care home. I could not leave the premises for private purposes of my own even if all the work tasks were completed.

13.    On some days, all the clients are away from the care home at the same time mid-day so that, for that period of time, I am temporarily relieved of my on-duty obligation to monitor and supervise them. However, this is not predictable in advance because there are many other days where at least one client stays home

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*

1   from the planned activity. In either case, these times are not recorded on our

2   timesheets.

3   14.   Apart from the times I describe in the previous paragraph, there is usually no

4   time during my 24 hour duty shift when I am completely relieved from the duty to

5   supervise and monitor clients, and be available to meet client needs or handle

6   emergencies.

7   15.   I cannot leave clients unsupervised in the homes, or allow the number of

8   staff to fall below what Jasmine Hall has told us is the staff/client ratio of at least

9   _3_ staff for each _4_ clients. *depend on Client*

10   16.   If I need to leave the care home for any personal reason during my 5 24-hour

11   shifts on duty, I have been told to ask Jasmine Hall management in advance so

12   they can arrange coverage.

13   17.   Permission is usually granted but may also be denied, and I do not know in

14   advance.

15   18.   Between the hours of 10 pm and 6 am (nighttime), the care aides are

16   responsible for monitoring the clients during the night, and taking care of clients *before*

17   who awaken and need help. *not happen before / don't remember*

18   19.   This does not happen every night but approximately _?_ times per month.

19   20.   I have been paid for ____ none ____ some ____ all ____ of the nights my

20   sleep was interrupted by clients. OR _✓_ I don't know if I have been paid for

21   interrupted sleep.

22   21.   I give this declaration freely, in order to give an accurate description of

23   the Jasmine Hall pay system, and not because of any threats or promises.

24   //

25   //

26   //

27   //

28   //

Exhibit   Q
Page   3

160

1   22.   I have read this declaration from beginning to end, and was told that I should

2   feel free to cross out or change any part of this declaration that I thought was not

3   accurate, fair or correct.

4

5        I declare under penalty of perjury in the County of Sacramento, California,

6   that the foregoing is true and correct.

7   Date  4/6-07                    _Melanie Pilac_____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                          Exhibit  Q
                            Page    4
27
                                 161
28

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*                    - 4 -

1  LAWRENCE BREWSTER
   Regional Solicitor
2  DAVID KAHN
   Counsel for ESA Programs
3  **JAN M. COPLICK**
   Senior Trial Attorney
4  Designated Counsel for Service
   California State Bar Number 124503
5  E-Mail: Coplick.Jan@dol.gov
   ANDREW SCHULTZ
6  Trial Attorney
   Office of the Solicitor
7  United States Department of Labor
   90 7th Street, Suite 3-700
8  San Francisco, California 94103

9

10 Telephone: (415) 625-7751
11 Facsimile:  (415) 625-7772

12               UNITED STATES DISTRICT COURT
13             EASTERN DISTRICT OF CALIFORNIA
14

15 ELAINE CHAO, SECRETARY OF      ) CIVIL ACTION NO. 2:05-cv-01306-
   LABOR, UNITED STATES           ) GEB-KJM
16 DEPARTMENT OF LABOR,           )
17              Plaintiff,         )
                                   )
18      v.                         )
   JASMINE HALL CARE HOMES,        ) DECLARATION  IN SUPPORT OF
19 INC., a corporation, HALL CARE  ) THE SECRETARY'S MOTION FOR
20 HOMES, INC., a corporation,     ) PARTIAL SUMMARY JUDGMENT
   GEORGE K. HALL, an individual, and )
21 ESTELA HALL, an individual      )
                                   )
22                                 )
              Defendants.          )
23                                 )

24      I, _Josefa (Joy) Lastrosa_ , swear the following to be true:
25

26 1.    I was employed by the Defendants ("Jasmine Hall" or "JH") from
27 _3-16 024_ to _6-1-04_ as a live-in care provider or care aide.
28 2.    The regular weekly work schedule for Jasmine Hall's care aides was 5 on-
   duty days in a row, then 2 days off.

                              Exhibit  R          162
                              Page  1

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*                          - 1 -

3.   I worked at Jasmine-Hall home # _*U*_ on this weekly schedule.

4.   I was paid $ _1,5⁵⁰ – 1,700_ per month in salary to cover all hours I was on duty monthly during the 5 on-duty days per week.

5.   If I worked any hours on my 2 days off, Jasmine Hall considers this "overtime" and I was paid extra.

6.   Each on-duty shift was 24 hours long.

7.   For each of my duty shifts, I was required to stay overnight at my assigned care home in the staff bedroom.

8.   I did _✓_ OR did not_____ have another residence where I could stay if I was not required to stay overnight at the care home.

9.   I did _✓_ OR did not ____ have to share the staff bedroom.

10.  During each 24 hour duty shift, I spent an average of _12 - ¹⁴_ hours daily in direct client care, behavioral interaction, client charting, and household chores.

11.  Apart from these work tasks, I was required to also be immediately available for potential emergencies at all times during my 24 hour duty shift when clients were in the care home.

12.  When clients were in the care home, I could not leave the premises for private purposes of my own even if all the work tasks had been completed.

13.  On some days, all the clients were away from the care home at the same time during mid-day at various scheduled Day Programs so that, for that period of time, I was temporarily relieved of my on-duty obligation to monitor and supervise them. However, this was not predictable in advance because on many other days, at least one client stayed home from the planned activity. In either case, these times were not recorded on our timesheets.

14.  Apart from the times I describe in the previous paragraph, there was usually no time during my 24 hour duty shift when I was completely relieved from the duty to supervise and monitor clients, and to be available to meet client needs or handle emergencies.

Exhibit   R          163
Page  2

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*

-2-

15.   I could not leave clients unsupervised in the homes, or leave if clients were there, because Jasmine Hall warned us we needed to have staff present to meet the staff/client ratio required by the State.

16.   If we care aides needed to leave the care home for any personal reason during my five 24-hour shifts on duty, we were told to ask Jasmine Hall management in advance so they could arrange coverage. Usually Estela Hall did this.

17.   Permission was usually granted but not always, and we care aides did not know in advance.

18.   Between the hours of 10 pm and 6 am (nighttime), we care aides were responsible for monitoring the clients, and taking care of clients who awakened and needed help.

19.   This did not happen every night but about _20_ times per month.

20.   I do not recall recording the time when my sleep was interrupted, or being paid for those times. _NO_ OR I believe I was paid for those times my sleep was interrupted. _NO_

21.   I give this declaration freely, in order to give an accurate description of the Jasmine Hall pay system, and not because of any threats or promises.

22.   I have read this declaration from beginning to end, and was told that I should cross out or change any part of this declaration that I thought was not accurate, fair or correct, which I felt free to do.

I declare under penalty of perjury in the County of Sacramento, California, that the foregoing is true and correct.

Date _4-7-07_

Exhibit   R
Page   3

164

LAWRENCE BREWSTER
Regional Solicitor
DAVID KAHN
Counsel for ESA Programs
**JAN M. COPLICK, Senior Trial Attorney**
*Designated Counsel for Service*
California State Bar Number 124503
E-Mail: Coplick.Jan@dol.gov
ANDREW SCHULTZ
Trial Attorney
Office of the Solicitor
United States Department of Labor
90 7th Street, Suite 3-700
San Francisco, CA, 94123

Telephone:  (415) 625-7751
Facsimile:  (415) 625-7772

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, <br><br> Plaintiff, <br><br> v. <br><br> JASMINE HALL CARE HOMES, INC., a corporation, HALL CARE HOMES, INC., a corporation, GEORGE K. HALL, an individual, and ESTELA HALL, an individual <br><br> Defendants. | CIVIL ACTION NO. 2:05-cv-01306-GEB-KJM <br><br><br><br><br> DECLARATION OF VALERIE LOWERY IN SUPPORT OF THE SECRETARY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

I, VALERIE LOWERY, declare as follows:

1.     I was employed by the Defendants ("Jasmine Hall" or "JH") during a period of time between December 2002 and May 2003 ("relevant time period"), first as a live-in care provider and then as an Administrator supervising several Jasmine Hall care homes.  All the information that I give in this Declaration concerns this relevant time period unless stated otherwise.

