| Clients: | | Plus 156 additional staff hours PER WEEK* |
|---|---|---|
| 12 | 1 Staff On Duty At All Times | |
| 13 | 1 Staff On Duty At All Times | "   175   "   "   "   "   " |
| 14 | 1 Staff On Duty At All Times | "   194   "   "   "   "   " |
| 15 | 1 Staff On Duty At All Times | "   213   "   "   "   "   " |

* WHEN CLIENTS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

5

## ADDITIONAL DIRECT CARE STAFF HOURS – LEVEL 4

### LEVEL 4A

| 1-3 | Consumers: | 1 Staff On Duty At All Times | |
|---|---|---|---|
| 4 | Consumers: | 1 Staff On Duty At All Times | Plus 12 additional staff hours PER WEEK* |
| 5 | Consumers: | 1 Staff On Duty At All Times | Plus 33 additional staff hours PER WEEK* |
| 6 | Consumers: | 1 Staff On Duty At All Times | Plus 54 additional staff hours PER WEEK* |
| 7 | Consumers: | 1 Staff On Duty At All Times | Plus 21 additional staff hours PER WEEK* |

*WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

6

Exhibit  Z
Page  9

260

## LEVEL 4B

| | | |
|---|---|---|
| 1-3 | Consumers: | 1 Staff On Duty At All Times |
| 4 | Consumers: 1 Staff On Duty At All Times | Plus 24 additional staff hours PER WEEK* |
| 5 | Consumers: 1 Staff On Duty At All Times | Plus 48 additional staff hours PER WEEK* |
| 6 | Consumers: 1 Staff On Duty At All Times | Plus 72 additional staff hours PER WEEK* |
| 7 | Consumers: 1 Staff On Duty At All Times | Plus 24 additional staff hours PER WEEK* |

*WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

7

Exhibit  Z
Page  10

261

## LEVEL 4C

| Consumers: | Staff | |
|---|---|---|
| 1-2 | 1 Staff On Duty At All Times | |
| 3 | 1 Staff On Duty At All Times | Plus 9 additional staff hours PER WEEK* |
| 4 | 1 Staff On Duty At All Times | Plus 36 additional staff hours PER WEEK* |
| 5 | 1 Staff On Duty At All Times | Plus 63 additional staff hours PER WEEK* |
| 6 | 1 Staff On Duty At All Times | Plus 90 additional staff hours PER WEEK* |
| 7 | 1 Staff On Duty At All Times | Plus 28 additional staff hours PER WEEK* |

WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

8

Exhibit Z
Page 11

262

**LEVEL 4D**

1-2   Consumers:   1 Staff
                   On Duty
                   At All Times

| | | |
|---|---|---|
| 3 | Consumers: | 1 Staff On Duty At All Times | Plus 18 additional staff hours PER WEEK* |
| 4 | Consumers: | 1 Staff On Duty At All Times | Plus 48 additional staff hours PER WEEK* |
| 5 | Consumers: | 1 Staff On Duty At All Times | Plus 78 additional staff hours PER WEEK* |
| 6 | Consumers: | 1 Staff On Duty At All Times | Plus 108 additional staff hours PER WEEK* |
| 7 | Consumers: | 1 Staff On Duty At All Times | Add 30 hours per week for each additional consumer |

*WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

9

## LEVEL 4E

| 1-2 | Consumers: | 1 Staff On Duty At All Times |  |
|---|---|---|---|
| 3 | Consumers: | 1 Staff On Duty At All Times | Plus 30 additional staff hours PER WEEK* |
| 4 | Consumers: | 1 Staff On Duty At All Times | Plus 64 additional staff hours PER WEEK* |
| 5 | Consumers: | 1 Staff On Duty At All Times | Plus 98 additional staff hours PER WEEK* |
| 6 | Consumers: | 1 Staff On Duty At All Times | Plus 132 additional staff hours PER WEEK* |
| 7 | Consumers: | 1 Staff On Duty At All Times | Add 34 hours per week for each additional consumer |

*WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

10

LEVEL 4F

| | | | |
|---|---|---|---|
| 1 | Consumer: | 1 Staff On Duty At All Times | |
| 2 | Consumers: | 1 Staff On Duty At All Times | Plus 4 additional staff hours PER WEEK* |
| 3 | Consumers: | 1 Staff On Duty At All Times | Plus 42 additional staff hours PER WEEK* |
| 4 | Consumers: | 1 Staff On Duty At All Times | Plus 80 additional staff hours PER WEEK* |
| 5 | Consumers: | 1 Staff On Duty At All Times | Plus 118 additional staff hours PER WEEK* |
| 6 | Consumers: | 1 Staff On Duty At All Times | Plus 156 additional staff hours PER WEEK* |
| 7 | Consumers: | 1 Staff On Duty At All Times | Add 38 hours per week for each additional consumer |

*WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

11

Exhibit  Z
Page  14

265

## LEVEL 4G

| | | |
|---|---|---|
| 1 | Consumer: | 1 Staff On Duty At All Times |
| 2 | Consumers: | 1 Staff On Duty At All Times | Plus 12 additional staff hours PER WEEK* |
| 3 | Consumers: | 1 Staff On Duty At All Times | Plus 54 additional staff hours PER WEEK* |
| 4 | Consumers: | 1 Staff On Duty At All Times | Plus 96 additional staff hours PER WEEK* |
| 5 | Consumers: | 1 Staff On Duty At All Times | Plus 138 additional staff hours PER WEEK* |
| 6 | Consumers: | 1 Staff On Duty At All Times | Plus 180 additional staff hours PER WEEK* |
| 7 | Consumers: | 1 Staff On Duty At All Times | Add 42 hours per week for each additional consumer |

*WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

12

Exhibit   Z
Page   15

266

## LEVEL 4H

| 1 | Consumer: | 1 Staff On Duty At All times | |
|---|---|---|---|

| 2 | Consumers: | 1 Staff On Duty At All Times | Plus 22 additional staff hours PER WEEK* |
| 3 | Consumers: | 1 Staff On Duty At All Times | Plus 69 additional staff hours PER WEEK* |
| 4 | Consumers: | 1 Staff On Duty At All Times | Plus 116 additional staff hours PER WEEK* |
| 5 | Consumers: | 1 Staff On Duty At All Times | Plus 163 additional staff hours PER WEEK* |
| 6 | Consumers: | 1 Staff On Duty At All Times | Plus 210 additional staff hours PER WEEK* |
| 7 | Consumers: | 1 Staff On Duty At All Times | Add 47 hours per week for each additional consumer |

WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

13

Exhibit Z
Page 16

267

## LEVEL 4I

1 Consumer:  1 Staff
           On Duty
           At All Times

| | | |
|---|---|---|
| 2 | Consumers: | 1 Staff On Duty At All Times | Plus 36 additional staff hours PER WEEK* |
| 3 | Consumers: | 1 Staff On Duty At All Times | Plus 90 additional staff hours PER WEEK* |
| 4 | Consumers: | 1 Staff On Duty At All Times | Plus 144 additional staff hours PER WEEK* |
| 5 | Consumers: | 1 Staff On Duty At All Times | Plus 198 additional staff hours PER WEEK* |
| 6 | Consumers: | 1 Staff On Duty At All Times | Plus 252 additional staff hours PER WEEK* |
| 7 | Consumers: | 1 Staff On Duty At All times | Add 54 hours per week for each additional consumer |

*WHEN CONSUMERS ARE AWAKE AND UNDER SUPERVISION BY THE FACILITY

14

Exhibit  Z
Page  17

268

## EXPERIENCE AND TRAINING

### LEVEL 2

### ADMINISTRATOR

- Six months prior experience providing direct supervision and special services to persons with developmental disabilities.

