LAWRENCE BREWSTER
Regional Solicitor
DAVID KAHN
Counsel for ESA Programs
**JAN M. COPLICK, Senior Trial Attorney**
*Designated Counsel for Service*
California State Bar Number 124503
E-Mail: Coplick.Jan@dol.gov
ANDREW SCHULTZ
Trial Attorney
Office of the Solicitor
United States Department of Labor
90 7th Street, Suite 3-700
San Francisco, CA, 94123

Telephone: (415) 625-7751
Facsimile: (415) 625-7772

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>    Plaintiff,<br><br>v.<br><br>JASMINE HALL CARE HOMES, INC., a corporation, HALL CARE HOMES, INC., a corporation, GEORGE K. HALL, an individual, and ESTELA HALL, an individual<br><br>    Defendants. | CIVIL ACTION NO. 2:05-cv-01306-GEB-KJM<br><br><br><br><br>DECLARATION OF VALERIE LOWERY IN SUPPORT OF THE SECRETARY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

I, VALERIE LOWERY, declare as follows:

1. I was employed by the Defendants ("Jasmine Hall" or "JH") during a period of time between December 2002 and May 2003 ("relevant time period"), first as a live-in care provider and then as an Administrator supervising several Jasmine Hall care homes. All the information that I give in this Declaration concerns this relevant time period unless stated otherwise.

2. As a residential care aide (RCA), I primarily worked at Jasmine Hall # IV, a residential group home for developmentally disabled (DD) clients with moderately severe disabilities whose care needs had been assessed at Level 3 (with Level 4 being the highest) and requiring a

minimum staff to client ratio of 1 staff member on site for every 3 clients but other Jasmine Hall care homes were Level 4. When I worked at JH IV, we had 6 clients in residence and 2 staff members on-duty at all times.

3. As a care aide, I worked the standard JH work week pattern of 5 consecutive days on, then 2 days off. Each of these 5 daily duty shifts was 24 hours long, for a total of 120 duty hours each week. I received a monthly salary of $1500, later raised to $1600 (all before taxes), to cover each month's worth of 120-hour workweeks.

4. If care aides also worked additional hours on our days off, JH called those hours "overtime" and paid us extra pay for them.

5. I had my own apartment where I stayed on my days off. However, on my 5 duty shifts each week as a care aide, I was required to sleep overnight at the care home, sharing the cramped staff bedroom with 2 other women. I had only a small portion of the closet in which to put my personal belongings, and there was no privacy. There was also no working television in our shared bedroom and we were not permitted by the house manager to use the main home TV after 8 p.m. There was no place to entertain a friend and entertaining was discouraged; a nurse friend of mine tried to visit a few times, and the house manager told her I wasn't there even though I was. At 9 p.m. the house manager locked the doors, and since the care aides did not have a key or code, we could not stay out past 9 pm, even in the yard.

6. My daily care aide duties included cooking meals and related clean-up, and doing housework such as making beds, doing laundry, cleaning the facility and yard maintenance. Our most important and also time consuming duty was providing direct care and supervision to meet the needs of the severely impaired residents. Jasmine Hall specialized in taking DD clients who additionally had serious behavioral and mental problems, who needed less physical care but much more behavioral care and attention.

7. The care aides (commonly called "staff") were responsible for handling the clients' daily behavioral data gathering and intervention programs, as well as some specified training programs, and all the related record keeping and charting. The problem behaviors were identified by a paid consultant but it was the care aides who tracked and provided the data about

Declaration

Exhibit S
Page 2

Page-2

166

how often daily they occurred, when, and why, and took the prescribed interventions and trainings.

8. These behaviors could range from nighttime bedwetting and soiling, yelling, stealing, smearing feces, hitting others, throwing food, public masturbation, self-injury, and others. Some of the training care aids provided to clients included performing daily hygiene and required us to hold our hand over the client's hand to teach themselves how to wash themselves, or brush their teeth – "hand over hand" training. The behavioral training was time intensive as it was done one-on-one and many DD clients tended to learn slowly.

9. The care aides were obligated to do behavioral monitoring and intervention throughout the entire 24-hour shift, including any evening leisure periods set up for the enjoyment of the clients, such as television watching, games night and video night. Watching television with clients was not the same as watching television with friends, because clients yelled out interruptions, got into fights, engaged in obsessive behaviors, or kept asking for an explanation of what was being said or shown on TV.

10. The care aides also had to be ready at all times to handle any emergency as well as to be constantly paying attention and monitoring for potentially dangerous situations. Some clients, if not watched closely, would wander away, or get up at night, and injure themselves. One client, for example, constantly urinated on herself and required close attention and frequent clean-up and laundry. At night, she was at risk of burning herself by leaving her face for long periods under the hot-water tap in the bathroom, if not carefully monitored.

11. We needed to sleep lightly to be sure to catch any problems, and our sleep was also interrupted many nights by client problems or by activity or noise made by another RCA in the shared staff bedroom. We didn't record or get paid for the interrupted sleep. I often got less than 5 uninterrupted hours of sleep per night.

12. As a care aide, I usually started work before 5:30 a.m., splitting the tasks with the other on-duty care aide to either cook a hot breakfast or wake clients up; bathe, shave and dress the clients and dispense morning medications; do laundry, make beds, make and eat lunch and dispense lunchtime medications; clean the house; supervise and interact with the clients during the afternoon into evening; make dinner and help the clients eat it, and clean up; help them get

ready for bed, dispense evening medications and put them to bed by 8 p.m. 13. On a typical day as a JH care aide, I spent virtually all of the daytime hours starting before 5:30 o'clock a.m. up until about 8 p.m. directly caring for or training clients, doing household and cooking duties, or handling medical or behavior issues. It was very rare if I had an hour free to myself.

14. Although many of the clients were enrolled in Day Programs, it was rare that all of them actually went. In any event, it was clearly understood that the care aides were not to leave our assigned care homes – even if no clients were present - during our 5 days on duty without advance permission.

15. This was also the company rule that I was told to apply as a supervisor, once I was promoted to Administrator, to ensure that the important staff to client ratios were always met.

16. Once, soon after I had been hired, I left the home one weekday during the middle of the day, for approximately one hour, to handle a personal chore, as I knew enough staff were still present to handle the single client who had not gone to Day Program that day. This incident was reported to George Hall, who then took me into the staff room and reprimanded me in very strong tones, saying, 'Its clear to me you left for a break. You cannot leave the facility until your day off. If you want your job, you need to stay here and not leave." I explained to Mr. Hall that I hadn't been needed for client care, as there had been sufficient RCA's to care for the one client at the home. George Hall responded, 'It doesn't matter. You cannot leave. That's the rule. If you want to keep your job, you have to stay here; you cannot leave until your day off.'

17. When offered the promotion to Administrator, I viewed it as a chance to escape these restrictive conditions of having virtually no private time or space, and no designated "time off" during at least 120 hours of each week. As Administrator, I also worked very long hours but I could sleep at home each night, and have some privacy and personal time for my own needs again.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on : April 06 2007         *Valerie A. Lowery*
                                    VALERIE LOWERY

*Declaration*