KEKER & VAN NEST LLP
JON B. STREETER - #101970
MICHAEL D. CELIO - #197998
CHRIS J. YOUNG - #239518
633 Battery Street
San Francisco, CA  94111-1809
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188
E-mail:   jstreeter@kvn.com
          mcelio@kvn.com
          cyoung@kvn.com

Attorneys for Defendants
JASMINE HALL CARE HOMES, INC.,
HALL CARE HOMES, INC., GEORGE K. HALL,
and ESTELA HALL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>                              Plaintiff,<br><br>        v.<br><br>JASMINE HALL CARE HOMES, INC., a corporation, HALL CARE HOMES, INC., a corporation, GEORGE K. HALL, an individual, and ESTELA HALL, an individual,<br><br>                              Defendants. | Case No. 2:05-cv-01306-GEB KJM<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Date:        January 24, 2012<br>Time:        9:00 a.m.<br>Dept:        10<br>Judge:       Hon. Garland E. Burrell<br><br>Date Comp. Filed:      June 28, 2005<br><br>Trial Date:  January 24, 2012 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   RELEVANT FACTUAL BACKGROUND....................................................................3

    A.    George Hall, Estela Hall, Jasmine Hall Care Homes, and Hall Care Homes ...........................................................................................................3

    B.    Jasmine Hall's Clients: High-Functioning Adults with Substantial Rights ...........................................................................................................5

    C.    Jasmine Hall's Employees ........................................................................7

    D.    Audits of Jasmine Hall.............................................................................8

        1.    Jasmine Hall passed its prior audits with flying colors.............................8

        2.    Current audit of Jasmine Hall ...............................................................9

III.  LEGAL AND FACTUAL ISSUES TO BE DECIDED ....................................................9

    A.    The Hall Defendants Did Not Violate the FLSA (Issues 1 and 2)......................10

        1.    The RCAs are free to engage in personal activities when not actively performing their duties..........................................................12

        2.    Jasmine Hall and its RCAs entered into a reasonable agreement........................................................................................15

            a.    RCAs enter the agreement on an informed and volitional basis ....................................................................16

            b.    The compensation is reasonable ...................................17

            c.    Living conditions are reasonable ..................................17

            d.    Duties and hours are reasonable ..................................18

    B.    The Hall Defendants Acted in Good Faith and Did Not Willfully Violate the FLSA (Issues 3 and 4)...........................................................19

    C.    Certain of the Alleged Violations—If They Occurred—Were *De Minimis* (Issue 5)...................................................................................20

IV.   CONCLUSION...................................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Anderson v. Mt. Clemens Pottery Co.*
  328 U.S. 680 (1946)..................................................................................20, 21

*Brigham v. Eugene Water & Elec. Bd.*
  357 F.3d 931 (9th Cir. 2004) ............................................................. *passim*

*Brock v. Claridge Hotel & Casino*
  846 F.2d 180 (3d Cir. 1988) ........................................................................20

*Leever v. City of Carson*
  360 F.3d 1014 (9th Cir. 2004) .....................................................................10

*Lindow v. United States*
  738 F.2d 1057 (9th Cir. 1984) .....................................................................21

*McLaughlin v. Richland Shoe Co.*
  486 U.S. 128 (1988).....................................................................................19

*Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*
  971 F.2d 347 (9th Cir. 1992) .................................................................13, 15

## Federal Statutes

Fair Labor Standards Act,
  29 U.S.C. § 201 *et. seq.* ...................................................................... *passim*

## State Statutes

Cal. Welf. & Inst. Code
  § 4500 *et. seq.* ...............................................................................................3

  § 4503(i)........................................................................................................6

  § 4512(a) .......................................................................................................3

  § 4646............................................................................................................6

  § 4751............................................................................................................6

## Federal Regulations

29 C.F.R. § 785.14 ............................................................................................2

29 C.F.R. § 785.16 ............................................................................................2

29 C.F.R. § 785.23 ................................................................................. *passim*

29 C.F.R. § 785.47 ......................................................................................20, 21

## State Regulations

Cal. Code of Regulation, Title 17, § 56026(c)...........................................6, 7

## Other Authorities

DOL FLSA Compliance Action Report ...............................................................9

ii

# I.  INTRODUCTION

George and Estela Hall run a small group of residential care homes in the Sacramento area for the developmentally disabled.  Operating under the names "Jasmine Hall Care Homes" or "Hall Care Homes," they employ Residential Care Assistants ("RCAs") who live full-time in the facilities and care for their clients when those clients are at home.  Before accepting employment, prospective RCAs tour the facility where they will live, meet the clients they will serve, and interview the other RCAs with whom they will work.  They are told, and they agree in writing, that they will be "on duty" each week for five, 24-hour shifts, and will be paid a monthly salary.

Virtually all of the clients who reside in the Halls' facilities hold outside employment, so they are typically absent during the day, and RCAs can do as they please when their clients are absent.  When clients are present, RCAs help them with the day-to-day tasks with which they need assistance.  The Halls provide a family-like setting in which their clients can receive the assistance they need while still maintaining their autonomy and independence—a public-policy objective which has been encouraged under state law for decades, ever since California began moving away from its less humane prior policy of handling the mentally disabled primarily through institutionalization.  The Halls have operated their homes in this manner, with the Department of Labor's ("DOL") knowledge and approval, since the first Jasmine Hall Care Home was founded in 1986.

In 1998, the DOL conducted an investigation into whether the Halls were paying their RCAs in compliance with the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et. seq.* ("FLSA").  The DOL found no violation of the FLSA.  Six years later, however, the DOL conducted a second FLSA investigation of the Halls.  None of the pertinent facts had changed.  By 2004, the Halls were still doing business and paying their RCAs in just the same manner that they had been doing for well over a decade.  What had changed was the assigned investigator, Sheila Creel, who for the first time began asserting that the Halls were in violation of the FLSA.  Faced with what appeared to be an arbitrary about-face, George Hall disagreed, pointing Ms. Creel to a regulatory exemption for homeworkers—29 C.F.R. § 785.23—that he had learned of, indeed that

he had been provided a copy of, by the DOL's investigator in its initial audit.  By this action, filed in 2005 following the second audit, the DOL challenges the Halls' long-standing business practices, claiming that RCAs need to be paid twenty-four hours a day, five days per week.