2.     As a residential care aide (RCA), I primarily worked at Jasmine Hall # IV, a residential group home for developmentally disabled (DD) clients with moderately severe disabilities whose care needs had been assessed at Level 3 (with Level 4 being the highest) and requiring a

*Declaration*

Exhibit   S
Page     1

165

minimum staff to client ratio of 1 staff member on site for every 3 clients but other Jasmine Hall care homes were Level 4.  When I worked at JH IV, we had 6 clients in residence and 2 staff members on-duty at all times.

3.      As a care aide, I worked the standard JH work week pattern of 5 consecutive days on, then 2 days off.  Each of these 5 daily duty shifts was 24 hours long, for a total of 120 duty hours each week.  I received a monthly salary of $1500, later raised to $1600 (all before taxes), to cover each month's worth of 120-hour workweeks.

4.      If care aides also worked additional hours on our days off, JH called those hours "overtime" and paid us extra pay for them.

5.      I had my own apartment where I stayed on my days off.  However, on my 5 duty shifts each week as a care aide, I was required to sleep overnight at the care home, sharing the cramped staff bedroom with 2 other women.  I had only a small portion of the closet in which to put my personal belongings, and there was no privacy.  There was also no working television in our shared bedroom and we were not permitted by the house manager to use the main home TV after 8 p.m.  There was no place to entertain a friend and entertaining was discouraged; a nurse friend of mine tried to visit a few times, and the house manager told her I wasn't there even though I was.  At 9 p.m. the house manager locked the doors, and since the care aides did not have a key or code, we could not stay out past 9 pm, even in the yard.

6.      My daily care aide duties included cooking meals and related clean-up, and doing housework such as making beds, doing laundry, cleaning the facility and yard maintenance.  Our most important and also time consuming duty was providing direct care and supervision to meet the needs of the severely impaired residents.  Jasmine Hall specialized in taking DD clients who additionally had serious behavioral and mental problems, who needed less physical care but much more behavioral care and attention.

7.      The care aides (commonly called "staff") were responsible for handling the clients' daily behavioral data gathering and intervention programs, as well as some specified training programs, and all the related record keeping and charting.  The problem behaviors were identified by a paid consultant but it was the care aides who tracked and provided the data about

Declaration

Exhibit  S
Page  2

166

1  how often daily they occurred, when, and why, and took the prescribed interventions and

2  trainings.

3  8.      These behaviors could range from nighttime bedwetting and soiling, yelling, stealing,

4  smearing feces, hitting others, throwing food, public masturbation, self-injury, and others.  Some

5  of the training care aids provided to clients included performing daily hygiene and required us to

6  hold our hand over the client's hand to teach themselves how to wash themselves, or brush their

7  teeth – "hand over hand" training. The behavioral training was time intensive as it was done one-

8  on-one and many DD clients tended to learn slowly.

9  9.      The care aides were obligated to do behavioral monitoring and intervention throughout

10  the entire 24-hour shift, including any evening leisure periods set up for the enjoyment of the

11  clients, such as television watching, games night and video night.  Watching television with

12  clients was not the same as watching television with friends, because clients yelled out

13  interruptions, got into fights, engaged in obsessive behaviors, or kept asking for an explanation

14  of what was being said or shown on TV.

15  10.     The care aides also had to be ready at all times to handle any emergency as well as to be

16  constantly paying attention and monitoring for potentially dangerous situations.  Some clients, if

17  not watched closely, would wander away, or get up at night, and injure themselves.  One client,

18  for example, constantly urinated on herself and required close attention and frequent clean-up

19  and laundry.  At night, she was at risk of burning herself by leaving her face for long periods

20  under the hot-water tap in the bathroom, if not carefully monitored.

21  11.     We needed to sleep lightly to be sure to catch any problems, and our sleep was also

22  interrupted many nights by client problems or by activity or noise made by another RCA in the

23  shared staff bedroom.  We didn't record or get paid for the interrupted sleep.  I often got less

24  than 5 uninterrupted hours of sleep per night.

25  12.     As a care aide, I usually started work before 5:30 a.m., splitting the tasks with the other

26  on-duty care aide to either cook a hot breakfast or wake clients up; bathe, shave and dress the

27  clients and dispense morning medications; do laundry, make beds, make and eat lunch and

28  dispense lunchtime medications; clean the house; supervise and interact with the clients during

the afternoon into evening; make dinner and help the clients eat it, and clean up;  help them get

*Declaration*

Exhibit  S
Page   3

167

1  ready for bed, dispense evening medications and put them to bed by 8 p.m. 13.   On a typical

2  day as a JH care aide, I spent virtually all of the daytime hours starting before 5:30 o'clock a.m.

3  up until about 8 p.m. directly caring for or training clients, doing household and cooking duties,

4  or handling medical or behavior issues. It was very rare if I had an hour free to myself.

5  14.   Although many of the clients were enrolled in Day Programs, it was rare that all of them

6  actually went. In any event, it was clearly understood that the care aides were not to leave our

7  assigned care homes – even if no clients were present - during our 5 days on duty without

8  advance permission.

9  15.   This was also the company rule that I was told to apply as a supervisor, once I was

10 promoted to Administrator, to ensure that the important staff to client ratios were always met.

11 16.   Once, soon after I had been hired, I left the home one weekday during the middle of the

12 day, for approximately one hour, to handle a personal chore, as I knew enough staff were still

13 present to handle the single client who had not gone to Day Program that day. This incident was

14 reported to George Hall, who then took me into the staff room and reprimanded me in very

15 strong tones, saying, 'Its clear to me you left for a break. You cannot leave the facility until your

16 day off. If you want your job, you need to stay here and not leave." I explained to Mr. Hall that

17 I hadn't been needed for client care, as there had been sufficient RCA's to care for the one client

18 at the home. George Hall responded, 'It doesn't matter. You cannot leave. That's the rule.   If

19 you want to keep your job, you have to stay here; you cannot leave until your day off.'

20 17.   When offered the promotion to Administrator, I viewed it as a chance to escape these

21 restrictive conditions of having virtually no private time or space, and no designated "time off"

22 during at least 120 hours of each week. As Administrator, I also worked very long hours but I

23 could sleep at home each night, and have some privacy and personal time for my own needs

24 again.

25 I declare under penalty of perjury that the foregoing is true and correct.

26 Executed on : April **26** 2007         *Valerie A. Lowery*

27                                              VALERIE LOWERY

28

Exhibit  S
Page  4

*Declaration*

1   LAWRENCE BREWSTER
    Regional Solicitor
2   DAVID KAHN
    Counsel for ESA Programs
3   **JAN M. COPLICK**, Senior Trial Attorney
    Designated Counsel for Service
4   California State Bar Number 124503
5   E-Mail: Coplick.Jan@dol.gov
    ANDREW SCHULTZ
6   Trial Attorney
    Office of the Solicitor
7   United States Department of Labor
8   90 7th Street, Suite 3-700
    San Francisco, California 94103
9
10  Telephone:  (415) 625-7751
    Facsimile:  (415) 625-7772
11

12

13              UNITED STATES DISTRICT COURT

14            EASTERN DISTRICT OF CALIFORNIA

15
16  ELAINE CHAO, SECRETARY OF     ) CIVIL ACTION NO. 2:05-cv-01306-
    LABOR, UNITED STATES          ) GEB-KJM
17  DEPARTMENT OF LABOR,          )
18             Plaintiff,         )
                                  )
19        v.                      )
    JASMINE HALL CARE HOMES,      ) DECLARATION  IN SUPPORT OF
20  INC., a corporation, HALL CARE) THE SECRETARY'S MOTION FOR
    HOMES, INC., a corporation,   ) PARTIAL SUMMARY JUDGMENT
21  GEORGE K. HALL, an individual, and )
22  ESTELA HALL, an individual    )
                                  )
23             Defendants.        )
24  _____)

25
26       I, SANDY NUNEZ, swear the following to be true:

27  1.    I am employed by Alta California Regional Center ("Alta"), 2135 Butano

28  Drive, Sacramento, California, 95825 in the position of QMRP for the Federal

                                        Exhibit   T        169
                                        Page      1

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*        - 1 -

1  Programs Department. I held the position of Residential Development Specialist
2  from September of 1999 through November of 2005.
3  2.    I have worked for Alta since November of 1985. Prior to that, I was
4  employed by Stanislaus County Dept. of Social services as a Social Worker in
5  Adult Protective Services for six years in Modesto, California.
6  3.    Alta is one of a network of 21 regional centers in California established by
7  the Lanterman Mental Retardation Services Act of 1969. Alta is a private non-
8  profit corporation working under contract with the California Department of
9  Developmental Services (DDS) to provide services to persons with developmental
10 disabilities (DD) and their families throughout a ten county area around
11 Sacramento.
12 4.    One of the services Alta provides is assessment and placement for 24-hour
13 non-medical residential care for DD adults and children in Community Care
14 Facilities (CCFs) which have been licensed by the Community Care Licensing
15 (CCL) Division of the State's Department of Social Services.
16 5.    In addition to CCL, these residential facilities are also regulated by the
17 Regional Centers. The initial process is called Vendorization, and is essentially an
18 approval process to ensure that the facility, its administrator staff will be able to
19 provide care at the Level of Services applied for. A diagram which Alta provides
20 in an attempt to demonstrate the vendorization process is attached as Exhibit A,
21 and a diagram which Alta provides in an attempt to summarize the differences
22 between the 4 Level of Services for which we vendor facilities is attached as
23 Exhibit B.
24 6.    Alta also makes available on its website sample forms which vendors can
25 download and use to assist them in reporting or recording some of the information
26 required under Title 17. One example is the Weekly Staff Schedule form, a blank
27 copy of which is attached hereto as Exhibit C, which residential facilities need to
28 fill out and maintain on a weekly basis, in order to demonstrate how their staffing
   complies with the direct care requirements both on a weekly basis and also to meet

1  the staff/client care ratio at any given time; if Alta does a spot audit of a residential

2  facility, we will request to see a current copy of this document and will also check

3  to ensure that staffing at the time mirrors that set forth in the schedule.

4  7.    Alta has made some spot visits (Unannounced Facility Monitoring Visits) to

5  different Jasmine Hall care homes since 2002. Alta has documented the results of

6  these visits in its files in Unannounced Facility Monitoring Visit Reports.

7  8.    Another Alta website form for residential care vendors is the Weekly

8  Resident Accountability log, a blank copy of which is attached hereto as Exhibit D.

9  All clients at a facility are required to sign out on this form, or something similar,

10  if they leave the facility.

11  9.    During 2005, I was working with George Hall and Estela Hall concerning

12  their vendorization application for Jasmine Hall # 7 on Bartig Way.   Alta had been

13  unwilling to approve the application to that point because George Hall was

14  disputing the application of several of Alta's residential vendor policy

15  requirements to his facility.    I attended several meetings on these matters, after

16  which meetings I immediately wrote notes to the file recording the meetings, a true

17  and accurate copy of which notes I attach as Exhibit E.

18  10.    One of these meetings took place on July 13, 2005, with George and Estela

19  Hall in attendance, as well as the Service Coordinator for the home, James T.

20  Williams from Alta, and myself, at the Jasmine Hall home on Bartig Way.  One of

21  the issues discussed during this meeting was Alta's Residential Vendor Policy that

22  all Level 4 homes should provide an "awake" staff at night. This means that Alta

23  would not vendor [or approve] care homes at Level 4 which would only provide

24  overnight client care and supervision (during 10 p.m. to 6 a.m. time period) by

25  sleeping care staff within earshot of the clients, no matter how vigilant and lightly

26  they slept. Instead, Alta was requiring care homes who wished to be vendored at

27  Level 4 to promise to provide at least one direct care staff member who was

28  designated to remain awake and on duty throughout the 10 p.m. to 6 a.m. time

period, called "awake" staff.                        Exhibit   T            171
                                                        Page  3

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*                  - 3 -

11.   At the July 13, 2005 meeting, George Hall and Estella Hall stated to Alta personnel that at each of their Jasmine Hall Level 4 homes, they always provide "awake" staff on duty.

12.   I also recall the same statement being made by Mr. and Mrs. Hall at the vendorization meeting held on 7/8/05 at the Jasmine Hall # 8 facility, located on 5949 Brett Drive in Sacramento, CA., 95842, that they always provide "awake" staff on duty at all their Level 4 homes.

13.   Approximately four years ago, I asked Estela Hall to participate in a panel discussion with two other residential care providers at a vendor orientation I arranged. During the presentation, an audience member asked how each paid their staff. The other two providers stated that they paid their staff an hourly wage, between 10.00 and $13.00 per hour, plus benefits. Estela Hall stated that she gave her staff a monthly salary and room and board, but declined to state the amount of the salary. After the presentation, one of the other panel members approached me privately to express concern and disapproval about the answer given by Estela Hall; this provider stated that paying salaries to staff in exchange for their availability at all hours because they lived at the facility, was not within the range of standard industry practices, and left the staff open to exploitation.  However, I felt Alta had not endorsed Estela Hall's answer.

14.   Throughout my professional dealings with Jasmine Hall facilities through the years, Estela Hall has often represented the corporate interests of Jasmine Hall with Alta, and has represented herself to be a principal in the Jasmine Hall operation.

I give this declaration freely, without promise or threat, and have been encouraged to change or cross out any portion of it that does not seem fair or accurate to me.

I declare under penalty of perjury that the foregoing is true and correct.

Date  4/10/07           _Sandy Nunez_

                          SANDY NUNEZ

*Declaration in Support of Secretary's Motion for Partial Summary Jt.*



# ALTA CALIFORNIA
### REGIONAL CENTER

## RESIDENTIAL SERVICES CONTRACT AGREEMENT – Level 4

This agreement is between Alta California Regional Center, hereafter referred to as the Regional Center, and _George Hall_ ; hereafter referred to as Contractor.
(Administrator)

Name of Corporation (if applicable): _Hall Care Homes, Inc_

1.   This contract is applicable to: _____
(Vendor Number)

Name of Facility: _Jasmine Hall III_

Address: _1601 Ferran Ave._

_Sacramento, CA 95832_

Phone Number: _____

_____ Owner-Operated   _X_ Staff-Operated _4,979.00_ Monthly Rate

2.   The facility will provide residential services for: _18 - 59_
(Age Group)

3.   Contractor Performance:

Residential Service Provider agrees to:

a.   Comply with Title 17 and 22 regulations applicable to community residential facilities.

b.   Provide supervision, training, and support, as needed, to implement the program design and the Individual Program Plan Objectives.

c.   Meet with the Planning Team to provide information necessary for development, review, and/or update of the IPP.

d.   Provide a basic staffing level of not less than one direct care staff person whenever clients are under the supervision of facility staff. Additional direct care staff hours are to be provided as determined by service level and number of clients.

Basic staff: _1  24 hrs._
Additional direct care staff hours: _252/wk_ .

Exhibit  U        173
Page    1

Service for the following Counties: Alpine, Colusa, El Dorado, Nevada, Placer, Sacramento, Sierra, Sutter, Yolo, Yuba

e.  Prepare and maintain on-going written client notes which will include, but not be limited to:

- Community and leisure activities.
- Overnight visits away from the facility.
- Illness.
- Reportable incidents (Serious bodily/physical harm, AWOL or death).
- Medical and dental visits.

f.  Ensure the preparation and maintenance of a dated and signed quarterly report of each residents progress on IPP objectives.

g.  Include in the quarterly reports a summary of the data collected for each client and actions taken in response to any barriers to client progress. Submit the quarterly report to the Regional Center within 15 days of the end of the quarter.

4.  I understand that all residents will have the choice to attend day program less than full time or not at all.

5.  Quality Assurance:

a.  I understand the Regional Center will conduct an evaluation of residential services utilizing the Title 17 Quality Assurance Regulations, 56001-56061.

b.  I understand that the following situations will require sanctions on the facility:

1.  If the Regional Center determines that the services provided by the contractor are not consistent with this contract or the designated service level.