- Complete eight hours continuing education within each twelve-month period.

- Complete Direct Support Professional (DSP) Training (2 – 35 hour courses) within two years of date of employment

### DIRECT CARE STAFF

- On-site orientation within the first 40 hours of providing consumer service.

- On-the-job training as needed

- Complete eight hours continuing education within each twelve-month period.

- Complete Direct Support Professional (DSP) Training (2 – 35 hour courses) within two years of date of employment

Exhibit Z
Page 18

269

## EXPERIENCE AND TRAINING

## LEVEL 3

### ADMINISTRATOR

- Nine months prior experience providing direct supervision and special services to persons with developmental disabilities.

- Twelve hours continuing education within each twelve-month period.

- Complete Direct Support Professional (DSP) Training (2 – 35 hour courses) within two years of date of employment

### DIRECT CARE STAFF

- On-site orientation within first 40 hours of providing consumer service.

- On-the-job training as needed.

- Twelve hours continuing education within each twelve-month period.

- Complete Direct Support Professional (DSP) Training (2 – 35 hour courses) within two years of date of employment

## EXPERIENCE AND TRAINING

### LEVEL 4

### ADMINISTRATOR

- Twelve months prior experience providing direct supervision and special services to persons with developmental disabilities.

- Twelve hours continuing education within each twelve-month period.

- Complete Direct Support Professional (DSP) Training (2 – 35 hour courses) within two years of date of employment

### DIRECT CARE STAFF

- On-site orientation within the first 40 hours of providing consumer service.

- On-the-job training as needed.

- Six months prior experience providing direct supervision and special services or twelve additional hours of continuing education during the first six months on the job.

- Twelve hours continuing education within each twelve-month period.

- Complete Direct Support Professional (DSP) Training (2 – 35 hour courses) within two years of date of employment

Exhibit Z
Page 20

271

## ADDITIONAL TRAINING REQUIREMENTS FOR
## LEVEL 3 AND LEVEL 4

### Administrators, Full-time Staff or Program Managers

If behavior management is a program component of your home, you *must* have expertise and knowledge in behavior management techniques.  Hiring a consultant part-time to train staff is not sufficient to meet this requirement.

The facility must hire a minimum of one *full-time* staff, preferably the Administrator or Program Manager, who has a working knowledge of behavior management techniques and who demonstrates the ability to work with community consultants to develop and implement behavior management plans.

Exhibit   Z
Page  21

272

## DOCUMENTATION REQUIREMENTS

The administrators of levels 2, 3, and 4 services are expected to:

1.  Participate with the regional center Planning Team to develop each client's Individual Program Plan. The IPP establishes the residential objectives and describes the methods to be utilized by the direct care staff for implementation.

2.  Prepare written ongoing notes which are signed, dated by the person making the entry and include:

    a.  Community and leisure activities;
    b.  Overnight visits away from the facility; illnesses;
    c.  Special incident reports, and
    d.  Medical and dental visits.

3.  Service Level 2 and 3 Administrator ensure the preparation and maintenance of written semi-annual reports of consumer progress toward achievement of each IPP objective. The report shall include the signature of the person preparing the report and the date.

4.  Service Level 4 administrators ensure the preparation and maintenance of a written quarterly report of consumer progress toward achievement of each IPP objective for which the facility is responsible. The report shall include:

    a.  A summary of data collected for each consumer;
    b.  Identification of barriers to consumer progress and actions taken in response to those barriers;
    c.  The completion date of the report and the signature of the person preparing the report. The quarterly report is submitted to the consumer's Service Coordinator within 30 days of the end of the quarter.

Exhibit Z
Page 22

273

## Community Residential Care Facilities
## Description of Levels of Care

The Alternative Residential Model is based on the principle that the services in care facilities are consistent with the needs of the consumer.  The Alternative Residential Model Identifies four levels of service.  All facilities have a program design which describes consumer profile and services provided in their facility. This Table should be used during the initial assessment in determining the appropriate level of care and services necessary for a consumer placement.

### LEVEL 1

1. Receives SSI basic rate
2. Provides basic care/supervision
3. Training program minimal
4. Medication monitoring
5. Consumers may have additional needs but have consistently rejected training/issues, support/treatment
6. Consumers are capable of Independent community travel
7. Follows Title 22 regulations

### LEVEL 2

1. Homelike environment where daily activities reflect patterns of non-disabled persons
2. Provides supportive program of supervision and training
3. Participates in Interdisciplinary team to develop IPP
4. Provide 1-6 ration for supervision
5. Maintain semi-annual reports on each consumer
6. Maintains written progress notes
7. Consumer profile may include:
   - Needs assistance with ADLs
   - Non-ambulatory/ambulatory
   - Behaviors: teasing, screaming, verbal abuse, hostile, resistive
   - verbal prompts for compliance

### LEVEL 3*

1. Homelike setting with a structured environment with staff intervention in a schedule/predictable manner
2. Provide supervision and training with an enriched staffing ratio as identified in Title 17
3. Participate with Interdisciplinary team to develop IPP
4. Maintain written progress notes
5. Maintain semi-annual reports on each consumer
6. Consumer profile may include:
   - significant limitations in ADLs
   - limitation in physical abilities
   - self-injurious behavior
   - significant behaviors; aggression running/wandering, tantrum, resistiveness, property destruction
   - physical prompts for ADLs

### LEVEL 4*

1. Homelike setting
2. Highly structured setting with staff intervention in predictable manner due to challenging consumer
3. Behavior plans
4. Provides enriched staffing identified in Title 17
5. Participate in IPP development
6. Provide consultants to meet consumer needs
7. Maintain quarterly progress report/ ongoing notes/summary of data
8. Participates in IPP development
9. Submit Quarterly Review to ACRC
10. Consumer profile:
    - severe limitations of ADLs
    - severe behaviors; aggression to self/others, resistiveness, tantrum, property destruction, AWOL, self-injurious, severe behaviors which prevent participation in ADL and community involvement

**Owner-Operated Facility**
An owner-operated facility is the residence of the licensee or a member of the governing board of a private non-profit corporation.
The licensee (owner-operator) may perform all of the activities necessary to operate the facility, or employ staff to assist.

**Staff-Operated Facility**
A staff operated facility is not the residence of the licensee or a member of the governing board of a private non-profit corporation.
The licensee may perform direct care duties for either the day or afternoon shift instead of hiring a staff person.
The licensee cannot provide direct care staffing for the facility on the night shift or staff overnight in the facility.

*Level 3 and 4 can offer Specialized Programs: Autism, Penal Code, Sex Offenders, Substance Abuse, and Dual Diagnosis.