The evidence at trial will show that the Halls' business practices are as legal as they are long-standing.  The mountain of briefing in this case might suggest that the applicable law is complex, even byzantine, but after stripping away the peripheral issues and cutting to the core of the matter—as the Court did in vacating its earlier summary judgment ruling and focusing the trial on whether the RCAs work pursuant to a reasonable agreement under 29 C.F.R. § 785.23— the law is fairly simple.  Where an employee resides full-time on his or her employer's premises, as RCAs do, he or she is *not* considered to be working every minute he or she is on the premises. As long as the employee can engage in personal pursuits when not actually working, "[A]ny reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted" because it is "difficult to determine the exact hours worked . . . ." 29 CFR § 785.23.[1]

---

[1] In its latest attempt to avoid any determination of whether a reasonable agreement under 29 C.F.R. § 785.23 governs the RCAs' employment relationship, the DOL filed a "motion *in limine*" (in reality, nothing more than a disguised renewal of its summary judgment motion) on November 23, 2011.  In its Reply Memorandum supporting that motion, filed yesterday, the DOL previews a different twist on its previously rejected theory that § 785.23 does not apply as a matter of law.  Citing 29 C.F.R. §§ 785.16 – 17, regulations which embody what is known in the case law as the "waiting time" doctrine, the DOL argues that because the RCAs are on duty 24 hours, they never have complete freedom to pursue personal endeavors.  But the DOL conveniently omits a later series of regulations governing the calculation of compensable "hours worked" during a duty shift.  In fact, one of the most basic "waiting time" regulations—29 C.F.R 785.14, a provision that clearly shows how the "waiting time" doctrine and the "hours worked" regulations interrelate—provides the best tip-off to just how misleading this omission is.  Section 785.14 states:

> Whether waiting time is time worked under the Act depends upon particular circumstances.  The determination involves "scrutiny and construction of the agreements between particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the circumstances.  Facts may show that the employee was engaged to wait or they may show that he waited to be engaged."  Such questions "must be determined in accordance with common sense and the general concept of work or employment."

29 C.F.R. § 785.14 (internal citations omitted).  Section 785.14 serves to confirm the correctness of the Court's decision to vacate the prior summary judgment ruling and try this case.

The agreement between Jasmine Hall and its RCAs is reasonable.  Jasmine Hall RCAs are provided with free housing, free food, medical and dental coverage, and a salary.  They live in well-maintained homes in Sacramento's residential neighborhoods, one of which has a brook flowing through the backyard.  They care for a small number of clients most of whom work outside the home, but who need assistance with some of the routine tasks of everyday life.  The RCAs are free to leave when their clients are not home, and regularly do, to take trips to the mall, to the park, and to meet with their friends and family.  When an RCA position comes open, current RCAs often recommend that Jasmine Hall hire one of their relatives—and Jasmine Hall often does.  The homes have, literally, a family atmosphere.

The law is that *any* reasonable agreement will be accepted.  Because each RCA works and is paid pursuant to a "reasonable agreement" under 29 C.F.R. § 785.23, this Court should find that the Hall Defendants[2] have not violated the FLSA.

## II.     RELEVANT FACTUAL BACKGROUND

**A.     George Hall, Estela Hall, Jasmine Hall Care Homes, and Hall Care Homes**

It has long been the State of California's policy to encourage residential placement of developmentally disabled adults.  The 1969 Lanterman Developmental Disabilities Services Act—the "Lanterman Act"—declares that it is the policy of the State to provide services and support to developmentally disabled adults in a manner that allows them to live like people without disabilities.  *See generally* Cal. Welf. & Inst. Code §§ 4500 *et seq*.  Rather than being warehoused in large institutions, this policy allows developmentally disabled adults to live in a home-like environment that respects their dignity and gives them a chance at living independently as much as possible.  Lanterman Act community care facilities are licensed by the California Department of Social Services and subsidized by the State.  The individuals covered by the Lanterman Act range from the severely disabled to those who work outside the home, but need some extra supervision and assistance to get through their daily tasks.  *See* Cal. Welf. &

---

[2] For convenience only, Jasmine Hall Care Homes Inc., Hall Care Homes Inc., George K. Hall and Estela Hall will be referred to herein collectively as the "Hall Defendants."  The Defendants are, however, legally separate entities and the DOL must prove its case as to each of them separately.

Inst. Code § 4512(a) (broadly defining "developmental disability").  Founded by George and Estela Hall, Jasmine Hall serves primarily this latter group—relatively high-functioning disabled individuals.

Since shortly after she emigrated to the United States in 1970 from the Philippines, Estela Hall has worked in group homes caring for those who could not care for themselves due to age, infirmity, or disability.  Her early jobs were almost identical to those at issue in this case, and over the following years and decades she devoted herself to learning everything she could about how best to care for her patients, especially those suffering from developmental disabilities.  Estela (referred to herein by her first name to distinguish her from George Hall) eventually became sufficiently skilled in her field that she was qualified to run a residential care home of her own.  Consistent with the overall goal of the Lanterman Act, she sought to provide a home-like environment for the disabled residents in her care—referred to as "clients" in the parlance of these kinds of homes—which, for most of them, provides comforts that they could never achieve on their own, since most either have no families or are estranged from the only family members they know.