2.  If there are two findings of substantial inadequacies within a twelve-month period (Title 17, 56057).

3.  If a substantial inadequacy is not corrected within the time frame specified in a corrective action plan (Title 17, 56057).

c.  I understand that corrective action and appeal shall be consistent with Sections 56056 and 56061 of Title 17 of the California Code of Regulations.

4.  I understand that I must maintain staff and services based on the designated service level or the Regional Center will reduce the approved service level to the level associated with the amount of direct supervision and services actually being provided. [Title 17, Sections 56004, 56054, and 56057.]

6.  Contract Termination:

a.  I agree that this contract may be terminated for cause by the Regional Center. Cause shall include, but not be limited to, failure to comply with the terms of the contract. The Regional Center will provide written notice to the contractor of action taken pursuant to contract and/or payment termination.

Exhibit  U
Page  2

174

    b.  I agree that the contractor may cancel this agreement with 30 days prior written notice.

7.  Contract Renewal:

    a.  I understand that the renewal of this contract shall be contingent upon the Regional Center's analysis of:

- Licensing evaluations and compliance with Quality Assurance Standards, Title 17 regulations and Title 22 regulations.
- Program effectiveness as evidenced by achievement of program objectives in IPP.
- Contract will be re-evaluated for renewal not less than every three years.

8.  Indemnification:

    a.  I agree to indemnify, defend, and save harmless the Regional Center and the State of California, its' officers, agents, and employees from any and all claims and losses accruing or resulting to any person, firm, or corporation furnishing or supplying work, services, materials or supplies in connection with the performance of this contract, or who may be injured or damaged by the service provider in the performance of the contract.

9.  Accessibility of Residents:

    a.  The service provider agrees to allow authorized staff of the Regional Center and the Department of Developmental Services access to the resident and the facility.

10.  I understand that Alta California Regional Center pays the SSI/SSA portion of the Board and Care payment on the 25th of the month in which it is received. This results in a portion of the payment being paid in advance. I agree that I will refund any prorated portion of the payment to Alta California Regional Center immediately when a consumer leaves our facility.

Continued funding for residential services is contingent upon funds being available through California.

11.  Effective Date:  _April 1, 2002_ .

_Sandy Nune_, RDS      _George Hill_
Regional Center Representative      Facility Administrator

_5/29/02_          _5/29/02_
Date                 Date

Exhibit   U
Page  3

175

1  LAWRENCE BREWSTER
   Regional Solicitor
2  DAVID KAHN
   Counsel for ESA Programs
3  **JAN M. COPLICK**, Senior Trial Attorney
   Designated Counsel for Service
4  California State Bar Number 124503
   E-Mail: Coplick.Jan@dol.gov
5  ANDREW SCHULTZ
   Trial Attorney
6  Office of the Solicitor
   United States Department of Labor
7  90 7th Street, Suite 3-700
   San Francisco, California 94103
8
9  Telephone: (415) 625-7751
   Facsimile:  (415) 625-7772
10
11
12
13              UNITED STATES DISTRICT COURT
14            EASTERN DISTRICT OF CALIFORNIA
15
16  ELAINE CHAO, SECRETARY OF          )  CIVIL ACTION NO. 2:05-cv-01306-
    LABOR, UNITED STATES               )  GEB-KJM
17  DEPARTMENT OF LABOR,               )
18            Plaintiff,               )
                                       )
19         v.                          )  DECLARATION  IN SUPPORT OF
    JASMINE HALL CARE HOMES,           )  THE SECRETARY'S MOTION FOR
20  INC., a corporation, HALL CARE     )  PARTIAL SUMMARY JUDGMENT
    HOMES, INC., a corporation,        )
21  GEORGE K. HALL, an individual, and )
22  ESTELA HALL, an individual         )
                                       )
23            Defendants.              )
24  _____)
25
26      I, JOYCE GLOVER, swear the following to be true:
27  1.    I was employed by the Defendants ("Jasmine Hall" or "JH") from
28  approximately December 2001 until July 2003 as a live-in care provider or care
    aide.

                                              Exhibit   V
                                              Page   1

*Declaration in Support of Secretary's Motion for Partial Su*          176          - 1 -

2.    The regular weekly work schedule for Jasmine Hall's care aides at that time was 5 on-duty days in a row, then 2 days off.

3.    Each on-duty day or shift was 24 hours long.

4.    I worked at Jasmine-Hall home #IV and, for a few weeks to relieve someone on vacation, at Jasmine Hall #VI, working according to the JH care aide schedule at both places.

5.    I was paid $1,500 per month, later rising to $1,600 per month, in salary before taxes to cover all hours I was on duty monthly during the 5 on-duty days per week.

6.    If I worked any hours on my 2 days off, Jasmine Hall considered this "overtime" and I was paid extra.

7.    Every night during my duty shifts, I was required to stay overnight at my care home in the staff bedroom.

8.    At Jasmine Hall # IV, I had to share the staff bedroom with 2 other employees each night, a married couple who slept in a double bed while I had a twin bed in the same room, with no barrier between us for privacy.

9.    In order to give myself and the married employees some minimal degree of privacy, I often spent the night sleeping on the sofa in the care home living room.

10.    At Jasmine Hall # VI, I had to share the staff bedroom with 3 other employees, in two sets of bunk beds, stacking four beds in a small room.  There was very little space left over for any personal belongings; the four of us had to share the dressers, and had no privacy from each other at all.

11.    I usually started my workday about 5:30 a.m., getting breakfast prepared, cleaning up clients, cleaning the house, assisting clients with performance of their personal chores, cleaning the bedrooms and changing beds, doing laundry. This generally took most of the morning, after which we would prepare and serve lunch, finish any household chores and do any client journaling of progress, problems or events, then start preparing dinner, dealing with the clients throughout, distributing medications, and finally preparing clients for bed by 8 to 9 pm.

12.    Along with these daily chores, we also had to conduct behavioral training and interaction and care for clients' unpredictable problems. We had to handle and gather data on identified behavioral deficiencies such as clients' running away, calling 911, threatening suicide, calling in false fire alarms, assaulting staff, talking to self (and voices) out loud, refusing to do personal grooming, and engaging in fights with other clients.

13.    I was usually working fairly constantly most of the time between 6 a.m. and 9 p.m., and sometimes long afterwards if I needed to go through the neighborhood looking for a client who had gone AWOL.

14.    It was very rare that all clients left the house during the daytime, for example, to attend Day Programs as claimed by George Hall. In fact, one client was not even enrolled in a day program, another had cancer and could not leave, another went twice a week, and two others attended a sheltered workshop.

15.    On occasion, there were a few periods of down-time during those hours when I had some time free, for example to watch television, but I was still responsible for the clients so I did not really relax during those times.

16.    When I began work for Jasmine Hall, I had hoped I would have enough free time in the evenings to finish the screenplay that I was writing. I had to get permission to set up my computer in the staff room, since it was shared by several persons, but it turned out that I had very little time free from client care to write. I finally finished a short screenplay for a short film, which won an award which included having my film professionally produced, but Jasmine Hall would not give me the time off in the evenings to participate in having my film made.

17.    Even during periods of down time, the clients would follow me around. As a care aide, I was expected to interact with them, and could not ask them to leave me alone or give me some "privacy". Most of all, I was not free to leave the premises and I was always aware that I was on duty.

18.    We were told by George Hall and Estela Hall that we could not leave while we were on duty, unless we either got advance permission or took the clients with

1 us, which then turned it into a client activity and required us to pay a lot of
2 attention to the clients.

3 19.    After 10 pm, the care aides were responsible for monitoring the clients
4 during the night, and taking care of clients who awaken and needed help.
5 Sometimes this was a continuation of the acting-out or AWOL behavior described
6 above, and other times involved clients getting up to smoke a cigarette, visit the
7 bathroom or doing something to disturb others.

8 20.    When I slept on the sofa at Jasmine Hall #IV, my sleep was regularly
9 interrupted by clients, even if I did not have to get up, approximately 30 to 40% of
10 the time.  When I shared the staff bedroom at Jasmine Hall #IV, the close sleeping
11 quarters I shared with 3 other people meant that any sounds or actions anyone else
12 made also interrupted my sleep, in addition to client interruptions.