20

Exhibit Z
Page 23

## SERVICE LEVEL GUIDELINES

The Lanterman Act requires that clients be placed in the least restrictive environment that successfully meets these individual needs. These guidelines are only a part of the process used to assess the level of client needs. Please review these guidelines when designing your program and when describing the client population you wish to serve.

| Characteristics | Level 2 | Level 3 | Level 4A-I |
|---|---|---|---|
| **Self-Care:** | Needs reminders to brush teeth, bathe, etc. Needs teaching. Needs assistance w/ shoe ties, zippers, buttons. Front/back and w/ weather appropriate clothing. | Significant self-care deficits - may need hand-over-hand, physical prompts, or combination. | ** Must have written, formal plan to address acquisition of skills in the self-help remediate behavior area(s).<br><br>Severe deficits in self-care – requires total (RSP must do it all) care. Bathe, brush teeth/oral hygiene, etc.<br><br>Hygiene/grooming skills: Bathing, shaving, tooth brushing, feeding, dressing, etc. |
| **Toileting:** | Independent or habit trained (may need reminders – accidents rare).<br><br>May need assistance with wiping after bowel movement. | 1) Not completely habit trained – in diapers (day and/or night) – frequently incontinent of bowl or bladder (day and/or night).<br><br>2) Habit trained for day and diapers at night. Verbal prompts may be needed. Physical assistance may be needed. Toileting schedule may be needed. | In diapers day and night. |

21

## SERVICE LEVEL GUIDELINES

| Characteristics | Level 2 | Level 3 | Level 4A-I |
|---|---|---|---|
| **Coordination & Mobility:** | No limitations in coordination and mobility. | Some limitations in both physical coordination and mobility. | Severe impairment in both physical coordination and mobility. |
| **Wheelchair:** | Can Manage most self-help, transfer skills. May use cane or walker at this level | Can bear weight for transfers and/or provide some help when given assistance to transfer – can steady self, use grab bar(s), etc. | Requires total assistance – no ability to bear weight, no ability to steady self or hold on to grab bar(s), etc. |
| | May have Uvision/hearing impairment. | May have vision/hearing impairment. | Must have both vision and hearing impairment. |
| | | Which may require additional assistance and/or modification of environment by RSP/staff. | Severe impact on client's ability to acquire the skills necessary to achieve any independent (and safe) mobility. |
| **Behavioral Challenges: Aggressive Behaviors/ Assault:** | Verbal threats/abuse may push, shove, grab, etc. Minor injury to others, (cut/bruise, etc.) First Aid. | Physical aggression or physical assault, with injury to others which may require medical attention. | Violent physical attacks which cause serious injury to others resulting in need for immediate medical attention by a physician, must have occurred with the last year. |
| **SIB:** | Pica – not a developmental behavior (see clinical psychologist). | Pica – not a developmental behavior – excludes clients whose cognitive level accounts for this. (See clinical psychologist.) | Pica – specific diagnosis of this is currently a problem. (See clinical psychologist.) |
| | Picking skin/biting self – minor injury occurs but first aid takes care of it; no medical treatment needed. | Picking skin/biting, poking self, etc. Inflicts minor injury on a regular basis first aid, creams, etc. and/or serious injury occurs infrequently, not more than once a month. | Picking skin/biting self, poking self, etc. Inflicts serious injury to self, requiring medical attention, ER visits, etc., on an ongoing frequent basis. |

## SERVICE LEVEL GUIDELINES

| Characteristics | Level 2 | Level 3 | Level 4A-I |
|---|---|---|---|
| Property Damage | Tearing clothing (minor/infrequent). Throwing furniture/objects, ripping magazines, etc. Picking at clothes, taking things apart/dismantling items. | Breaking windows, tearing clothing, destroys furniture, (TV's, etc.)<br><br>6 or more serious incidents in past 12 months of this behavior includes damage to personal and/or facility property. | Breaking windows, tearing clothing, destroys furniture, (TV's, etc.) Customary pattern of severe property damage, frequency of once a month. |
| AWOL | Client may wander off w/out supervision, running away or wandering off (runs to escape/avoid) and wanders off due to need to explore or wanders off without a plan. ** Does not include clients who do not come home on time. | Client may actively attempt to leave. Individual with cognitive impairments that would run into the street. | Client actively attempts to leave, may require alarm(s) on door(s). Client's cognitive level means he would do unsafe things such as getting into traffic, serious endangerment. |
| Fire Setting: | Not a behavior for at least 5 years and person has been in setting where there was opportunity for this behavior. | History of this, but has not occurred within last 3-5 years. (Given a setting where this could have occurred.) | Client has history of this and behavior has occurred within last 2 years. |
| Sexual: Public Masturbation | None to occasional occurrence | Behavior occurs, but client responds to verbal prompts and/or redirection. | Behavior disrupts participation in daily activities (work, social, etc.) and requires specific behavior plan to deal with behavior, may involve police reports, calls to the regional center, community care licensing. |
| Molestation: | SC to consult with Clinical Psychologist. (*Behavior must be substantiated.) | SC to consult with Clinical Psychologist. (*Behavior must be substantiated.) | SC to consult with Clinical Psychologist. (*Behavior must be substantiated.) |

23

Exhibit  Z
Page  26

277

1  LAWRENCE BREWSTER
   Regional Solicitor
2  DAVID KAHN
   Counsel for ESA Programs
3  **JAN M. COPLICK**, Senior Trial Attorney
   Designated Counsel for Service
4  California State Bar Number 124503
   E-Mail: Coplick.Jan@dol.gov
5  ANDREW SCHULTZ
   Trial Attorney
6  Office of the Solicitor
   United States Department of Labor
7  90 7th Street, Suite 3-700
   San Francisco, California 94103
8
9  Telephone:  (415) 625-7751
   Facsimile:  (415) 625-7772
10
11
12
13           UNITED STATES DISTRICT COURT
14          EASTERN DISTRICT OF CALIFORNIA
15
16  ELAINE CHAO, SECRETARY OF        )  CIVIL ACTION NO. 2:05-cv-01306-
    LABOR, UNITED STATES             )  GEB-KJM
17  DEPARTMENT OF LABOR,             )
18           Plaintiff,              )
                                     )
19      v.                           )
    JASMINE HALL CARE HOMES,         )  DECLARATION  IN SUPPORT OF
20  INC., a corporation, HALL CARE   )  THE SECRETARY'S MOTION FOR
21  HOMES, INC., a corporation,      )  PARTIAL SUMMARY JUDGMENT
    GEORGE K. HALL, an individual, and )
22  ESTELA HALL, an individual       )
                                     )
23                                   )
             Defendants.             )
24                                   )
25
26      I, Luis F. Cabuhat, swear the following to be true:

27  1.    I am currently employed by the United States Department of Labor,

28  Employment Standards Administration, Wage and Hour Division, at [Saipan Field

                                            Exhibit   AA
                                            Page   1
*Declaration in Support of Secretary's Motion for Partial Summary Judgment*          - 1 -

Office, 1st Floor Kallingal Buidling, Saipan MP 96950 with a mailing address:
AAA-4035, Box 10001, Saipan MP 96950]

2.      In the course of my employment, I was assigned to translate the "Declaration
in Support of the Secretary's Motion for Partial Summary Judgment," attached at
Exhibit 1, from English into Tagalog.  The Tagalog translation is attached at
Exhibit 2.

3.      Tagalog, the official language of Republic of the Philippines (or a
commonly spoken language in Philippines) is my first language.

4.      I am fluent in written and spoken Tagalog.

5.      I am fluent in written and spoken English.

6.      [if certified to translate by any court or any agency]

7.      The translation at Exhibit 2 is a fair and accurate translation from the
English language version of the same document attached at Exhibit 2.

I declare under penalty of perjury that the foregoing is true and correct.