The first Jasmine Hall Care Home was a very modest beginning.  In 1986, Estela and her then-husband, George Hall, borrowed approximately $3,000 dollars to purchase a foreclosed home at a public auction.  Even though they had a very limited amount of money they could spend, the Halls were able to purchase the home because it was, quite literally, an abandoned crack house in Oak Park, an unglamorous neighborhood.  The Halls set about restoring the home, and the surrounding neighborhood, to make it a suitable home for Estela to take over and run as a residential care center.  They worked for more than a year to turn the home into an attractive, pleasant home and to help make the neighborhood more desirable by chasing off unsavory characters.  In 1988, the Halls moved into the home—today referred to as Jasmine Hall I—and served as its first RCAs.  In the beginning they had only two clients, and Estela did almost everything herself, including cooking, cleaning, purchasing groceries, and working with the clients.  George would assist when he returned from his job for the State.  Although they were technically "on duty" at all times—they had no employees in the beginning—the clients were

gone from the home virtually every weekday, either at school or at a job.  Jasmine Hall I was not profitable at all in those days—like many dreams, Estela's desire to do the work was motivated by personal satisfaction rather than financial rewards.  George's job with the State provided enough for them to live on even as Jasmine Hall was losing money.  But the clients became like family to Estela.  In fact, the first of their clients soon took to calling Estela "momma," a name by which she is still known at the various homes.

In 1988, the Halls converted a second property only a few blocks away into Jasmine Hall II.  They moved into that home to set it up just as they had set up the first home—a process they would repeat with each of the eight homes they would eventually run.  As a result, the Halls hired their first employees: a married couple from the Philippines that Estela knew socially, having previously worked with other members of their family.  The couple agreed to the same work schedule that RCAs follow to this day: a duty shift of five days on and two days off.  When the clients were gone—every weekday from 8:00 a.m. to 4:00 p.m.—Estela and the RCAs from Jasmine Hall I would go to the mall, meet for lunch, or attend to their personal pursuits. Although the work can be challenging at times, it is not overwhelming.

As Jasmine Hall has grown, this pattern has continued.  There are now eight Jasmine Hall Care Homes, and each time a new home opened Estela would move in and work there for a substantial period of time to ensure it was functioning properly.  To this day, she is a frequent presence at each of the homes, filling in for RCAs when they are unable to work, buying food, and talking with and caring for the clients.  Although George and Estela divorced some time ago, George too remains an active presence around the homes.  Now retired from the government, he also fills in for RCAs when they have other matters and assists in the running of the homes.

**B.    Jasmine Hall's Clients: High-Functioning Adults with Substantial Rights**

As noted above, Jasmine Hall's clients are relatively high-functioning adults who need some assistance in managing the demands of daily life.  Almost without exception, Jasmine Hall's clients attend "program" during the day—usually either school or a job at a local store (some current residents work, for example, at Coldstone Creamery, 7-Eleven, or Goodwill Industries).  They are typically absent from the home during normal working hours.  Many of

1   them get to work without assistance from Jasmine Hall's staff.  None is bedridden (Jasmine Hall

2   requires its clients to be ambulatory), nor is any so disabled as to require constant attention.

3        It is essential to understand that Jasmine Hall Homes are <u>not</u> locked facilities.  Under the

4   Lanterman Act, "An adult person with a developmental disability has the legal right to determine

5   where his or her residence will be."  Cal. Welf. & Inst. Code § 4751.  The residents are permitted

6   to leave if they choose; indeed, under the Lanterman Act clients cannot be compelled to do

7   anything against their will.  The staff can only "redirect" behavior.  The clients are neither

8   prisoners nor wards of the state nor children; to the contrary, as a matter of law they are free

9   adults with the right to live their lives as they see fit.  *See, e.g.,* Cal. Welf. & Inst. Code § 4503(i)

10   (listing residents' rights).  The goal of residential care facilities is to provide the clients the

11   support they need (which varies from individual to individual); each client has every right to

12   choose not to accept that support.  Jasmine Hall's admission documents make this clear, quoting

13   Section 4503 of the Welfare and Institutions Code, which states that every resident has the right

14   "To make choices in areas including, but not limited to, his or her daily living routines, choice of

15   companions, leisure and social activities, and program planning and implementation."  *See*, *e.g.*,

16   Defense Trial Exhibit ("Def. Exh.") F at DEF 013385.

17        Throughout this case, the DOL has used language suggesting that Jasmine Hall's clients

18   are dramatically disabled, and that caring for them is the equivalent of caring for an infant.  The

19   evidence at trial will show that this is not true.  In most cases, caring for Jasmine Hall's clients is

20   much more like being the parent of an eighteen-year old: there are certainly tasks and decisions

21   with which they will need help and they may sometimes behave disruptively, but they are legal

22   adults capable of making their own decisions, even if those decisions may be ones with which an

23   RCA might disagree.

24        Under the Lanterman Act, a "care plan" is prepared for each client.  *See, e.g.,* Def. Exh.

25   C-21 at DEF 3285.  That plan sets forth a set of goals and objectives for that particular client

26   over the next quarter.  The Lanterman Act further requires the preparation of a quarterly report

27   documenting the progress that the client has made.  *See* Cal. Welf. & Inst. § 4646; Cal. Code of

28   Regulation, Title 17, § 56026(c).  The Act's goal is clear: care homes are not dumping grounds

for undesirables, but instead a place where developmentally disabled adults can attempt to achieve their fullest potential.

**C.      Jasmine Hall's Employees**

Jasmine Hall employs two categories of employees: Administrators and RCAs.  The Administrators do not live on the property (and as a result, no back wages are claimed on their behalf by the DOL).  The Administrators oversee the operation of each home, prepare work schedules, and are responsible for driving clients to any appointments that they have during the day.  They are typically in the homes between 9:00 a.m. and 5:00 p.m., although individual hours vary.

The RCAs live in the homes full time and are responsible for client care.  Since the first RCAs were hired in approximately 1988, Jasmine Hall has hired mostly by word of mouth.  The jobs are popular and are filled quickly, usually by friends or family of existing RCAs.  The majority of RCAs have immigrated from the Philippines like Estela Hall, although there have been RCAs of a variety of backgrounds over time.

As set forth in the Duty Statement that each RCA signs when they accept a position at Jasmine Hall, the job of an RCA is to care for the clients by assisting them with their particular needs.  *See* Def. Exh. D.  Their responsibilities include ensuring that the house is clean and in good working order, preparing nutritious meals, making sure that the clients take any medication that has been prescribed for them, and assisting the clients to meet the care plan that has been laid out for them.  *See id.* at DEF 2660.