13 21.    Our sleep interruptions were never recorded and we were never paid for
14 nights when we did not get at least 5 hours of uninterrupted sleep.

15 22.    I give this declaration freely, without promise or threat, and have been
16 encouraged to change or cross out any portion of it that does not seem fair or
17 accurate to me.

18 I declare under penalty of perjury in the County of Sacramento, California, that
19 the foregoing is true and correct.

20 Date 4-9-07

JOYCE GLOVER

27
28

Exhibit  V
Page  4

179

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*

- 4 -

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---o0o---

ELAINE CHAO, SECRETARY
OF LABOR, UNITED STATES
DEPARTMENT OF LABOR,

      Plaintiffs,

    vs.

JASMINE HALL CARE HOMES,
INC., a corporation, HALL
CARE HOMES, INC., a corporation,
GEORGE K. HALL, an individual,
and ESTELA HALL, an individual,

      Defendants.
                    /

**COPY**

Case No. 2:05-CV-13060-GEB-KJM

--o0o--
Friday, March 16, 2007

--o0o--

Deposition of
ESTELA HALL
--o0o--

Ref. No. 1-3588
REPORTED BY:  RUTH E. DIEDERICH, CSR NO. 4952

**CAROL NYGARD**

& ASSOCIATES

**DEPOSITION REPORTERS**

916-928-8999 • 877-Get-Rptr
Fax 916-928-9989

4180 Truxel Road • Suite 100 • Sacramento, CA 95834
www.sacramentocourtreporter.com

Exhibit  W
Page  1

180

```
 1                        APPEARANCES

 2    COUNSEL FOR THE PLAINTIFF:

 3
           US DEPARTMENT OF LABOR
 4         BY:   JAN M. COPLICK, Esq.
           71 Stevenson Street, Suite 1110
 5         San Francisco, California  94105
           (415) 975-4484
 6
      COUNSEL FOR DEFENDANTS:
 7
           ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS, LLP
 8         BY:   BALDWIN J. LEE, Esq.
           Three Embarcadero Center, 12th Floor
 9         San Francisco, California  94111-4074
           (415) 837-1515
10
      ALSO PRESENT:
11
           SHELIA CREEL
12         GEORGE HALL

13

14                    ---o0o---

15

16

17

18

19

20

21

22

23

24

25                                       Exhibit   W
                                         Page  2
```

Estella Hall

```
 1                        INDEX
                                              Page No.
 2

 3          EXAMINATION BY MS. COPLICK              4

 4


 5                       EXHIBITS

 6

 7     Exhibit No.          Description       Page No.

 8          A          A sample schedule         32

 9          B          A personnel report        49

10          C          A personnel report        49

11          D          A personnel report        49

12          E          A time sheet              77

13          F          Staff service hours       107
                       and activities report
14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit  W
Page  3

182

3

Estella Hall

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--0o0--

1
2
3
4  ELAINE CHAO, SECRETARY
   OF LABOR, UNITED STATES
5  DEPARTMENT OF LABOR,
6
       Plaintiffs,
7
       vs.                    Case No. 2:05-CV-13060-GEB-KJM
8
   JASMINE HALL CARE HOMES,
9  INC., a corporation, HALL
   CARE HOMES, INC., a corporation,
10 GEORGE K. HALL, an individual,
   and ESTELA HALL, an individual,
11
       Defendants.
12 _____/
13                    ---o0o---
14      BE IT REMEMBERED, that on Friday, March 16,
15 2007, commencing at the hour of 3:08 p.m. thereof, at
16 the offices of Carol Nygard & Associates, 4180 Truxel
17 Road, Suite 100, Sacramento, California, before me,
18 Ruth E. Diederich, a Certified Shorthand Reporter of
19 the State of California, there personally appeared
20                    ESTELA HALL
21      called as a witness by the Plaintiffs, who,
22 being by me first duly sworn, was thereupon examined
23 and interrogated as hereinafter set forth.
24             EXAMINATION BY MS. COPLICK
25      Q.   Mrs. Hall, for the record, will you please

Exhibit W
Page  4

4

```
 1      state your name.

 2          A.    Estela Hall.

 3          Q.    And is your middle initial "O"?

 4          A.    Correct.

 5          Q.    What does the "O" stand for?

 6          A.    Ocampo.

 7          Q.    Could you spell that, please?

 8          A.    It's, O-c-a-m-p-o.

 9          Q.    Is this your maiden name, by any chance?

10          A.    Yes.

11          Q.    I have my middle name as my maiden name.

12      Strike that, all of that.

13              Mrs. Hall, thank you for being here today to

14      have your deposition taken.  Have you ever had your

15      deposition taken before?

16          A.    No.

17          Q.    I hope you had a chance to talk with your

18      counsel before, but let me also just go over the

19      general ground rules of a deposition while we're on

20      the record so it can be clear.