Date 4/16/2007

Luis F. Cabuhat

LAWRENCE BREWSTER
Regional Solicitor
DAVID KAHN
Counsel for ESA Programs
**JAN M. COPLICK**, Senior Trial Attorney
Designated Counsel for Service
California State Bar Number 124503
E-Mail: Coplick.Jan@dol.gov
ANDREW SCHULTZ
Trial Attorney
Office of the Solicitor
United States Department of Labor
90 7th Street, Suite 3-700
San Francisco, California 94103

Telephone: (415) 625-7751
Facsimile:  (415) 625-7772

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br>Plaintiff,<br><br>v.<br><br>JASMINE HALL CARE HOMES, INC., a corporation, HALL CARE HOMES, INC., a corporation, GEORGE K. HALL, an individual, and ESTELA HALL, an individual<br><br>Defendants. | CIVIL ACTION NO. 2:05-cv-01306-GEB-KJM<br><br><br><br>DECLARATION  IN SUPPORT OF THE SECRETARY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

Ako si, _____, na sumusumpa sa sumusunod na pawang katutuhanan:

1.  Ako ay nagtratrabaho (empleyado) ng Nasasakdal ("Jasmine Hall" or "JH")

noong _____, hanggang _____ bilang isang Residenteng Katulong Kasingbahay  (live-in) at naguuraga sa bahay.

2.      Ang isang linggong regular na iskedyul sa trabaho para sa Residenteng Katulong Kasingbahay sa Jasmine Hall's ay 5 (lima) araw ang tungkulin (duty) na diretso ang trabaho, pagkatapos ay mayroon kaming dalawang araw na walang pasok.

3.      Ako ngayon ay nagtratabaho (emploeado) sa Jasmine-Hall ang bilang ng bahay ay (home) # _____ sa isang buong linggo linggong iskedyul.

4.      Ako ay binabayaran $ _____ na buwanan ang suweldo para sa lahat ng mga horas na aking tungkulin (duty) sa buwanan nasa 5 limang araw ang tungkuling trabaho sa bawat isang linggo.

5.      Kapag ako ay nagtrabaho na ako ay pahinga at walang pasok sa trabaho, ang Jasmine Hall ay itinuturing ito na "dagdag suweldo" (overtime) at binabayaran ng ekstra.

6.      Ang bawat tungkulin sa iskedyul (shift) na may 24 oras ang haba.

7.      Bawat isang tungkulin nasa iskedyul (shifts), Ako ay dapat tumigil sa magdamag sa residenteng arugaan bahay sa kuwarto o silid ng manggagawa o trabahador.

8.      Ako ay ____ walang ____ ibang tirahan o tahanan na puwedeng tigilan kung hindi ako kailangan tumigil ng magdamag sa residenteng arugaan bahay(care home).

Exhibit  AA
Page  4

281

9.    Ako ay _____ hindi _____ nakikisalo sa kuwarto o silid ng  manggagawa na hanggang sa _____ at sa iba pang manggagawa.

10.    Bawat isang 24 oras na tungkulin sa iskedyul (shift), Ako ay karaniwan gumagawa _____ oras bawat araw sa pagintindi at paglingkod sa kliyente, interaksyon sa kilos at gawa, (charting) ng kliyente, at iba pang gawaing sa residenteng tirahan.

11.    Sa isang ordinaryong araw, ay bibihirang na ako may mahigit na pang karaniwan _____ na libreng oras na hindi ako kailangan magintindi o maginteraksiyon sa kliyente o kaya's may gagawaing pang ibang bagay.

12.    Bukod sa nasabing kung tungkulin, Ako a dapat na laging handa sa potensyal na emerhensiyas (emergencies) sa lahat ng oras sa loob na tungkulin 24 oras sa residenteng uragaan bahay.  Ako ay hindi puwede umalis sa loob ng nasasakupan ng residenteng bahay para magawa ko ang pribadong pangangailanganan kahit na ang tungkulin ay natapos kuna.

13.    Sa ibang araw ang lahat ng kliyente ay wala sa residenteng arugaan bahay at sa katanghalian na oras, Ako ay pasamantalang libre sa mga tungkulin at obligasyon para masubaybayan at pangasiwaan sila.  Gayunman, ito ay hindi puwedeng ipauna sapagkat may roong ibang mga araw na meron kahit isang (1) kliyente nanasa bahay at sa mga planong gagawain.  Alin man sa itong ang manga oras ay hindi nakatala sa libro (timesheets).

14.    Sa bawat na initala ko at sa nauna talataan (paragraph), na walang karaniwan na oras sa loob ng 24 oras na ang tungkulin (shift) na ako ay lubusan libre sa manga tungkulin para pangasiwaan at subaybayan ang kliyente at laging

Exhibit  AA
Page  5

kailangan ang pangangailangan ng kliyente or dili kaya'y kailangan ito sa emerhensiya (emergencies).

15.     Hindi kung puwedeng iwanan ang kliyente na walang nanganagsiwa sa residenteng bahay, o dili kaya'y payagan and bilang ng empleyado or trabahador (staff) na bumaba sa bilang na kailangan ng Jasmine Hall na sinabi sa amin ang porseyento ng trabahador/kliyente _____ trabahador _____ bawat isang kliyente.

16.     Kung kailangan umalis ako sa residenteng aruguan bahay para sa (shift) 5 24 oras, Ako ay dapat humingi ng permiso at iyabiso agad sa nanganagsiwa at namumumo ng Jasmine Hall para ito ay ayusin at mapalitan ako sa akin tungkulin iskedyul.

17.     Ang permiso ay laging pinagkakaloob pero puwedi rin itong hindi pagkaloob, at hindi ko alam kung kaylan ang iyayabiso at pangangailanganan.

18.     Sa pagitan na ika 10 pm at 6 am (gabi), and Residenteng Katulong Kasingbahay ay kailangan subaybayan ang kliyente sa buong magdamag, at sa lahat ng kailangan nito sa mga nagising na kliyente at kailangan ang tulong agad.

19.     Hindi ito nangyayari gabi-gabi pero humigit-kumulang _____ ilang beses sa isang buwan.

20.     Ako ay nabayaran para sa _____ wala ____ ilan ____ lahat_____ ng mga gabi na ako ay natutulog na ginambala at ginising at naantala ang aking pagtulog dahil sa kliyente. O _____ Hindi ko alam kung ako ay nabayaran ng sahod na

Exhibit AA
Page 6

1   ako'y ginising at naantala ang aking pagtulog dahil sa kliyente para itoy

2   paglinkuran ng kanilang kailangan.

3

4   21.   Ako ay nagbibigay ng deklarasyon ito na malaya, para magbigay ng tamang

5   paglalarawan ng Jasmine Hall tungkol sa sistema ng pagsusuweldo o sahod, at alin

6   man na walang itong banta o pangako.

7

8   //

9   //

10  //

11  //

12  //

13

14  22.   Binasa ko itong akin deklarasyon sa umpisa hanggang huli at sinabi sa akin

15  na puwede kong tanggalin o kaya'y palitan and deklarasayong nasa loob ko ay

16  hindi tama, patas o katutuhanan.

17

18  Ako ay nagpapahayag sa ilalim ng parusa ng palsong panunumpa sa County

19  ng Sacramento, California na itong aking inilathala ay tunay at pawang

20  katutuhanan lamang.