The day-to-day routine is similar to that of any family.  Because the clients typically work outside the home or go to day program, there is a period of intense activity in the morning when the homes' occupants get ready for the day.  This brief period runs from between 6:30 a.m. (when most of the residents arise) to approximately 8 a.m. when the clients typically leave the home.  Most do not return until approximately 4:00 p.m. in the afternoon.  When the clients return, they do what almost any working person does when he or she returns from work: go to their own rooms, read, watch television or pursue other solitary pursuits.  The RCAs do not need to entertain them or actively supervise them.  The RCAs prepare dinner, and then most of the

1   residents go to bed before 10:00 p.m.  The active portion of an RCA's day thus usually lasts less

2   than eight hours; the actual amount of time spent working is typically much less.

3     When an RCA position comes open, it is usually advertised in the Sacramento Bee,

4   although more often than not a current RCA will have a personal recommendation for a

5   candidate.  RCA interviews are conducted at one of the Jasmine Hall facilities and the applicant

6   has an opportunity to see the home and room in which they will live—RCAs interview for a job

7   in a specific home.  Prior to actual employment, RCAs receive a tour of the specific home to

8   which they will be assigned; they talk with other RCAs and the clients with whom they will

9   work.  There are no surprises as to the living and work conditions.  The vast majority of those

10  rooms are shared with other RCAs, although from time to time a married couple will have a

11  private room of their own.  During the employment process, the prospective RCA is given the

12  opportunity to meet the current RCAs and to talk with them about the job.  They are also told

13  about the clients with whom they will be working (both the good and the bad) so that they have a

14  clear sense of what the job entails.

15    Once hired, RCAs go through a 90-day probationary period to make sure that they are

16  well-suited to the job and to the particular home.  If the match is a good one, the RCA becomes a

17  permanent, full-time employee.  The salary for RCAs begins at $1,500 a month and includes free

18  room and board, plus medical, dental and vision care coverage.  Before this lawsuit was filed,

19  Jasmine Hall paid 100% of RCAs' healthcare benefits.  Regrettably, the cost of this six-year-plus

20  litigation has become so expensive that Jasmine Hall can now afford to offer only 50% of the

21  cost of RCAs' healthcare coverage.

22  **D.    Audits of Jasmine Hall**

23    **1.    Jasmine Hall passed its prior audits with flying colors.**

24    As set forth above, Jasmine Hall has been operated in an unchanged manner since

25  approximately 1987.  Although it has grown, the layout of the homes, the services offered to the

26  clients, and the working conditions of the RCAs have changed very little.

27    In 1998, the DOL conducted an investigation into the employment and pay practices of

28  the Hall Care Homes.  The DOL did not find any violation and did not issue any penalties during

that investigation.  Plaintiff concedes this.  *See, e.g.,* Decl. of Sheila Creel at ¶59 (submitted by Plaintiff in support of its Motion for Partial Summary Judgment) ("record further reflects that no violations were found"); *see also* Def. Exh. H, DOL FLSA Compliance Action Report at DOL 1852 ("ER provides 24 hr [*sic*] residential care for 22 developmentally disabled adults . . . . No violations found.").

### 2.      Current audit of Jasmine Hall

Six years later, a new investigator, Sheila Creel, was assigned to audit the Hall Care Homes.  Creel commenced her wage-and-hour audit in March of 2004.  Over the course of a few months, she interviewed employees, conducted site inspections, and communicated with third parties, such as the California Department of Developmental Services.  George Hall spoke with Creel, filled out questionnaire documents per her request, and voluntarily provided documents. Hall also identified to Creel the exemption he believed applies to his employees—29 C.F.R. § 785.23—which provides that employees who reside on the employer's premises may enter into any reasonable agreement with his or her employer regarding hours worked.  Creel disagreed with Hall's application of 29 C.F.R. § 785.23 to the RCAs.  This action followed.

### III.      LEGAL AND FACTUAL ISSUES TO BE DECIDED

In its August 8, 2007 Pretrial Order, this Court identified the seven points of law that have been preserved for trial.  Those issues are:

(1) Whether any Defendant is liable for payment of wages under the Fair Labor Standards Act ("FLSA").

(2) Whether Defendants meet 29 C.F.R. § 785.23 grounds for paying their employees less than 24 hours of their work shift.

(3) Whether any Defendant willfully violated the FLSA and is therefore subject to a three-year statute of limitations.

(4) Whether any Defendant acted in good faith and/or had reasonable grounds for believing that he, she, or it did not act in violation of the FLSA.

(5) Whether some or all of the disputed time for which Plaintiff seeks recovery is not compensable pursuant to the doctrine of *de minimis non curat lex*.

(6) Whether Plaintiff's claims seek any relief on behalf of persons who were and are properly classified as exempt employees.

(7) Whether some or all of Plaintiff's claims are barred in whole or in part by the

DEFENDANTS' TRIAL BRIEF
CASE NO. 05-cv-01306-GEB KJM

1
2

equitable doctrine of laches, avoidable consequences, waiver, estoppel, and/or unclean hands since some residential care workers did not raise any issue concerning their wages when reporting their work hours to their employer.[3]

3  Final Pretrial Order, Dkt. 89 at 3.  The answer to these questions is simple: none of the Hall

4  Defendants violated the FLSA.  Jasmine Hall and its RCAs had a reasonable agreement under 29

5  C.F.R. § 785.23 and under Ninth Circuit law.  *See Brigham v. Eugene Water & Elec. Bd.*, 357

6  F.3d 931, 941 (9th Cir. 2004).  Once the Hall Defendants demonstrate that their agreement was

7  reasonable, none of the other issues are relevant.  The Hall Defendants' position on each of the

8  issues is set forth in more detail below.

9  **A.      The Hall Defendants Did Not Violate the FLSA (Issues 1 and 2).**

10        Under applicable law, it falls to the Hall Defendants to establish that they did not violate

11  the FLSA.  *See Leever v. City of Carson*, 360 F.3d 1014, 1018 (9th Cir. 2004).  When they begin

12  the case—Defendants here present their case first as they have the obligation to establish their

13  entitlement to rely on § 785.23—they will demonstrate that they complied with the FLSA at all

14  times.