21              We're here and the court reporter will be

22      taking down everything that -- all the questions I ask

23      you and the answers that you provide under oath.  And

24      you understand that the oath that you have just taken

25      is the same as in a court of law and obligates you to
```

Estella Hall

1      A.    A flex time is -- sometimes a staff, actually,

2    will have some things to do, and, you know, they'll

3    call me, I'll be there.  Or they have things to do,

4    they'll call the administrator, and the administrator

5    will take some of the responsibility of -- or the

6    family comes and the clients leave.

7      Q.    Yes.

8      A.    It varies from time to time.  It depends on

9    the situation.

10     Q.    Uh-huh.  Can you give me some other examples

11   of types of situations?

12     A.    Somebody might want to go to the store or

13   might want to go to the bank.

14     Q.    That's a staff member or a client?

15     A.    Staff member.

16     Q.    And if that happens, if the staff member wants

17   to go to a store, do you pop over to the house and

18   cover for them?

19     A.    I do, or I even take them to the store.

20     Q.    Okay.  What if they want to go to the bank?

21   Do you do the same thing, you go over to the house and

22   cover?

23     A.    I do the same thing, and there are other

24   administrators who does the same thing.

25     Q.    Okay.  But the staff members can't just leave

Exhibit   W
Page  6

127

Estella Hall

1    and go to the bank without calling -- excuse me.

2    Strike that.

3         The staff can't just leave and go to the bank

4    without calling you, unless there's no clients in the

5    home; right?

6    A.    That's not the case.

7    Q.    So what -- could you correct what -- why I'm

8    wrong in that statement?

9    A.    They have -- you know, some of the staff leave

10   the premises.  They don't need to call me.

11   Q.    Uh-huh.  How long can they leave for if they

12   are not going to call you and let you know?

13   A.    It varies.  I mean, it varies.  It's -- it

14   varies.

15   Q.    If -- if there's full clients on -- on the

16   premises, what's the longest you would expect staff to

17   be leaving for without calling you?

18   A.    Can you rephrase the question again?

19   Q.    Uh-huh.

20        If all the clients are -- are in the facility,

21   what's the longest that you would expect staff to

22   leave the premises for without calling you so that you

23   could arrange to fill in?

24   A.    Half an hour, an hour.

25   Q.    Okay.  Mrs. Hall, are you aware of any persons

Exhibit  W

Page  7

128

1

2

3          I, RUTH E. DIEDERICH, a Certified Shorthand

4    Reporter of the State of California, duly authorized

5    to administer oaths, do hereby certify:

6          That I am a disinterested person herein,

7    that the witness named in the foregoing deposition,

8    was by me duly sworn to testify the truth, the whole

9    truth and nothing but the truth;  that the deposition

10   was reported in shorthand by me, Ruth E. Diederich, a

11   Certified Shorthand Reporter of the State of

12   California, and thereafter transcribed into

13   typewriting.

14

15

16

17

18          _____
               RUTH E. DIEDERICH, CSR No. 4952

19

20

21

22

23

24                                  Exhibit  W
                                         Page  8

25                                         187

1
Carol Nygard & Associates
4180 Truxel Road, Suite 100
Sacramento, California 95834
2
(916) 928-8999

3

4
March 28, 2007                    1-3588

5
ESTELA HALL
C/O Allen, Matkins, Leck, Gamble, Mallory & Natsis, LLP
6
    Attn:  Baldwin J. Lee, Esq.
Three Embarcadero Center, 12th Floor
7
San Francisco, California  94111-4074

8
        Re: Chao, et al, v. Jasmine Hall Care Homes,
            Inc., et al
9

Dear Ms. Hall:
10
        Your deposition in the above matter is now
11
available at this office.

12
        Since the original deposition may not be
released from our custody, if you wish to sign it,
13
please appear at this office, 4180 Truxel Road, Suite
100, Sacramento, California, within the next 30 days
14
on any weekday between the hours of 9:00 a.m. and
11:00 a.m. and 4:00 p.m. It will be necessary that you
15
bring this letter with you.

16
        In the alternative, you may wish to read your
attorney's copy of the deposition and notify this
17
office by letter of any changes you desire to be made.

18
                        Very truly yours,
                        CAROL NYGARD & ASSOCIATES
19

20

21
                        *Jawellet Matthucci*

22

23

cc:  ALL COUNSEL
24

25
                                        Exhibit  W
                                        Page  9

                                188

                                                            151

Direct Care Staff Schedule

Facility: JASMINE Hall II

Week Of: april 5/11/04

| | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| 1:00 AM | L | GM | JL | RA | JL | RA | GM | JL | GM | GM | RA | JL | GM |
| 2:00 AM | | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 3:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 4:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 5:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 6:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 7:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 8:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 9:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 10:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 11:00 AM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 12:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 1:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 2:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 3:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 4:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 5:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 6:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 7:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 8:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 9:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 10:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 11:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| 12:00 PM | L | GM | JL | RA | JL | RA | JL | GM | JL | GM | GM | RA | JL | GM |
| TOTAL | | | | | | | |

Direct Care Staff

#1 Josefa Lastimas

#2 Gloria Mate

#3 Rebecca Arreola

#4 Estrella Hall   Tue + W'ens 6AM 9/11's Sat 6AM 5PM

#5 George Hall   Sat 4PM/9PM

#6

#7

#8

#9

#10

△TI EXHIBIT A
Deponent E Hall
Date 3/10/07 Rptr LD
DEPOBOOK

DEF1240

Exhibit W
Page 10

189

STATE OF CALIFORNIA — HEALTH AND HUMAN SERVICES AGENCY

CALIFORNIA DEPARTMENT OF SOCIAL SERVICES

# PERSONNEL REPORT

**INSTRUCTIONS:** This form is intended for keeping a current roster of all the facility personnel, other adults and licensees residing in the facility, including backup persons, volunteers and licensee if administrator/director. Show license/certificate number if applicable for specialized staff (e.g., Social Worker and other consultant(s)). Show coverage for twenty-four hour supervision in residential facilities. Report any changes in personnel to the licensing agency as required by regulations. Send original to Licensing Agency and retain copy in facility file.

| NAME OF FACILITY | FACILITY TYPE | FACILITY NUMBER |
|---|---|---|
| Jasmine-Hall V | Adult Residential | 347000288 |

| LICENSED BY | | DATE |
|---|---|---|
| Dr. George K. Hall | | Sept 16, 2005 |

**STAFF SUBJECT TO CRIMINAL BACKGROUND CHECK REQUIREMENTS:** The following staff members are subject to a criminal background check pursuant to Sections 1522, 1568.09, 1569.17 and 1596.871 of the Health and Safety Code. A California background clearance or a criminal record exemption shall be obtained prior to employment, residence or initial presence in the facility.

| NAME | DATE EMPL'D | JOB TITLE | SPECIFY DAYS AND HOURS ON DUTY | | | SPECIFY DAYS AND HOURS ON DUTY | | | SPECIFY DAYS AND HOURS ON DUTY | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | DAYS | FROM | TO | DAYS | FROM | TO | DAYS | FROM | TO |
| Licensee/Administrator | | | | | | | | | | | |
| Dr. George K. Hall | 1/19/88 | Pres/CEO (Licensee, Adm.) | Tu-Sat | 6 am | 5 pm | | | | | | |
| Estela O. Hall | 1/19/88 | VP Operations (Adm.) | Tu-Sat | 6 am | 5 pm | | | | | | |
| Sochitl Zimmerly | 8/16/97 | Adm. Support | M-F | 6 am | 5 pm | | | | | | |
| Rose Mendoza | 9/1/02 | Live-In Res. Care Asst. | Thur-M | | | | | | | | |
| Grace Darwin | 6/25/99 | Live-In Res. Care Asst. | Sat-W | | | | | | | | |
| Antonio Darwin | 4/1/02 | Live-In Res. Care Asst. | Tu-Sat | | | | | | | | |

Deponent E. Hall
Date 3/16/07 Rptr. P.O
EXHIBIT 6
DEPOBOOK

SOC 600 (11/03) (PUBLIC)

Exhibit W
Page 11

190

...IFORNIA — HEALTH AND HUMAN SERVICES AGENCY

CALIFORNIA DEPARTMENT OF SOCIAL SERVICES