21

22  Petsa (Date)   _____

23

24

25

26

27                    Exhibit  AA
                      Page   7
28

                      284

LAWRENCE BREWSTER
Regional Solicitor
DAVID KAHN
Counsel for ESA Programs
**JAN M. COPLICK**, Senior Trial Attorney
Designated Counsel for Service
California State Bar Number 124503
E-Mail: Coplick.Jan@dol.gov
ANDREW SCHULTZ
Trial Attorney
Office of the Solicitor
United States Department of Labor
90 7th Street, Suite 3-700
San Francisco, California 94103

Telephone: (415) 625-7751
Facsimile:  (415) 625-7772

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | )<br>)<br>) | CIVIL ACTION NO. 2:05-cv-01306-GEB-KJM |
| Plaintiff, | ) | |
| v. | ) | |
| JASMINE HALL CARE HOMES, INC., a corporation, HALL CARE HOMES, INC., a corporation, GEORGE K. HALL, an individual, and ESTELA HALL, an individual | )<br>)<br>)<br>)<br>) | DECLARATION  IN SUPPORT OF THE SECRETARY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Defendants. | )<br>) | |

I, _____, swear the following to be true:

1.    I have been employed by the Defendants ("Jasmine Hall" or "JH") from _____, to _____ as a live-in care provider.

Exhibit  AA
Page  8

*Declaration in Support of Secretary's Moti*        285        *dgment*        - 1 -

2.   The regular weekly work schedule for Jasmine Hall's care aides is 5 on-duty days in a row, then 2 days off.

3.   I currently work at Jasmine-Hall home #_____ on this same weekly schedule.

4.   I am paid $_____ per month in salary to cover all hours I am on duty monthly during the 5 on-duty days per week.

5.   If I work any hours on my 2 days off, Jasmine Hall considers this "overtime" and I am paid extra.

6.   Each on-duty shift is 24 hours long.

7.   For each of my duty shifts, I must stay overnight at my care home in the staff bedroom.

8.   I do_____ do not_____ have another residence where I could stay if I was not required to stay overnight at the care home.

9.   I do_____ do not _____ have to share the staff bedroom with up to _____other employees.

10.  During each 24 hour duty shift, I spend an average of _____ hours daily in direct client care, behavioral interaction, client charting, and household chores.

11.  On a typical day, it is rare that I have more than _____ daytime hours free when I am not required to care for and interact with clients or handle household chores.

12.  Apart from these work tasks, I must also be immediately available for potential emergencies at all times during my 24 hour duty shift when clients are in the care home.  I could not leave the premises for private purposes of my own even if all the work tasks were completed.

13.  On some days, all the clients are away from the care home at the same time mid-day so that, for that period of time, I am temporarily relieved of my on-duty obligation to monitor and supervise them.  However, this is not predictable in advance because there are many other days where at least one client stays home

Exhibit  AA
Page  9

1 | from the planned activity. In either case, these times are not recorded on our
2 | timesheets.

3 | 14.   Apart from the times I describe in the previous paragraph, there is usually no
4 | time during my 24 hour duty shift when I am completely relieved from the duty to
5 | supervise and monitor clients, and be available to meet client needs or handle
6 | emergencies.

7 | 15.   I cannot leave clients unsupervised in the homes, or allow the number of
8 | staff to fall below what Jasmine Hall has told us is the staff/client ratio of at least
9 | _____ staff for each _____ clients.

10 | 16.   If I need to leave the care home for any personal reason during my 5 24-hour
11 | shifts on duty, I have been told to ask Jasmine Hall management in advance so
12 | they can arrange coverage.

13 | 17.   Permission is usually granted but may also be denied, and I do not know in
14 | advance.

15 | 18.   Between the hours of 10 pm and 6 am (nighttime), the care aides are
16 | responsible for monitoring the clients during the night, and taking care of clients
17 | who awaken and need help.

18 | 19.   This does not happen every night but approximately _____ times per month.

19 | 20.   I have been paid for _____ none _____some_____ all____of the nights my
20 | sleep was interrupted by clients.  OR  _____ I don't know if I have been paid for
21 | interrupted sleep.

22 | 21.   I give this declaration freely, in order to give an accurate description of
23 | the Jasmine Hall pay system, and not because of any threats or promises.

24 | //
25 | //
26 | //
27 | //
28 | //

Exhibit  AA
Page   10

287

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*                    - 3 -

22.    I have read this declaration from beginning to end, and was told that I should feel free to cross out or change any part of this declaration that I thought was not accurate, fair or correct.

I declare under penalty of perjury in the County of Sacramento, California, that the foregoing is true and correct.

Date    _____

Exhibit  AA
Page  11

288

1  LAWRENCE BREWSTER
   Regional Solicitor
2  DAVID KAHN
   Counsel for ESA Programs
3  **JAN M. COPLICK,** Senior Trial Attorney
   Designated Counsel for Service
4  California State Bar Number 124503
   E-Mail: Coplick.Jan@dol.gov
5  ANDREW SCHULTZ
   Trial Attorney
6
   Office of the Solicitor
7  United States Department of Labor
   90 7th Street, Suite 3-700
8  San Francisco, California 94103
9
   Telephone:  (415) 625-7751
10 Facsimile:  (415) 625-7772
11

12              UNITED STATES DISTRICT COURT

13           EASTERN DISTRICT OF CALIFORNIA

14
   ELAINE CHAO, SECRETARY OF        ) CIVIL ACTION NO. 2:05-cv-01306-
15 LABOR, UNITED STATES             ) GEB-KJM
16 DEPARTMENT OF LABOR,             )
                   Plaintiff,       )
17                                  )
        v.                          )
18 Jasmine Hall CARE HOMES, INC., a ) DECLARATION  IN SUPPORT OF
19 corporation, HALL CARE HOMES,    ) THE SECRETARY'S MOTION FOR
   INC., a corporation, GEORGE K.   ) PARTIAL SUMMARY JUDGMENT
20 HALL, an individual, and ESTELA  )
21 HALL, an individual              )
                                    )
22           Defendants.            )
23 _____)

24
   I, Sheila Creel, hereby swear the following to be true:
25
26     1.     I am a senior Wage and Hour Investigator in the Sacramento District

27 Office, and the investigator assigned to the Jasmine Hall ("Jasmine Hall") FLSA
28
   case.                                          Exhibit  BB
                                                  Page  1

                                                    289

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*          - 1 -

2.    In that capacity, I have personal knowledge of the following matters and can testify to them at trial; I also have reviewed the government records in this matter, kept in the ordinary course of business.

3.    As a Wage and Hour Investigator, my task is to make a fair determination of a business' compliance with the FLSA, which includes statutorily-required recordkeeping and proper payment for all hours worked by employees.

4.    I am trained to make this determination by objectively assessing relevant data, visiting the worksite(s), conducting confidential interviews with past and present employees, requesting and reviewing timecards and schedules, and payroll records for a representative period of time, according to standard investigation methods in which I have been formally trained, and received updated training regularly.

5.    I started investigating this case in March of 2002. My initial document request to Defendants covered April 1, 2002 to April 1, 2004, for records required to be made and kept by employers subject to the Act pursuant to Section 11 of the Act and to Part 516 of the regulations (29 CFR Part 516), including the names and addresses of Jasmine Hall's employees, the rates of pay, and the corresponding times when these individual employees were on-duty and

Exhibit  BB<br>Page  2

290

providing services to Defendants' business, particularly hours worked by each employee each workday and each workweek.

6.    Because a Wage Hour Investigator must first establish the weekly hours worked by an individual employee before determining whether an employee has received correct wage payment, I asked Defendant George Hall a number of times, from our first meeting on March 23, 2004, to provide such mandatory records of daily and weekly hours worked and employee hours on duty.