15        29 C.F.R. § 785.23 provides:

16  An employee who resides on his employer's premises on a permanent basis or for
17  extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties
18  when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable
19  agreement of the parties which takes into consideration all of the pertinent facts will be accepted. This rule would apply, for example, to the pumper of a stripper well who
20  resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home.
21

22        The parties agree that nothing in the plain text of § 785.23 requires judicial interpretation.

23  *See* Order Vacating the Order Filed December 28, 2007, Dkt. 133 at 2:18-20; Reporter's

24

25

26  [3] Not all of these issues will be presented at trial.  For example, the Halls do not intend to press
27  issue 7 at trial.  Similarly, issue 6 is unlikely to be litigated.  The Halls do not understand the DOL to claim that the Administrators of the various Jasmine Hall homes (who are exempt) are
28  owed back wages.  If the Halls have understood the DOL's position correctly, this issue will not be litigated at trial.

Transcript of Hearing Re Reconsideration (May 2, 2011) at 50:18-20.[4]  As a result, the Court's task is to apply § 785.23 to the facts as shown by the evidence adduced at trial.  By its terms, § 785.23 calls for a fact-intensive inquiry.  The Court must determine whether the RCAs reside on the premises on a permanent basis or for extended periods; if so, whether they worked pursuant to agreement; if so, what the nature of that agreement was and whether the agreement "takes into account all of the pertinent facts."  Throughout this case, the DOL has urged the Court to take a rigid, categorical approach to analyzing whether the FLSA requires Jasmine Hall to pay its RCAs wages and overtime for work performed twenty-four hours a day, five days a week.  But the governing test is more flexible and sensitive to context than the DOL suggests.  The only *sine qua non* of § 785.23, by its plain terms, is that workers subject to it must either be permanent residents or extended stay residents.  Beyond that, the test for whether there is a reasonable agreement necessarily depends on the facts and circumstances.

After considering all of the facts, the answer will be very clear: no, the FLSA does not so require.  In this Circuit, the application of § 783.23 is controlled by *Brigham v. Eugene Water & Electric Board*, 357 F.3d 931, 936 (9th Cir. 2004).  To determine whether an employer must pay a live-in employee for on-call time under the FLSA, *Brigham* directs us to evaluate, "(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties."  *See id*. at 937.  Here, both factors weigh decisively in favor of Jasmine Hall: RCAs are free to engage in personal activities when not actively performing their duties, and—more importantly—have explicitly agreed that they will not be compensated for non-working time.

As set forth above, Jasmine Hall's RCAs are typically on duty for 5 consecutive 24-hour shifts.  During those duty assignments, they spend only a fraction of their time actually performing client care and supervision.  Under the terms of a signed written agreement, each RCA explicitly acknowledges that he or she will "live on the facility site in a room assigned by

---

[4] Absent ambiguity, there is no need for the Court to resort to any aids to construction.  Thus, it is unnecessary for the Court to consider whether the DOL's construction and application of the governing statute and regulations should be given deference.

the Home Care Administrator" and that "the presence of the RCA in the facility while engaging in personal activities and not busy, taking of meals, and scheduled periods of sleep will not be considered as part of the regular work program, or pay schedule."  *See* Def. Exh. D.

The law has long recognized that when a worker lives full-time on the premises of his or her employer, as Jasmine Hall RCAs do, it is difficult to determine exactly how much work they are doing for purposes of the FLSA.  As *Brigham* explains, 29 C.F.R § 785.23 "offers a sound methodology for calculating how many hours the employees actually worked within the meaning of FLSA."  *Id.*  at 942.  Section 785.23 states that: "It is, of course, difficult to determine the exact hours worked" when "[a]n employee resides on his employer's premises on a permanent basis or for extended periods of time . . . ."  As a result, "any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted."  *See* 29 C.F.R. § 785.23.  The Ninth Circuit has been explicit about the rationale underlying § 785.23:  "The crucial insight of [§ 785.23] is that—in these specific circumstances, where an employee not only works but also resides on his or her employer's premises—the characterization of time for FLSA purposes need not be an all-or-nothing proposition, as it otherwise would be in the off-premises residency context."  *Brigham*, 357 F.3d at 941.  In other words, the very purpose of § 785.23 is to obviate the "all or nothing" choice that the DOL here seeks to force upon Jasmine Hall and upon this Court.

Here, because the employees are free to engage in personal activities when not on duty and have a reasonable agreement with Jasmine Hall, the FLSA has not been violated.

    1.    **The RCAs are free to engage in personal activities when not actively performing their duties.**

Jasmine Hall will demonstrate at trial that the RCAs can and do engage in personal activities when they are not performing their duties.  It is undisputed that the RCAs were paid for eight hours of each 24-hour duty shift.  The evidence at trial will show that they worked eight hours of each shift—if even that—and that they were free to pursue personal activities the remainder of their day.  Specifically, the evidence will demonstrate that the RCAs had a 1.5 hour period of activity in the mornings between 6:30 a.m. when the clients typically awake, and

8:00 a.m. when they typically leave for work.  The clients would return from work at approximately 4:00 p.m., and would retire for the night no later than 10:00 p.m.  This six hours of work, combined with the approximately 90 minutes of work in the morning, constituted an average day of approximately 7.5 hours—almost precisely the eight hours for which the RCAs were paid.  The remainder of the time, RCAs could do as they pleased—and often did.