**ONNEL REPORT**

**INSTRUCTIONS:** This form is intended for keeping a current roster of all the facility personnel, other adults and licenses residing in the facility, including backup persons, volunteers and licensee / administrator/director. Show license/certificate number if applicable for specialized staff (e.g., Social Worker and other consultant(s)). Show coverage for twenty-four hour supervision in residential facilities. Report any changes in personnel to the licensing agency as required by regulations. Send original to Licensing Agency and retain copy in facility file.

| DUTY | FACILITY TYPE | FACILITY NUMBER |
| --- | --- | --- |
| a-Hall II | Adult Residential | 340311355 |
| BY | | DATE |
| orge K. Hall | | Sept 16, 2005 |

FF SUBJECT TO CRIMINAL BACKGROUND CHECK REQUIREMENTS: The following staff members are subject to a criminal background check pursuant to Sections 1522, 1568.09, 1569.17 and 6.871 of the Health and Safety Code. A California background clearance or a criminal record exemption shall be obtained prior to employment, residence or initial presence in the facility.

| NAME | DATE EMPL'D | JOB TITLE | DAYS | SPECIFY DAYS AND HOURS ON DUTY FROM | TO | DAYS | SPECIFY DAYS AND HOURS ON DUTY FROM | TO | DAYS | SPECIFY DAYS AND HOURS ON DUTY FROM | TO |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| nsee/Administrator | | | | | | | | | | | |
| orge K. Hall | 1/19/88 | Pres/CEO (Licensee, Adm.) | Tu-Sat | 6 am | 5 pm | | | | | | |
| O. Hall | 1/19/88 | VP Operations ( Adm.) | Tu-Sat | 6 am | 5 pm | | | | | | |
| Zimmerly | 8/16/97 | Adm. Support | M-F | 6 am | 5 pm | | | | | | |
| ca Arreola | 6/19/04 | Live-in Res. Care Asst. | Sat-W | | | | | | | | |
| Daproza | 9/12/05 | Live-in Res. Care Asst. | Thur-M | | | | | | | | |
| | | | | | | | | | | | |

Exhibit W
Page 12

191

A (W) EXHIBIT C
Deponent E. Hall
Date 3/16/07 Rptr. QQ
DEPOBOOK

Page 1 of 2

(1103) (PUBLIC)

STATE OF CALIFORNIA — HEALTH AND HUMAN SERVICES AGENCY

CALIFORNIA DEPARTMENT OF SOCIAL SERVICES

# PERSONNEL REPORT

**INSTRUCTIONS:** This form is intended for keeping a current roster of all the facility personnel, other adults and licensee residing in the facility, including backup persons, volunteers and licensee if administrator/director. Show license/certificate number if applicable for specialized staff (e.g., Social Worker and other consultant(s)). Show coverage for twenty-four hour supervision in residential facilities. Report any changes in personnel to the licensing agency as required by regulations. Send original to Licensing Agency and retain copy in facility file.

| NAME OF FACILITY | FACILITY TYPE | FACILITY NUMBER |
|---|---|---|
| Jasmine-Hall | Adult Residential | 340310594 |
| **PREPARED BY** | | **DATE** |
| George K. Hall | | Sept 18, 2005 |

**STAFF SUBJECT TO CRIMINAL BACKGROUND CHECK REQUIREMENTS:** The following staff members are subject to a criminal background check pursuant to Sections 1522, 1568.09, 1568.17 and 1596.871 of the Health and Safety Code. A California background clearance or a criminal record exemption shall be obtained prior to employment, residence or initial presence in the facility.

| NAME<br>Licensee/Administrator | DATE<br>EMPL'D | JOB TITLE | SPECIFY<br>DAYS AND HOURS ON DUTY<br>DAYS | FROM | TO | SPECIFY<br>DAYS AND HOURS ON DUTY<br>DAYS | FROM | TO | SPECIFY<br>DAYS AND HOURS ON DUTY<br>DAYS | FROM | TO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| George K. Hall | 1/19/08 | Pres/CEO (Licensee, Adm.) | Tu-Sat | 6 am | 5 pm | | | | | | |
| Estela O. Hall | 1/19/08 | VP Operations (Adm.) | Tu-Sat | 6 am | 5 pm | | | | | | |
| Erie McCollough | 7/25/05 | Adm. In Training | M-F | 8 am | 5 pm | | | | | | |
| Leo Santiano | 4/14/03 | Live-In Res. Care Asst. | Tu-Sat | | | | | | | | |
| Prianka Basanayaka | 8/11/03 | Live-In Res. Care Asst. | Thur-M | | | | | | | | |
| | | | | | | | | | | | |

EXHIBIT D
Deponent _Ez Az 11_
Date _3/14/06 Apin ka_
PENGAD-BayOnne

SEP 1 9 2005

LIC 500 (11/03) (PUBLIC)

LE AND ADDITIONAL
WORKED REPORT

Med    2007

This form is largely illegible. The document is a "LEAVE AND ADDITIONAL TIME WORKED REPORT" with various checkbox categories for types of leave, a calendar grid for days 1–31, and signature blocks.

Date: 03-26-05

March 05

TOTAL: 2 3

Δ EXHIBIT E
Deponent E. Hall
Date 3/16/07 Rptr. RD

DEF0397
CONFIDENTIAL

Exhibit W
Page 14

193

# STAFF SERVICE HOURS

NAME _(illegible)_
FACILITY _(illegible)_

| DATE | | | House Keeping | | | | | | | Direct Care | | | | | | Consumer Programming | | | | | | | | | | | | WEEK TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FROM ___ TO ___ | | | Meal Prep | | | Laundry | Clean/Dust Vacume | Maintanence | Other | Med/Assist | Personal/Ass | Impulse Management | First Aide 911 | Other | Comm. Survival Enrichment Group | Shower | Bed Making | Grooming | One to One Counseling | Money Management | Social Skills Training | Community Outing | Bus Mobility | Current Events | Resident Government | Other | |
| | | | Brkfst | Lunch | Dinner | | | | | | | | | | | | | | | | | | | | | | |
| SUNDAY 3 | A.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | P.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | NOC. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MONDAY 4 | A.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | P.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | NOC. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TUESDAY 5 | A.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | P.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | NOC. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WEDNESDAY 6 | A.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | P.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | NOC. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| THURSDAY 7 | A.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | P.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | NOC. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FRIDAY 8 | A.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | P.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | NOC. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SATURDAY 9 | A.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | P.M. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | NOC. | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOTALS | | | | | | | | | | | | | | | | | | | | | | | | | | ADD TOTALS IN BACK |

| | Initials | Signature | | Initials | Signature |
|---|---|---|---|---|---|

STAFF SIGNATURES AND INITIALS

* Must have identified problem in IPP or Service Plan
* Enter time and initials in appropriate boxes above.

DEF1482

EXHIBIT ___
Deponent ___
Date 3/16/07 Rptr. ___

Exhibit   W
Page   15

194

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

ELAINE CHAO, SECRETARY OF LABOR,
UNITED STATES DEPARTMENT OF LABOR,

COPY

        Plaintiffs,

vs.                                         No. 2:05-CV-1306
                                                 GEB-KJM
JASMINE HALL CARE HOMES, INC., a
corporation, HALL CARE HOMES, INC.,
a corporation, GEORGE K. HALL, an
individual and ESTELLA HALL, an
individual,

        Defendants.
_____/

--oOo--
Thursday, March 15, 2007
--oOo--

DEPOSITION OF
LYLE MCCOLLOUGH
--oOo--

Ref. No. 1-3587
Reported by:  KIMBERLY A. BARRETTE, CSR No. 6671

## CAROL NYGARD
### & ASSOCIATES

## DEPOSITION REPORTERS

**916-928-8999 · 877-Get-Rptr**
**Fax 916-928-9989**

**4180 Truxel Road · Suite 100 · Sacramento, CA 95834**
**www.sacramentocourtreporter.com**

Exhibit  X
Page  1

Lyle McCollough

1                    A P P E A R A N C E S

2                          --oOo--

3

4    FOR THE PLAINTIFFS:

5

6              U.S. DEPARTMENT OF LABOR
               OFFICE OF THE SOLICITOR
7              BY:   Jan M. Coplick, Esq.
               71 Stevenson Street, Suite 1110
8              San Francisco, California   94105
               (415) 975-4484
9

10

11

12   FOR THE DEFENDANTS:

13

14             ALLEN, MATKINS, LECK, GAMBLE & MALLORY, LLP
               BY:   Amy Wintersheimer Findley, Esq.
15             501 W. Broadway, 15th Floor
               San Diego, California   92101-3541
16             (619) 233-1155

17

18   ALSO PRESENT:

19             Sheila Creel, U.S. Dept. of Labor

20             George Hall, Jasmine Hall Care Homes

21

22                          --oOo--

23

24

25

          Exhibit  X
          Page  2

                                                              2

     196
                        Carol Nygard & Associates
                            916-928-8999

Lyle McCollough

1              I N D E X   O F   E X A M I N A T I O N

2

3                                                          PAGE

4

5     BY MS. COPLICK                                         4

6

7

8

9              I N D E X   O F   E X H I B I T S

10    Plaintiff's

11    A          Schedule, Jasmine Hall VI                  66

12    B          Personnel Report, Jasmine Hall VI          72

13    C          Facilities Staff Work Schedule, DEF1246    73

14    D          Facilities Staff Work Schedule, DEF1236    74

15    E          Weekly Home Log, DEF5870 - CONFIDENTIAL    111

16    F          Weekly Home Log, DEF5874 - CONFIDENTIAL    111

17    G          Weekly Home Log, DEF5878 - CONFIDENTIAL    111

18    H          Weekly Home Log, DEF5805 - CONFIDENTIAL    114

19

20

21

22

23

24

25
      Exhibit  X
       Page  3

         197
                                                            3