7.    Although Jasmine Hall eventually failed to provide documents in several mandatory recordkeeping categories,  in violation of the recordkeeping provisions of Section 11 of the Fair Labor Standards Act, I did get a response to my requests for individual employee time schedules.

8.    On April 1, 2004, Mr. Hall sent me an e-mail attaching a Jasmine Hall employee duty schedule (a true and accurate copy of which Email and attachment is attached as Exhibit 1) representing that this schedule was the standard weekly work duty schedule used in all the Jasmine Hall care homes, for all employee Resident Care Aides (RCA's) during the entire period of our review.

9.    The schedule Mr. Hall provided at Exhibit 1 shows three care aide employees at  each home, rotating among themselves so that, for six of the seven 24-hour duty days, one employee had the day off, while the other two employees each worked 8 hours of the  16 non-sleep, or daytime, hours in two shifts – the first

Exhibit    BB
Page   3

8-hourshift from 6 am to2 pm, and the second shift from 2 pm until 10 pm; this schedule provided for only one care aide on duty at a time.

10.    In the course of a given workweek, the schedule at Exhibit 1 would result in three employees being on-duty for a total of 40 hours each, all during the "day-time" or "awake" hours of 6 a.m. to 10 p.m.

11.    The schedule at Exhibit 1 showed no care aide on–duty or responsible for the care and supervision of clients between the overnight hours of 10:00 pm to 6:00 am, which time was marked "bedtime".  This would be inconsistent with the care homes having an "awake" staff member on duty overnight.

12.    In subsequent conversations with Mr. Hall, I asked him how the facilities met their obligations to provide client care and supervision, including during night hours, under the schedule he had provided me at Exhibit 1.  He stated that the schedule at Exhibit 1 is what he called an "example" or "model" schedule for "live-in" caregivers who reside at the care homes.  He further stated that he did not need to schedule his workers because they were "live-ins" and would be doing things during their duty days that people do not get paid for, such as eating, watching TV and sleeping.  Therefore, Mr. Hall stated, these care aides are not shown on the "model" schedule between 10 p.m. and 6 a.m., because that is when most people at home typically sleep..

Exhibit   BB
Page   4

292

13.     At the same time, Mr. Hall admitted that the Jasmine Hall employees on shift remained available to the clients when needed throughout these night-time hours, as well as the scheduled day-time hours.

14.     I requested from Mr. Hall time records relating to sleep hours, including a summary of the dates and times that care aide staff were woken up at night to provide client care and supervision or received uninterrupted sleep; I never received any such records, and employees later informed me that no such records were kept.

15.     Even though he admitted that Jasmine Hall's employees were required to be available to provide client care and supervision throughout their scheduled duty periods, Mr. Hall told me that he believed he was entitled to rely on the *Homeworker* regulation at 29 CFR 785.23 to use Duty Statements he had drafted for signature by the employees as "employment agreements" and stating that Jasmine Hall did not consider sleep nor other "leisure type" activities, such as T.V. watching to be compensable. Mr. Hall said he believed these employment agreements allowed Defendants to pay Jasmine Hall's care aides only 8 hours out of every 24 hour duty shift.

16.     This seemed inconsistent with my FLSA training and reference material concerning the *Homeworker* regulation and the specific requirements for its application, one of which is that an employer can reach reasonable agreements

Exhibit   BB
Page   5

to designate unpaid time only when an employee  has definable periods of complete relief from duty, and is free to leave the premises during the off-duty non-sleep hours.

17.    In addition, in the residential care industry, the Labor Department has consistently enforced its published interpretation as stated in published opinion letters circulated to the industry and available on the Labor Department's website, that the provision of private sleeping quarters to employees is also considered a threshold requirement for the Homeworker regulation.   Only employers who bring themselves within these specified regulatory criteria will be considered as eligible for consideration of the Homeworker regulation such that the Labor Department can go on to assess  other mandatory elements, particularly the reasonableness of any claimed employment agreements.

18.    My investigation confirmed what Mr. Hall had admitted to me, namely that the Jasmine Hall employees remained "available" on-site throughout their shifts to meet client care and supervision needs. The employees were not relieved of duty nor free to leave the premises during these shifts, and did not have private sleeping quarters.

19.    In my discussions with Mr. Hall between April and June of 2004, I attempted unsuccessfully to get him to clarify any  times and hours when an individual Jasmine Hall employee was, in fact, relieved from duty during the five

*Declaration in Support of Secretary's Motion for Partial S*

consecutive 24 hour duty shifts referenced in the "employment agreements", but he never directly answered me on that point. I similarly attempted, without success, to get him to directly answer my many questions as to how or by whom night supervision of clients was provided under his "model" schedule (at Exhibit 1).

20.    In the next phase of my review, I conducted separate confidential interviews with current workers and worksite visits to understand the business and staffing patterns, followed by interviews with former workers.

21.    All persons I interviewed described the Jasmine Hall work pattern as 5 consecutive days (made up of 24-hour duty shifts) on, followed by 2 days off, per week, with the care aides rotating their days off. Each time I visited one of the Jasmine Hall homes or spoke with someone working at one of the homes, my observations of the employees' actual work patterns and obligations were also consistent with this pattern; there was usually more than one employee providing needed care or supervision to clients at almost any time of day, employees remained available for client care and supervision throughout their entire on-duty shift, and even in the evenings the clients seemed to require a great deal of attention and interaction. Moreover, the employees on duty were not free to leave the homes to meet with me off-site, for example.

22.    This more onerous work schedule, and the restrictions on employee freedom during their assigned shifts, was expressly admitted throughout

Defendants' Personnel Manual, including in the following provisions, accurate

copies of which are attached hereto, collectively, as Exhibit 2:

a) Prohibited Conduct Number #15: Failure to obtain permission to

leave work for any reason during normal working hours.   (DEF

1208);

b) Employees are also expected to remain at their entire work

schedule except when required to leave on authorized company

business.  (DEF 1211);

c)  Employees may not conduct personal business…during their

scheduled working hours. (DEF 1218);

d) Medical Leave: Title 17 §.56004 requires staffing

ratios…consequently, [Hall Care Homes] expects full-time live-in

staff to continue to reside at their work site while on medical leave.

(DEF  1223.)

23.   The care aide employees expressed a significant degree of concern,

higher than in most investigations I conduct, that George Hall or Estela Hall not

see them in any potentially cooperative role.   Most of them would refuse to speak

to me in the presence of any other person, and would insist that I meet them

privately or interview them in my car around the corner from the care home.

Several of them expressed concern that they not speak to me on a Jasmine Hall

296

telephone line, as they expected George Hall to check the care homes' telephone

records for calls made to our Wage and Hour telephone numbers, and feared a

possible negative reaction from George Hall if he found that any employees had

spoken with the Labor Department without his knowledge.

24.    The employees stated, and my own observations appeared to confirm,

that the actual Jasmine Hall work schedules were more accurately reflected in

Defendants' *Direct Care Staff Schedules* (or *Weekly Staff Schedules*) True and

accurate examples of such *Direct Care Staff Schedules* from Defendants'

document production are attached as Exhibit 3.

25.    In the Direct Care Staff Schedules for each Jasmine Hall care home,

the care aides/RCAs[1] are shown scheduled by their initials for each hour slot in the

24-hour duty shift.