In *Brigham*, the Ninth Circuit set forth an "illustrative" list of factors to consider "in gauging the extent to which employees could pursue personal activities during the course of their on-call shifts[.]"  *Id.* at 936.  Adopting those factors from *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers,* 971 F.2d 347 (9th Cir. 1992)*,* the so-called "*Owens* factors" are:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether the use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Id.* at 351.  *Brigham* explained that "no one factor is dispositive" and that "the employee [need not] have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject."  *Id.* at 350-351 (internal quotations omitted).  The employees in *Brigham* were required to monitor and maintain a power generation facility (a dam in rural Oregon) and, like the employees in this case, were required to live on site.  After addressing each *Owens* factor, the court ruled that the factors "weigh narrowly in favor of the employees."  *Brigham*, 357 F.3d at 938.  In this case, as discussed below, the RCAs have considerably more freedom than the *Brigham* employees, and thus the *Owens* factors weigh strongly in favor of the Halls.

At trial, the evidence will show that six of the seven factors favor Jasmine Hall.  It is, of course, true that the employees were required to live on the premises (Factor 1).  But each of the other factors weighs in favor of Jasmine Hall.

- There were no geographical limitations placed on the RCAs (Factor 2).  Unlike the plaintiffs in *Brigham,* who had to live within walking distance of the dam they

were monitoring, the RCAs were free to go anywhere they pleased as long as they were able to return home by the time the clients were scheduled to return home.

- Factor 3 is much the same: during the periods where they were not actively working, the evidence will show that the RCAs were rarely bothered with work responsibilities.  When they are at home, they are free to watch television or movies, talk on the telephone, or pursue any other activity in which they are interested.  And as noted above, they were not required to be at home if the clients were not there.  Unlike the dam workers in *Brigham*—who were called out to the dam twice a month—the evidence in this case will show that it was a rare occurrence that the RCAs were needed during the day because the clients simply were not home.  Moreover, on those occasions when a client had a medical or other appointment, it was the Administrators, not the RCAs, who were required to transport and accompany the client.

- Factor 4, "a fixed time limit for a response," does not apply at all—the workers in *Brigham* had to run (literally) to the dam on short notice if a problem was found; such emergencies are rare in the life of an RCA.

- The evidence will further show that RCAs can and do trade shifts frequently (Factor 5).  Indeed, Estela and George Hall function as *de facto* backups to the RCAs, and will fill in for them as needed if an Administrator or another RCA cannot.

- Factor 6, the use of a pager, has little application here, as the hours that an RCA is needed are quite regular.  Again, the duties and schedule of an RCA is relatively consistent and surprises are rare.

- Finally, and perhaps most importantly, the RCAs do actively engage in personal activities (Factor 7).  Unlike the dam workers in *Brigham*, who lived in a remote mountain valley, the RCAs live in a major city, Sacramento.  They are within easy reach of malls, restaurants, and all of the other amenities of modern life, which they can and do utilize.  And if they do not wish to leave home, each

14

1   facility has a television, DVD player (with a library of movies) and a backyard.

2   Testimony at trial will show that RCAs go to the mall, go shopping, meet friends,

3   watch television, read, garden, exercise, entertain guests, or do any of the other

4   things that people normally do.

5   Taken together, the evidence at trial will show that the *Owens* factors weigh in Jasmine

6   Hall's favor.  Although "an employee need not have substantially the same flexibility or freedom

7   as he would if not on call," *Brigham*, 357 F.3d at 936 (internal quotations omitted), the life of an

8   RCA does provide substantial flexibility.

9   The same is true for night-time periods.  The sleep of RCAs is not regularly interrupted.

10   Jasmine Hall policy requires that RCAs record any interruptions to their sleep at night so that

11   they can be compensated for the time they spend, if any, helping residents during the night.  The

12   evidence at trial will be that the vast majority of Jasmine Hall's clients never wake during the

13   night.  The few that sometimes wake do so only infrequently—so infrequently in fact that the

14   RCAs almost never ask to be paid for the time.

15   In short, at trial the Hall Defendants will show that, under *Brigham* and *Owens*, the

16   "degree to which the employee is free to engage in personal activities" weighs decisively in

17   favor of Jasmine Hall.

18   **2.      Jasmine Hall and its RCAs entered into a reasonable agreement.**

19   The evidence at trial will also demonstrate that the second of the two prongs the Court

20   must examine under *Brigham*, the agreement between the parties, weighs in favor of Jasmine

21   Hall.  Section 785.23 makes clear that "any reasonable agreement of the parties which takes into

22   consideration all of the pertinent facts will be accepted."  The agreement between Jasmine Hall

23   and its RCAs was more than reasonable: they received not only a salary, but free housing, free

24   food, medical, dental and vision benefits, and a variety of other incidental benefits (free local

25   telephone, free utilities, *etc*.).  The RCAs understood the nature of the agreement they were

26   making, and entered into it voluntarily and with a complete appreciation of the nature of the job

27   they were being asked to perform.  The evidence at trial will demonstrate:

28

DEFENDANTS' TRIAL BRIEF
CASE NO. 05-cv-01306-GEB KJM

1

   **a.      RCAs enter the agreement on an informed and volitional basis**

2         Jasmine Hall RCAs are interviewed for a specific position in a specific home.  As a

3 result, they understand in advance exactly what job they are applying for and exactly what the

4 conditions are like.  They see the room that they will be living in, know if it is to be shared (most

5 likely), and they can meet the clients for whom they will be caring.  They are given the chance to

6 meet with the RCAs that they would be working with prior to accepting the job.  In other words,

7 potential RCAs begin their employment knowing what is expected of them, how they are to be

8 paid, and what the living conditions are like.

9         Once a potential RCA is offered a position, he or she signs a one-page written agreement

10 that generally lays out the responsibilities of the position and the compensation therefor.  The

11 agreement is not integrated and does not set out the entire agreement between the parties (for

12 example, RCAs receive medical benefits, but those are not mentioned in the written agreement),

13 but it does form an important part of it.[5]  For the purposes of this action, the section labeled

14 "Working Conditions" is particularly relevant:

15         The performance of the duties of a Resident Care Assistant is a shared
          responsibility and calls for individuals to work in teams of two or more on a 24
16        hour duty assignment.  The working teams are expected to live on the facility site,
          in a room assigned by the Care Home Administrator, and share in the home life of
17        its residents.  Consequently, the presence of the RCA in the facility while
          engaging in personal activities and not busy, taking of meals, and scheduled
18        periods for sleep will not be considered as part of the regular work program, or
          pay schedule.  The RCA will work a 5 day work week at times and intervals
19        assigned by the Home Administrator.  In addition to food and lodging, the RCA
          will be paid a salary with a total value of $1,500.00 per month.