```
 1                              --oOo--

 2            BE IT REMEMBERED that on THURSDAY, the 15TH

 3      day of MARCH, 2007, at the hour of 9:48 a.m. of said day,

 4      at the Offices of CAROL NYGARD & ASSOCIATES, 4180 Truxel

 5      Road, Suite 100, Sacramento, California, before me,

 6      Kimberly A. Barrette, a Certified Shorthand Reporter,

 7      personally appeared LYLE MCCOLLOUGH, who was examined as

 8      a witness in said cause.

 9                              --oOo--

10                         LYLE MCCOLLOUGH,

11      called as a witness herein, having been administered an

12      oath in accordance with C.C.P. Section 2094, was examined

13      and testified as follows:

14                              --oOo--

15                           EXAMINATION

16      BY MS. COPLICK:

17      Q.        Mr. McCollough, did I pronounce that

18      correctly?

19      A.        McCollough, yeah.

20      Q.        Can you please state your name for the record?

21      A.        Lyle McCollough.

22      Q.        And where do you live, sir?

23      A.        I can be reached through my attorney.

24      Q.        Okay.  And Allen Matkins is your attorney?

25                MS. FINDLEY:  That's correct, yes.
```

Exhibit X
Page 4

198

Lyle McCollough

```
1                BY MS. COPLICK:  Q.  Can you please tell me
2      your current position, your current job title?
3      A.         I'm an administrator.
4      Q.         Okay.  And for whom do you work?
5      A.         I work for Hall Care Homes.
6      Q.         How long have you worked there?
7      A.         It will be two years, I think, the last week
8      of this July.
9      Q.         Well, Mr. McCollough, before we get started
10     into the substance of the deposition, I'd like to just go
11     over a few ground rules about the deposition and lay out
12     what will happen today.
13                And you understand that you've been sworn
14     under oath to tell the truth and answer questions that
15     I'm going to ask you and to give your best answers,
16     unless your counsel objects and instructs you not to
17     answer.  So do you understand that?
18     A.         Yes.
19     Q.         And it's important when we're talking here
20     today that -- because the court reporter, that you can
21     see here, the nice lady smiling at the end of the table,
22     is writing down everything we say -- that we both try and
23     not speak over each other even though in normal
24     conversation people have a tendency to cut each other off
25     and interrupt each other.  But we have to try and let
```

Exhibit X
Page 5

5

199

1    A.       Yes.

2    Q.       How many staff personnel provide the staff

3    coverage at Jasmine Hall 3?

4             MS. FINDLEY:  I'm going to object, overbroad,

5    vague as to time.

6             BY MS. COPLICK:  Q.  Currently?

7    A.       Could you repeat the question?

8    Q.       Certainly.  How many staff members provide the

9    Title XVII requisite coverage at Jasmine Hall 3?

10            MS. FINDLEY:  Currently?

11            BY MS. COPLICK:  Q.  Currently.

12    A.       There's four staff that live at Number 6.

13    Q.       And is one of those staff members expected to

14    be on a -- on their days off at any given time; is that

15    how the schedule works?

16            So that three staff members are on duty and

17    one staff member is off duty out of those four staff

18    members?

19    A.       I have difficulty with the term "on duty" in

20    that question.

21    Q.       Okay.  Is there a shift pattern at Jasmine

22    Hall 3 of five days on and two days off?

23    A.       Well, again, the term "on and off" are vague

24    to me.

25    Q.       What is the shift schedule?  Please describe

Exhibit  X
Page  6

200

18

Lyle McCollough

1    it for me at Jasmine Hall 3.

2            I don't want to put words in your mouth, so

3    I'll let you describe it for us.

4    A.        I don't do scheduling.

5    Q.        Who does scheduling?

6    A.        Estela Hall does, I believe.

7    Q.        Do you see a staff schedule posted at the

8    home?

9    A.        I don't recall.

10    Q.        So you don't have any recollection of seeing a

11    staff schedule posted at the home?

12    A.        There are dozens of documents posted.  I don't

13    recall.

14    Q.        Do you have any awareness of the -- of the

15    staff at Jasmine Hall 3, some of them having days off?

16    A.        Yes.

17    Q.        Okay.  When they are not -- how do they know

18    when it is their day off?

19    A.        I wouldn't know.

20    Q.        What do you consider their -- the rest of the

21    time that they're not on a day off, how would you

22    describe that time?

23    A.        That's kind of vague.  Could you rephrase

24    that, please?

25    Q.        Certainly.  Well, you said that you know what

Exhibit   X
Page  7

19

Lyle McCollough

1    a day off means for the staff at your homes that you
2    administer.  Is that correct?
3    A.        Yes.
4    Q.        So I'm asking if -- let's say hypothetically a
5    staff member has Thursday and Friday as days off out of a
6    given week.  Can we agree hypothetically to that?
7    A.        Yes.
8    Q.        Okay.  Then what would Monday, Tuesday, and
9    Wednesday of that same week constitute for that staff
10   member?
11   A.        Availability to provide services as needed.
12   Q.        So those are considered -- is there a
13   shorthand that's used for those days or that category of
14   time?
15   A.        I don't understand that.
16   Q.        Okay.  Well, we have a shorthand to describe
17   the term "days off."  We understand the concept of being
18   off work.  Do we?
19   A.        Yes.
20   Q.        Now, we're trying to draw a distinction
21   between the time that falls in that category that we seem
22   to be clear on versus the other category of time -- and
23   you described it as "availability to provide services as
24   needed," which we'll talk about a little more in a
25   minute, but I'm just wondering if there's a shorter

Exhibit  X
    Page 8

20

202                 Carol Nygard & Associates
                         916-928-8999

Lyle McCollough

terminology used within your home to describe that time

or those days.  That's a long phrase.

A.        I'm standing by that answer.

Q.        And I'm not trying to argue with that answer

or -- or get you to disown the answer.

          I'm just saying, when you say is Smith

available to provide the services as needed on Wednesday,

or would you say Smith is on on Wednesday?

A.        No, I wouldn't say that.

Q.        What would you say?

A.        Available.

Q.        Available, okay.  Do you ever have -- strike

that.

          Now, let's go back for a moment to the

available -- your phrase "availability to provide

services as needed."

          Does that category apply exclusively to people

who -- staff members who live on the premises?

A.        No.

Q.        So that category applies to some people who

live off the premises?

A.        Yes.

Q.        So how do you determine when services are

needed during that period of time?

A.        That's very vague.

Exhibit  X
Page  9

203                    Carol Nygard & Associates
                          916-928-8999

Lyle McCollough

Q.      The question is?

A.      Mm-hmm.

Q.      Okay.  So these persons -- this time that's considered they are available to provide services as needed, who determines the need for the services?  How is the need determined?

A.      Mostly the daily routine.

Q.      And what is the daily routine?

A.      For me or for --

Q.      No, for the --

A.      -- for the residential --

Q.      -- the staff who fall within this category.

A.      They get up seven-ish.  Get everybody up, feed them, medicate them, get them to program, clean up the house.  Done by 9:30, 10.

Q.      Then what do they do?

A.      Then they do what they want.

Q.      So they are on free time?

A.      Yes.

Q.      How long does that period last, typically?

A.      Five or six hours.

Q.      And then what happens?

A.      Clients begin returning from program.

Q.      And what do the -- are the staff needed to provide any services when the clients return from

Exhibit  X
Page  10

204                        Carol Nygard & Associates
                                 916-928-8999

22

Lyle McCollough

program?

A.        No.

Q.        Okay.  So the client -- the staff are free to
continue using the time for their own purposes at that
point?

A.        Yes.

Q.        Okay.  So approximately what time of the day
are we now talking about?

A.        Between 2 and 4.

Q.        So it's your testimony that staff aren't
required to provide any services between 2 and 4 p.m.?

A.        Seldom.

Q.        Then from 4:00 on?

A.        Dinner, evening meds, clean up after dinner.

Q.        What time would dinner finish, typically?

A.        Maybe by 6 I would say.

Q.        And then after dinner?

A.        Generally speaking.

Q.        Yeah, typically.

A.        Then it's their free time again.

Q.        Until what time?

A.        At 9:00 HS meds are given.  Takes about 10, 15
minutes.

Q.        I'm sorry, what kinds of meds are given?

A.        Hours sleep, bedtime meds.

Exhibit  X
Page  11

Lyle McCollough

Q.          Okay.  Can you just -- because I'm not

familiar with the terminology, "HS meds" --

A.          HS.  It's a term.  Sorry.

Q.          No, I -- please feel free to use your own

terminology and it's up to me to try and learn it, so

thank you for explaining it.  And the meds are given and

what happens next?

A.          That's it.  That's the end of the day.

Q.          And so most of the clients would be in bed by

what time, typically?

A.          About 10.

Q.          10:00?

A.          If not earlier.

Q.          Okay.  And I so --

A.          And, again, I didn't say 10:00; I said 9:00.

Q.          9:00, okay.  I apologize.  So from 9:00

onward, are there any services required, typically, of

the staff?

A.          No.

Q.          What about night interruptions, requirements

throughout the -- the evening first and then the night?

A.          Rarely.

Q.          Rarely.  We'll go back through this in a

little more detail in a minute, but let me ask first, how

do you know all this?

Exhibit  X
Page  12

24

206

# HALL CARE HOMES, INC.
## EMPLOYEE POLICY

Exhibit   Y
Page   1

DEF1185