26.    These schedules are designed to demonstrate specifically how the

intended staff scheduling of individual direct care staff members in each Jasmine

Hall care home for a given week will be sufficient to meet Jasmine Hall's

Lanterman Act requirements at that facility, in both client staff ratios and in total

hours of direct care.

Exhibit   BB
Page   9

297

---

[1]  One additional set of initials, either "GH" or "EH", is shown on those hours of the day during which all clients could be expected to be in residence, usually 3 pm. to 10 pm., when Title 17 staffing ratios would mandate the addition of one additional direct care staff member.

27.   Any unplanned variation in the  actual on-duty staffing from the assignments shown in the Direct Care Weekly Schedules at a facility – for example, if an employee were to leave the premises for personal reasons of his or her own during unpaid non-sleep hours —- would potentially affect the care home's compliance status with Title 17 in the home's ability to meet both its care hour totals for that week, and the  client/staff ratio.

28.   Four of Jasmine Hall's 8 care homes currently operate at the highest Level of Care in the residential system, Level 4(i); Jasmine Hall #3, #6, #7 and #8. For Level 4(i), Title 17 Section 56004 requires a maximum client/staff ratio of 2:1 at all times that clients are awake in the house, and a total number of direct care hours, not including consultant hours, of 312 hours *weekly* if 4 clients are currently residing at the home; and 420 hours *weekly* if 6 clients are currently placed at the home, the maximum number permitted under the homes' licenses.

29.   Notably, Mr. Hall's "model" on-duty staffing pattern in Exhibit 1 – in which on-duty hours are limited to 8 per day per employee, the same number of hours per day for which Defendants pay their employees -- appears to provide only 120 hours weekly of direct client care and supervision in homes with 3 staff members, and 160 hours for homes with 4 staff members.

30.   The total hours of direct client care demonstrated by Exhibit 1 fall well below the weekly hours required for even the sole Jasmine Hall Level 3 care

*Declaration in Support of Secretary's Motion for Partial Summar*          298          - 10 -

home, while the single staff person on duty at a time would fail to meet the minimum staff client ratios at all seven of the Level 4 Jasmine Hall homes.

31.     The same inconsistencies and defects apply to an alleged new "Work Schedule" that George Hall and Estela Hall posted at each home in 2004, which was formatted very much like the example Mr. Hall had Emailed to me months earlier.   Many of these alleged new  Work Schedules were provided in Defendants' documents production (such as DEF 1237, a true copy of which is attached as Exhibit 4.)

32.     Each worker was listed by name on each home's new Work Schedules for no more than 8 hours each day and accordingly, these "model" schedules would equally fail to satisfy the care homes' Title 17 direct care hour requirements weekly, and the staff/client ratios, as did Exhibit 1.

33.     The CCL licensing files I reviewed contained official Jasmine Hall care home floorplans and measurements, provided to CCL by Jasmine Hall, of the staff rooms for each care home, true copies of which are attached collectively as Exhibit 5.

34.     In visiting the care homes, I found that the Jasmine Hall live-in residential staff members were  required to share relatively small rooms with up to 3 other staff members, often of the opposite sex, as well as  business supplies.

Exhibit    BB
Page   11

299

35.     Due to the lack of private sleeping quarters provided to the Jasmine Hall employees, together with the fact that Defendants had failed to keep proper time records to support their assertions that employees were relieved of duty, as well as the great amount of contrary evidence that the Jasmine Hall care aides were not in fact completely relieved of duty and free to leave the premises during their unpaid non-sleep hours, the Labor Department informed Defendants in 2004 that they did not satisfy the requirements to assert the Homeworkers regulation as justification for failing to pay their employees all hours in their  assigned duty shift.  Further, any agreement to pay for only eight hours out of every 24 spent on-duty did not meet the requirement that an agreement be "reasonable". Mr. Hall disagreed with this conclusion, and refused to change Jasmine Hall's pay practices then or since.

36.     After litigation in this matter began, I returned to the  Jasmine Hall care homes again to help make a video record of the employee living quarters at each care home, still frames from which video are attached to this Declaration collectively as Exhibit  7, as true and accurate representations of the conditions I observed on April 11, 2006.

37.  The staff bedroom was used, in many of the care homes, for storage of special food, cleaning supplies, and items to be kept out of reach of the clients.

Exhibit   BB
Page      12

300

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*                              - 12 -

This further reduced the amount of space and privacy available for use by any individual staff member.

38.   This was the case at Jasmine Hall #1, where the staff bedroom housed up to three care aides in the period from 2002 to the present, in bunkbeds plus a twin bed, together with the home's fax machine, filing cabinet, and two large bookcases containing food and supplies for the home, as shown in Exhibits 7- JH1.

39.   At Jasmine Hall #2, two care aides shared a room with twin beds, as well as the desk, chair, supplies and copier used by the home's Administrator, as shown in Exhibits 7- JH2.

40.   Many of the Jasmine Hall staff rooms were also used by Jasmine Hall for management offices by the care homes' Administrators or supervisors, who each supervised two to four homes and traveled among them throughout the day.

41.   At Jasmine Hall #3, two older married couples have to share a single small room containing two double beds directly across from each other with no sound or visual privacy barrier between them, as shown in Exhibit 7-JH3. I was told that the four care aides who lived in the single room often hung a sheet from the ceiling between the beds, so as to provide some semblance of privacy because the older women are very shy about being seen in night clothes by the others.

42.   At Jasmine Hall #4, a married couple has had to share the sole staff bedroom with a third care aide, currently their son but previously an unrelated

Exhibit BB
Page  13

single woman, with no barrier or curtain between the beds.   The closets are used to store large stocks of house cleaning and paper supplies.

43.    At Jasmine Hall #6, two sets of bunk-beds house 4 care aides in a relatively small room, with the aides having only a small portion of the closet for their clothes, toiletries and personal belongings, and a portion of a dresser, as shown in Exhibit 7- JH6.

44.    Jasmine Hall # 7, at the time of my video visit, did provide one or two private bedrooms to staff members as well as a shared bedroom, but I understand that all staff have since had to share bedrooms together.

45.    At Jasmine Hall #8, four care aides, male and female,  similarly slept in one room, using two sets of bunk beds, shared closet space, and small plastic dressers, where possible, to hold their toiletries, as shown in Exhibit 7– JH8.

46.    The care aides/RCA's had no other room or living space of their own in the home where they could have any privacy from either the clients or other staff.

47.    Jasmine Hall's Personnel Manual additionally provided that employees – including their personal items and their persons – have no expectation of privacy in the sleeping space provided by Defendants, in the following provisions, true copies of which are attached hereto as Exhibit 8:

Exhibit   BB
Page   14

*Declaration in Support of Secretary's Motion for Partial Sun*

a) Employees have no right of privacy – they can be searched for drugs (DEF 1210);

b) Employer property & furnishings can be inspected anytime w/o notice. Personal items are subject to inspection and search, with or without notice, with or without the Employee's prior consent. (DEF 1215).

48. The more intensive client need and staff involvement required at Level 4 facilities was reflected in the Jasmine Hall Daily Schedule documents I reviewed in Community Care Licensing's public files, in which Defendants had expressly promised to CCL in the course of their licensing process that each home's staff would provide daily client activities and training on a scheduled basis throughout the entire day, at 6:00 to 6:30 am. for example, in Hygiene, Bedmaking, and Matching Clothes, at 5:00 to 6:00 pm in Dinner Preparation, Table Preparation, Food Preparation (M, W) and Table Manners, while at 7:00 to 8:00 p.m. in Residential Training, Grooming, and Group Discussion and Personal Counseling. (A true and accurate copy is attached as Exhibit 9.)