20

21 *See* Def. Exh. D at DEF 2660 (original emphasis omitted).  Although drafted in layman's terms,

22 the point of the agreement was clear: even though the RCA may be present in the house for 24

23

24 [5] There is no requirement the "agreement" referenced in § 785.23 be fully integrated, or even in
writing at all.  The Ninth Circuit has held that "[o]ur caselaw clearly recognizes that an
25 agreement cognizable for purposes of the FLSA overtime inquiry may arise by conduct."
*Brigham*, 357 F.3d at 938 (collecting cases).  *Brigham* further noted that "[o]ur sister circuits
26 likewise have recognized the force of constructive agreements in the FLSA overtime
compensation context."  *Id.* at 938-39 (collecting cases from the 4th, 5th, 6th and 10th circuits).
27 In assessing the facts at issue in *Brigham*, the Ninth Circuit ruled that a "constructive agreement"
had "aris[en] from the employees' decision to continue working under the [challenged] policy."
28 *Id.* at 939.

hours, their mere presence on site does not constitute work and thus the RCA will not be paid for 24 hours.  In practice, this means pay for eight hours, even when the RCA does not actually work eight hours, and generally they do not.  For the purposes of the § 785.23 analysis, what is most essential about this arrangement is that all RCAs understand from the outset of their employment that they would *not* be paid for 24 hours of work.

**b.**      **The compensation is reasonable**

Jasmine Hall pays its employees a salary that begins at $1,500 per month and increases as the RCA becomes more skilled and is certified to provide a higher level care.  Along with their salary, it is undisputed that RCAs receive housing at no cost, which they can use as their primary residence even when they are not working.  They also receive all of their food at no cost without regard to whether they are on duty or not.  This includes every single meal that an RCA ever needs, including snacks, such that an RCA has no need to ever purchase food for him or herself at any time.  They are also offered medical, dental, and vision insurance at Jasmine Hall's expense—which is not required by law.  Moreover, the employees are not required to pay any part of their utilities (water, trash, electricity, gas, *etc.*) or their local telephone service.  So, while an RCA's cash salary may be modest, he or she has literally no other expenses.  It is 100% "profit" (for lack of a better term) to the RCAs—and thus the actual compensation the RCAs receive greatly exceeds their salary alone.

Indeed, many RCAs are financially comfortable enough that they have been able to purchase homes of their own—domestically or abroad—and petition for members of their family to be allowed to join them in this country.  Others are able to send significant amounts of money back home and support their relatives there.  These jobs are referred to family members because they are perceived to be good jobs; if the job was the one portrayed by the DOL, why would family members encourage their loved ones to take it?  The question answers itself: because it is a good job, vastly superior to the alternatives available.

**c.**      **Living conditions are reasonable**

Each of the Jasmine Hall homes is a single-family residence that is clean, well-maintained and attractive.  Each has a yard and landscaping; one home, Jasmine Hall VII, even

17

has a creek beside it.  Each house has at least one large television (some have more than one)
with cable service, a DVD or VCR and a library of movies that employees may use when not
actively caring for patients.  Indeed, in the evenings, RCAs sometimes watch television with
residents as part of their compensable time.

Every RCA room is completely separate from client rooms and each is lockable.  RCAs
also have a bathroom that is not shared with clients.  Most RCAs share rooms, although in at
least one case, a married couple has a private room of their own.

Food is free, plentiful, and healthful.  Each home has multiple refrigerators for storing
food which is accessible by the residents at any time.  Every home receives regular deliveries of
fresh fruit and vegetables.  Moreover, life in the Jasmine Hall Care Homes is social, and the
residents of the eight homes are invited to a party every weekend at one of the homes.  George
Hall serves as the DJ for this weekly party, to which clients and staff are encouraged to invite
their families and friends.

### d.    Duties and hours are reasonable

Finally, as set forth above, the RCAs are compensated for the work they perform.  The
vast majority of Jasmine Hall clients are not severely disabled; every one is ambulatory.  Most
lead productive lives, but from time to time need some help.  Almost all of Jasmine Hall's clients
work outside the home or go to school, and are thus typically absent during the day.  When the
clients are not present, the staff is free to do as they please.  The typical RCA duty shift consists
of a period of activity in the morning assisting clients to get ready for work, and then a period in
the afternoon or early evening when the clients return.  Most days, this does not amount to 8
hours of actual work.

RCAs are paid overtime for any additional work they do beyond their scheduled duty
shifts.  This includes any time they are required to attend to clients at night or additional shifts
that they elect to work on their off days or when they are otherwise not scheduled to work.  The
evidence at trial will show that many RCAs actively seek out overtime shifts.  RCAs are required
to fill out a timesheet on which they are to record extra work, including any night time
disturbances.  *See* Def. Exh. O at DEF 0199.

1                                    *        *        *

2          In short, the evidence at trial will show that the agreement between Jasmine Hall and its

3   RCAs was reasonable, voluntary, and fully compliant with § 785.23.  Once it is determined that

4   § 785.23 applies, no further analysis is needed; no FLSA violation has occurred and the case is

5   over.

6   **B.        The Hall Defendants Acted in Good Faith and Did Not Willfully Violate the FLSA
               (Issues 3 and 4).**
7

8          None of the Hall Defendants violated the FLSA and intend to so demonstrate at trial.  To

9   the extent, however, that this Court comes to the opposite conclusion, the Hall Defendants will

10  demonstrate that any violation was not willful.[6]

11         In 1998, the DOL conducted an investigation into the employment and pay practices of

12  the Hall Care Homes.  Def Exh. H.  The DOL did not find any violation and did not issue any

13  penalties during that investigation.  *Id.* at DOL 1852 ("[Employer] provides 24 hr [*sic*]

14  residential care for 22 developmentally disabled adults . . . . No violations found.").  Six years

15  later, a new investigator came to the opposite conclusion.  Defendant George Hall repeatedly

16  spoke with the new investigator and identified the exemption he believed applies to his

17  employees—29 C.F.R. § 785.23.