49. This degree of intensive client need and staff involvement throughout the course of the care aides' duty shift was further reflected in various medical records and charts, approximately five thousand pages of which I have reviewed. For example, clients frequently knocked on the staff room door in the middle of the

Exhibit BB
Page 15

1   night for all sorts of reasons, such as wanting a shower (Ex. DEF 2076, DEF

2
3   2229.)   One patient needed cough medicine administered every 4 hours and pain

4   medication at 1:30 am (DEF 4499) and had diarrhea at 10:30 pm (DEF 4503.)

5
6   Another client had ongoing problems of urinary incontinence averaging 4.8

7   incidents per week (DEF 2200), requiring staff to document each incident, monitor

8   his consumption of liquids before bedtime, and wake him up every night at
9
10  midnight to take him to the bathroom); by Staff's "great efforts", the behaviorist

11  noted the behavior decreasing (DEF 2195.) When it began to increase, the care

12
13  aides were required to wake up the client every night between 2 am. and 3 am., to

14  document the sessions, and to 'collect frequency and prescriptive analysis data re

15  eliminating inside and outside the toilet' (DEF 2210.)

16
17      50.    In February 2007, I conducted a review of all client attendance and

18  accountability logs produced by Defendants to date, to help establish how often all

19
20  clients were gone from the care homes for other supervised activities such as Day

21  Programs. George Hall had told me that the clients were consistently absent during

22
23  the daytime, but my own observations, during daytime visits to the Jasmine Hall

24  care homes and telephone conversations with staff, were to the contrary; that there

25  was almost always at least one client who remained at each home during the

26
27  daytime.

Exhibit   BB
Page   16

304

51.   Of the 908 pages of weekly logs provided to Plaintiff by Defendants, only 158 weeks or approximately 18 per cent showed as much as one single day where all the residence clients were absent from the home at the same time for a minimum of one hour.

52.   The common daytime presence of at least one client in the Jasmine Hall care homes was further documented in records I reviewed at Alta California Regional Center, which included records of Unannounced Visits made to Defendants' care homes by Alta staff.  The Unannounced Visit records recorded the number of clients present at the time of the visit.  In each such record I reviewed, one or more clients were documented by Alta as being present in the care home at the time of Alta's visit; true copies of these documents are attached at Exhibit 10.

53.   Individual client medical files and charts contained in Defendants' document production that I reviewed contained numerous notations that clients had not gone to any day program, or their designated work activity, that day or for several days that week, such as the following individual examples:

> Client sometimes skipped day program 4/05/05 (DEF 2066);
> Sometimes doesn't go to day programs - 4/23/05 (DEF 2067);
> Client goes to day program except when he doesn't feel well (DEF 2069);
> Came back from program at 10 am - 7/22/04 (DEF 2078);
> Client stayed home from program (DEF 2132.)

Exhibit   BB
Page   17

305

54. The high degree of client need and intensive staff involvement throughout the course of the care aides' duty shift was also reflected in the documents I reviewed at Alta Regional Center which specified the severity and frequency of the disruptive behaviors that Jasmine Hall is willing to accept in client placement, including fire setting, property damage, going AWOL, and public masturbation.

55. For example, as shown in Exhibit 11 attached, clients can be placed at Jasmine Hall #8 who have a recent history of suicide attempts, weekly runaway attempts, fire setting or who engage in disruptive behaviors on a *Daily* basis at the *Highest* level of severity. In addition, clients can be placed at Jasmine Hall #8 who have been convicted of child molestation, indecent exposure, domestic abuse, or have a history of rape, animal cruelty, or homicide (Exhibit 11, page 14) and who require physical assistance with *every* Activity of Daily Living, including Toileting, Dressing, Hygiene, Eating, and Bathing. (Exhibit 11, page 15.)

57. That clients with disruptive behaviors and intensive care needs are in fact resident at Jasmine Hall's facilities was also demonstrated throughout Defendants' documents that I reviewed, including client notes and charting - itself an additional time-intensive duty required of care aides. The following samples were contained within a few hundred pages selected at random:

Exhibit   BB
Page   18

306

*Declaration in Support of Secretary's Motion for Partial Summary Judgment*                - 18 -

a)      The first client was described as doing well with "one on one" attention from staff when upset or engaging in self-injurious behavior (DEF 1914); Client was dancing to her radio during the night, and wet her panties (DEF 1932); Client needed medical treatment after she  injured herself with a toothbrush in a delicate area (DEF 1932); Doesn't sleep at night but flushes the toilet constantly, goes downstairs at midnight to eat and makes a mess, complains to staff (DEF 1945); Client is agitated at night, going up and down the stairs repeatedly, wet her panties so the staff changed them and a few hours later, she did it again. (DEF 1945.)

b)      For a second client, staff was tasked by the behavior consultant with tracking his hand-washing routine on a daily basis to confirm the rate of non-compliance during hand washing, "Staff should make a deal with client  prior to each session and make reinforcements available." (DEF 1995); Staff was also instructed to "encourage socialization and engage in reality based conversations", and monitor for inappropriate behavior (trying to beg for cigarettes from strangers or trading possessions for cigarettes.) (DEF 2051); One evening entry noted: 10 pm Staff found clients' room empty, client

Exhibit   BB
Page   19

307

missing, found them in the back yard drinking wine. Threatened to

slap the staff. (DEF 2076);

      c.    A third client needed care aides "to assist with all of her

ADL's" (DEF 2098); while her records showed repeated acts of self-

injurious and disruptive behavior such as "Scratched her legs until

bleeding, fought with staff who tried to stop her (DEF 2120); Care

aides had to clean the bathroom because another client had scattered

stool on the floor of the bathroom. This client had then flooded it with

water, mixing with the stool. Client got upset and began hitting the

staff. (DEF 2127); In the evening, the client was watching TV when

another client turned it off. Client started screaming and the other one

grabbed her – staff had to separate them.  (DEF 2131.)

58.    I have calculated the minimum wage and overtime backwages due to

the Jasmine Hall care aides/RCA employees in this case as amounting to

$3,270,201.35, for the relevant period through April 30, 2007, in a manner

consistent with standard WH backwage methodology and according to the process

set forth in detail in Appendix I to this Declaration, which I incorporate herein by

reference. My calculations were also reviewed and approved by my supervisor.

59. I reviewed Wage and Hour's existing files on Defendants which

contained a record of a brief 1998 investigation of George Hall and Jasmine Hall

Exhibit   BB
Page   20

1   #1; this record further reflects that no violations were found but that pamphlets

2   explaining the concept of FLSA "hours worked" and on-duty status in the

3

4   residential care home industry were given to Mr. Hall.

5       60.     Wage and Hour caused an asset search to be conducted, which land

6

7   title records search showed that Defendant George Hall owns various parcels of

8   real property in the Sacramento area, including all of the Jasmine Hall care homes

9

10  and the real property on which they are located.  A true and accurate copy of the

11  summary of findings of the said land title search is attached as Exhibit 12.

12      I declare the foregoing to be true to the best of my knowledge, under penalty

13

14  of perjury.

15  Dated:     April 15 , 2007

16                                  Sheila Creel, Wage Hour Investigator

17

18

19

20

21

22

23

24

25

26

27                                              Exhibit   BB
                                                 Page  21
28

                                                    309