18         In order to establish a claim that an employer "willfully" violated the FLSA, one must

19  show that the employer knew, or showed reckless disregard for whether its conduct was

20  prohibited by the FLSA.  *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 134-35 (1988).

21  Neither awareness of the possible application of the FLSA, nor acting without a reasonable basis

22  that an employer is complying with the FLSA, nor negligence is enough to establish willfulness.

23  *Id.* at 133, 135.

24         The DOL contends that the Hall Defendants knew that they were violating the FLSA

25  because DOL investigator, Sheila Creel, told George Hall that the RCAs should be paid for all 24

26  hours of their duty period.  But the mere fact that an investigator informs a potential defendant of

27  _____

28  [6] A finding of "willfulness" against the Hall Defendants extends the statute of limitations from
    two years to three years.

her opinion that the pay practices violated the FLSA, does not in itself make the violation willful. *See Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 188 n.9 (3d Cir. 1988).  Indeed, here, the prior enforcement history demonstrates that the Hall Defendants did not willfully violate the FLSA.  It is undisputed that no violations were found and Jasmine Hall did not pay any overtime wages as a result of the DOL's 1998 investigation of Jasmine Hall's pay practices.  In *Brock*, the Third Circuit rejected the DOL's argument that employer had willfully violated the FLSA based on the fact that employer did not change its pay practices even after the DOL declared them improper.  In that case, the DOL attempted to establish the employer had willfully violated because it claimed that the employer had attended a seminar that should have put it on notice that its practices violated the FLSA.  The DOL also claimed that willfulness was established because the employer did not change its pay practices even after the Department had declared them improper.  In rejecting the DOL's willful violation claim, the court stated that "private parties must retain a right to disagree with the Secretary's interpretation of the regulations . . . Such disagreement is not willfulness."  *Id*. at 188 n. 9.

So too here.  The mere fact that a DOL investigator stated during her 2004 investigation that she believed Jasmine Hall's pay practices regarding the care aides were improper—directly contradicting her predecessor's view—does not support a finding of willfulness.

**C.     Certain of the Alleged Violations—If They Occurred—Were *De Minimis* (Issue 5).**

The evidence at trial will demonstrate that Jasmine Hall's RCAs were properly paid for the hours they worked.  If, contrary to the Hall Defendants' expectations, the evidence suggests that Jasmine Hall's practices fell afoul of the FLSA, such violations were *de minimis* and thus not compensable.  Under the *de minimis* doctrine, the Court may disregard time amounting to "only a few seconds or minutes of work beyond the scheduled working hours . . . ."  *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 692 (1946).  Thus, "[i]t is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."  *Id*.  These principles are codified at 29 C.F.R. § 785.47, which states that "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be

disregarded." In *Lindow v. United States*, the Ninth Circuit held that, to determine whether otherwise compensable time is *de minimis*, the Court should consider "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." 738 F.2d 1057, 1063 (9th Cir. 1984).

As set forth in more detail above, the active portion of an RCA's day typically lasts less than eight hours—sometimes much less. It is conceivable that, on rare occasions, an RCA's active time could have lasted just over eight hours (or a work week more than forty hours) and that he or she did not receive payment for those extra seconds or minutes. If that were the case— and the Hall Defendants do not believe that it is the case—the negligible additional time would have been *de minimis* under *Lindow* and 29 C.F.R. § 785.47. Specifically, all three *Lindow* factors noted above counsel in favor of disregarding any unpaid compensable time. First, there would have been considerable "practical administrative difficulty" in recording these extra seconds or minutes. Indeed, that practical difficulty is precisely the reason that employers such as Jasmine Hall are permitted to enter into reasonable agreements regarding the number of hours worked. *See* 29 C.F.R. § 785.23 ("It is, of course, difficult to determine the exact hours worked [when] [a]n employee resides on his employer's premises on a permanent basis or for extended periods of time."). Second, the aggregate amount of any unpaid compensable time would be negligible. If an RCA happened to have worked an extra few minutes on a few different occasions, that time would not, in the aggregate, amount to "a substantial measure of his time." *Mt. Clemens Pottery Co*., 328 U.S. at 692. Finally, the evidence will show that even if there were bits of unpaid compensable time, such occurrences were exceedingly rare. Thus, the "regularity of the additional work" factor would cut in favor of applying the *de minimis* doctrine. In short, when applied to the facts of this case, all three *Lindow* factors demonstrate that any unpaid compensable time was *de minimis* and thus should be disregarded.

## IV.   CONCLUSION

Estela Hall, George Hall, Hall Care Homes and Jasmine Hall Care Homes provide a valuable service to their clients: a family-like setting in which the clients can get the assistance

1   they need while still maintaining their autonomy and independence.  Indeed, Jasmine Hall

2   represents exactly what the State of California had in mind when it began the process of moving

3   those with disabilities into residential facilities.  Jasmine Hall's employees do not have the

4   easiest jobs, but there is nothing unreasonable about the terms under which they work.  The only

5   thing unreasonable here is the position advanced by the Department of Labor.  In their view, the

6   RCAs must be paid 24 hours per day, rendering Jasmine Hall untenable as a business and likely

7   forcing it to close.  But the law says the opposite: any reasonable agreement will be accepted if it

8   takes into account all of the facts.  All of the facts here say the same thing: the Hall Defendants

9   did not violate the law.

                                    Respectfully submitted,

11   Dated:  January 4, 2012                    KEKER & VAN NEST LLP


                                    By:   */s/ Jon B. Streeter*_____
                                          JON B. STREETER
                                          Attorneys for Defendants
                                          JASMINE HALL CARE HOMES, INC.,
                                          HALL CARE HOMES, INC., GEORGE
                                          K. HALL, and ESTELA HALL

DEFENDANTS' TRIAL BRIEF
CASE NO. 05-cv-01306-GEB KJM